# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

GEORGE LODER,                                    )
                                       )

           Plaintiff                             )

      v.                                            )
                                          )

MAINE INTELLIGENCE ANALYSIS CENTER               )
State of Maine, Department of Public Safety       )
                                        )

JOHN COTE, CHIEF OF MAINE STATE POLICE           )
*In his official capacity*                        )
                                        )

SCOTT IRELAND                                    )
                                        )

MICHAEL JOHNSTON                                 )
                                        )

         Defendants                             )

## COMPLAINT AND DEMAND FOR JURY TRIAL

    Plaintiff George Loder complains against defendants as follows:

## Parties

1.  Plaintiff George Loder is a citizen of the United States, resident of Scarborough, Maine, and currently works as a State Trooper for the Maine State Police. (Sometimes hereinafter referred to as "Loder")

2.  Defendant Maine Intelligence Analysis Center, State of Maine, Department of Public Safety, (sometimes herein referred to as "MIAC') is an agency created by Executive Order dated December 8, 2006 for the purpose of ensuring that Homeland Security intelligence information is appropriately shared between federal, state, county, local

and tribal authorities.

3. The MIAC is funded in part using federal dollars from the Homeland Security Grant Program (HSGP), the Department of Justice's High Intensity Drug Trafficking Area (HIDTA) and the BJA's Edward Byrne Memorial Justice Grant, among others.

4. Six civilian analyst positions in the MIAC are funded entirely through federal grants where compliance with 28 CFR part 23 is a special condition.

5. By accepting federal funds, the MIAC is bound to comply with federal law, including the Privacy Act, 5 U.S.C. § 552a, other related statutes, and 28 C.F.R. § 23.

6. Col. John Cote is Chief of the Maine State Police and responsible for day to day management of the MIAC.

7. The Maine State Police is the designated state point of contact (POC) to initiate background checks on individuals possessing or receiving firearms mandated by the Brady Handgun Violence Prevention Act (Brady Act) of 1993, Public Law 103-159, and the National Instant Criminal Background Check System (NICS).

8. As the NICS POC the Maine State Police act as agent for the Federal Bureau of Investigation and bound by federal laws including the Privacy Act, 5 U.S.C. § 552a, other related statutes, and 28 C.F.R. § 23.

9. By contracting with and/or working on behalf of the Federal Bureau of Investigation ("FBI") the MIAC is an "agency" as defined in 5 USC §552(f)(1) and/or otherwise bound by federal law.

10. Scot Ireland is a lieutenant for the Maine State Police and supervisor of the MIAC and Loder.

11. Michael Johnston is a sergeant for the Maine State Police and supervisor of the MIAC.

12. Defendants maintain a "system of records" as that term is defined in 5 U.S.C.§ 552a(5)

### Nature of Claim

13. George Loder reported to defendants that the MIAC is engaging in unlawful activity with respect to the collection, transmission, management, and retention of citizens data and was removed from the Joint Terrorism Task Force, retaliated against and demoted.

14. Data that Loder reported to be unlawfully collected, managed and retained by defendants includes the social and/or political activity of Seeds of Peace counselors and staff, the use of an automated license plate recognition system, a de facto gun registry, criminal investigations and otherwise private information related to lawful activity of people exercising their civil rights.

15. This lawsuit challenges the legality of Loder's removal from the Joint Terrorism Task Force ("JTTF") under the Whistleblower Protection Act, and alleges violations of federal and state civil rights laws and the constitution.

16. Loder seeks redress for civil liberties lost, damages, attorneys fees and an injunction.

### Administrative Proceedings

17. Loder exhausted his available administrative remedies by filing a Charge of Discrimination with the Maine Human Rights Commission that issued a Right to Sue Letter dated November 21, 2019.

18. Loder filed a Notice of Tort Claim with Janet T. Mills. Attorney General and Colonel John E. Cote of the State Police dated November 9, 2018.

19. Actions pursuant to 5 U.S.C. §552a(g)(1)(C)and (D) do not require exhaustion of any administrative remedies, or

20. In the alternative, Loder has exhausted his administrative remedies pursuant to 5 U.S.C.

3

§552a.

## Jurisdiction

21. This Court has original jurisdiction under 28 U.S.C. §1331 and 5 U.S.C. §552a(g).

22. This Court has concurrent jurisdiction to hear plaintiff's state law claims pursuant to 28 U.S.C. §1367.

## Venue

23. Venue is proper in this Court pursuant to 28 U.S.C. §1391 because all events giving rise to plaintiff's claims occurred in this District.

## Demand for Jury Trial

24. Plaintiff demands a trial by jury of all claims to the extent allowed by law.

## Facts

25. George Loder was hired by the Maine State Police in 1994 and remains employed there presently.

26. At all relevant times Loder has performed the duties of his jobs satisfactorily.

27. In December 2011, Loder applied for but was not selected for a detective's position assigned to the FBI's Joint Terrorism Task Force (JTTF).

28. The JTTF investigates reports of terrorism-related activities in Maine.

29. In February 2012 Loder applied for a field agent's position with the Maine Information Analysis Center (MIAC) and was selected. This position was contingent upon successful completion of a federal background check to obtain a security clearance at the "Secret" level.

30. In late 2012, the JTTF position became available for a second time and the vacancy announcement was reposted. Loder reapplied and was selected for transfer to the JTTF.

4

According to the job posting, the JTTF position was "under the supervision of the Maine Information and Analysis Center (MIAC), and on Temporary Duty (TDY) to the Joint Terrorism Task Force (JTTF) located in Portland, ME.  This will be considered <u>a fixed duty position with the duty position being Portland</u>…" (emphasis added)

31. This position on the JTTF was contingent upon Loder being able to successfully pass a second federal background check, to include a polygraph examination and full disclosure of all his finances in order to obtain a security clearance at the "Top Secret – SCI" level, considerably higher than the "Secret" level required by the MAIC.

32. In early 2013, Loder was accepted for assignment to the FBI's Joint Terrorism Task Force (JTTF).

33. The JTTF assignment was a TDY from the Maine State Police (not the MIAC) that - on paper anyway – was supervised by the State Police Sergeant in the MIAC. The "under the supervision of" the MIAC is further defined in a Memorandum of Understanding between the Maine State Police and the FBI, which indicates that Loder was to answer to the MIAC supervisor for administrative purposes (payroll, state-required training, etc.) and the FBI supervisor for operational purposes.

34. The MIAC and JTTF are distinct entities. The position Loder had as a JTTF member was governed by a Memorandum of Understanding between the FBI and the Maine State Police, whereas the relationship between the FBI and the MIAC is spelled out in a different MOU.

35. The MIAC is not a law enforcement agency and does not enforce the law or conduct criminal investigations. Its purpose is to receive, analyze and share information between agencies and make recommendations to the Governor and the Maine

Homeland Security Council.

36. The Executive Order dated December 8, 2006 that established the MIAC states: "For the management of intelligence sharing between and among partners, the MIAC shall conform to all existing rules and statutes relating to the handling of sensitive intelligence information, including but not limited to the rules of intelligence sharing articulated in Section 28 of the Code of Federal Regulations Part 23."

37. The MIAC maintains an "index pointer" type of Multijurisdictional Criminal Intelligence Database and provides information to outside entities on by request.  This database contains Personal Identifying Information (PII) and is administered by all MIAC personnel, including the federally funded civilian analysts.

38. The following is an excerpt from the FBI's training manual for the Task Force Officer (TFO) position at the JTTF : *(U) As a deputized Task Force Officer you will be afforded all rights and responsibilities of a Special Agent.  There are caveats that you will need to be cognizant of, in the cross-over of responsibilities from Local/State Law Enforcement Officer (LEO) to Federal LEO.  All caution and prudence should be used when utilizing your authority as a Federal LEO.  When handling federal matters, do so in a manner that is consistent with all rules and regulations of an FBI Special Agent.  Vice versa, when handling "state" matters, do so consistent with the local/state rules and regulations. Be very cautious never to cross over.  When in doubt, please as the Chief division Counsel situated within your FBI Field Officer.*

39. Loder's job responsibilities were never as depicted in the Performance Management Forms provided by the state. His "job description" as it appeared on the job posting was largely copied from that of a Planning and Research Associate II. In February of 2015,

Loder met with then-MIAC supervisor, Sgt. Carlton Small, in a coffee shop in downtown Portland. Sgt. Small explained that the State Police had not conducted any performance evaluations for him since he transferred to the JTTF, while his work performance had been reviewed at regular intervals by the FBI supervisor, SSRA Aaron Steps, with favorable ratings.

40. Sgt. Small then produced the performance evaluations for 2012, 2013, 2014, and 2015 and asked Loder to sign them.

41. The job descriptions in Loder's 2016 and 2017 evaluations contain only "Assignment to the Joint Terrorism Task Force."

42. On March 13, 2017 Johnston emailed A.U.S.A. Richard Murphy and asked for feedback about Loder for purposes of completing a personnel evaluation.

43. Murphy wrote on March 14, 2017 "I worked with George on one major investigation during 2015-16. He was the affiant on a fairly involved search warrant and assisted in other court process. I found George responsive, enthusiastic and a pleasure to work with."

44. In early to mid-2017, Loder learned that Maine State Police Sgt. Michael Johnston made a policy change whereby all State Police personnel were given direct access Maine Drug Enforcement Agency intelligence files, including many that revealed the identity of active confidential informants.

45. Believing these disclosures were made in error and violation of the law, Loder called Sgt. Johnston and expressed his concern that such disclosures were illegal. Johnston became annoyed and stated "They (confidential informants) chose to cooperate with the police."

46. Shortly thereafter on the morning of November 14, 2017, Loder received a telephone call from Sgt. Johnston, who said that henceforth Loder was to take part in weekly MIAC meetings via conference call.

47. Loder was instructed by Johnston to give a summary of his active criminal and national security cases, allegedly to better involve the MIAC staff in those investigations.

48. The MIAC staff consists of both civilian and sworn law enforcement personnel from several different federal and state agencies.

49. Loder told Sgt. Johnston that he could not comply with the directive to share information as presented because it would be a violation of the law, specifically the Privacy Act and related regulations, among other things.

50. Loder told Johnston, for instance, he was at that time reviewing returns from a grand jury subpoena and not at liberty to discuss the content without approval from the court. Loder also told Johnston there were administrative and accounting requirements he had to follow before disclosing any information contained in FBI files. Requests for information are required to be in writing.

51. Johnston became angry and said words to the effect that "at the end of the day you are still a member of the State Police and I'm your supervisor," and questioned the "value of having a State Police Detective go around pretending to be an FBI Agent."

52. The implication was that if Loder did not comply with the order to share information there would be retribution.

53. Prior to November 2017, as a member of the JTTF Loder had limited interaction with the MIAC.

54. Following the November 14, 2017 phone call, Johnston sent Loder an email instructing him to acknowledge the directive to attend MIAC staff meetings and included the statement, "the purpose of this meeting is to share information with other members of the unit and to increase situational awareness of MIAC's activities. Your guidance as to share relevant information that is in full compliance with any FBI policies, regulations or guidelines in addition to applicable federal laws. Basically I defer to your judgment on what you feel is appropriate, relevant and reasonable to share."

55. The November 14, 2017 email was copied to Aaron Steps at the FBI, and at the bottom Johnston wrote, "Aaron, feel free to contact me if you have any questions."

56. Following November 14, 2017, Loder did his best to comply with Johnston's directive without making any disclosures that violated the law or FBI policy.

57. While attending some of these staff meetings, Loder learned that the MIAC completely ignores its own privacy policy, the federal Privacy Act, and that it regularly engages in violations of state law, federal law, and rules of criminal procedure.

58. To wit, Loder learned that MIAC retains and shares personal information on individuals who are not suspected of engaging in any criminal or terrorist activity, including information that would otherwise require a subpoena or warrant to obtain.

59. Loder learned that MIAC routinely monitors the social media accounts and/or conducts background checks on individuals associated with lawful public protests, frequently citing a pretextual criminal offense (subjects may litter during the protest, for example) to justify the collection.  MIAC then retains all the data collected even after finding no indication of a threat, hazard, or criminal activity.

60. Upon information and belief in September 2018, MIAC was monitored protests against the controversial new Central Maine Power transmission line project and shared information with CMP - and now there's a CMP executive on MIAC's oversight committee.

61. Loder learned that data collected by an automated license plate recognition system is unlawfully retained and otherwise in violation of 29-A M.R.S. § 2117-A.

62. Statutory limits on when license plate data can be used, such as protecting public safety or an active criminal investigation based upon articulable facts suggesting criminal activity 29-A MRSA sec 2117-A are thwarted by agreements the State Police/MIAC have with agencies in other states having plate readers to provide information on Maine registered vehicles found to make frequent or quick trips to certain source cities (New York City, Hartford, Lawrence).  The owners of the vehicles are screened as possible drug couriers.  The information is mined from the license plate data of the other agencies by computer without any pre-existing suspicion of criminal activity.

63. Loder learned that MIAC conducts electronic surveillance of people's social media and other accounts and permanently retains personal and private information on those individuals because they engaged in constitutionally protected activity such as participating in a lawful protest or purchasing a firearm.

64. Loder learned that MIAC unlawfully maintains records about people who lawfully purchase firearms indefinitely, contrary to federal and state law.

65. Mandated by the Brady Handgun Violence Prevention Act (Brady Act) of 1993, Public Law 103-159, the National Instant Criminal Background Check System (NICS) was established for Federal Firearms Licensees (FFLs) to contact by telephone, or other

electronic means, for information to be supplied immediately on whether the transfer of a firearm would be in violation of Section 922 (g) or (n) of Title 18, United States Code, or state law.

66. The NICS is a national system that checks available records on persons who may be disqualified from receiving firearms. The FBI developed the system through a cooperative effort with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and local and state law enforcement agencies.

67.  The NICS is a computerized background check system designed to respond instantly on most background check inquiries, so the FFLs receive an almost immediate response.

68. Depending on the willingness of state governments to act as agent for the NICS, the FFLs contact either the FBI or a designated state point of contact (POC) to initiate background checks on individuals possessing or receiving firearms.

69. Located at the FBI's Criminal Justice Information Services Division in Clarksburg, West Virginia, the NICS Section processes background checks for the FFLs in those states that have declined to serve as POCs for the NICS.

70.  In states like Maine where the State Police have agreed to serve as the POC for the system, the FFLs contact the NICS through the State Police for all firearm transfers.

71. The State Police conduct the NICS check and determine whether the transfer would violate state or federal law.

72. Federal law requires the NICS and states acting as the POC for the system to destroy information about an inquiry resulting in an allowed transfer, but MIAC maintains the data contrary to state and federal law.

73. The Maine State Police as the POC for the NIC system maintains in its MIAC database information about the lawful purchase of guns by citizens, essentially creating a registry, in violation of state and federal law.

74. Loder discovered that the Maine State Police report background check findings to the FBI/NICS but instead of thereafter destroying the information as required by law, it is entered into the MIAC database indefinitely.

75. Loder learned that MIAC circumvents the accounting requirements of the Privacy Act and related state and federal laws in the maintenance of its data base.

76. On March 21, 2018, Loder attended training on federal rules for discovery put on by the U.S. Attorney's Office where there was discussion about when the involvement of an outside agency in the investigative process triggers a review of that agency's records for Brady material.

77. On March 26, 2018, Loder met with Johnston at the FBI Office in Portland for his annual performance evaluation. While waiting for FBI SSRA Aaron Steps to arrive, a comment was made that it might be the last State Police performance evaluation Loder would receive because he would soon be eligible for retirement.

78. Johnston then asked Loder what his plans were for the year and in the conversation it was mentioned that Detective David Pelletier (MIAC) would be retiring in a few months. At no time did Johnston say anything about Loder replacing Pelletier.

79. Loder told Johnston on March 26th that he wished to remain on the JTTF but would considering a vacancy that had been recently posted for a Detective in the Major Crimes Unit if remaining at the JTTF was not possible.

80. Johnston told Loder on March 26, 2018 there was no reason Loder could not remain on the JTTF if that is what he wanted.

81. SSRA Steps and Sgt. Johnston then reviewed Loder's work performance for the last year and he was given a favorable evaluation.

82. After SSRA Steps excused himself due to another commitment, Sgt. Johnston proceeded to go over a few new "work expectations" he had for Loder to increase his interaction with the MIAC.

83. Johnston again instructed Loder to attend weekly MIAC staff meetings and engage more in round-table discussions about the cases he was working on for the FBI.

84. Johnston told Loder to "share away" and Loder told Johnston that under FBI policy and the Privacy Act, he would need to submit a formal request for the information before personally identifying information (PII) on the subjects of federal investigations could be disclosed, and that he was required to document all disclosures on an FD-999 inserted into the case file.

85. Loder told Johnston he had concerns about the contents and maintenance of MIAC database and its compliance with federal law.

86. The next day, on March 27, 2018 Loder told SSRA Steps what Johnston wanted him to do, i.e. "share away" about his ongoing work on the JTTF and that he was uncomfortable with it because he could be held personally responsible for any unauthorized disclosures.

87. SSRA Steps suggested Loder call A. Harris, the FBI's Assistant Chief Division Council (Boston Division) to get her opinion.

88. On March 28, 2018, Loder sent information to the MIAC via email regarding an individual who was observed engaging in suspicious behavior. He followed up on the email with a phone call to Johnston to provide context and explain the apparent nexus to criminal activity. In response, Johnston told Loder no nexus to criminal activity was required because 28 CFR 23 did not apply to MIAC activity database.

89. On or about April 6, 2018, Loder spoke with ACDC Harris by telephone. He explained to Harris that he was being pressured by his State Police supervisor to "share away" FBI information with the MIAC, and that he was uncomfortable disclosing some of it without following protocol

90. ACDC Harris confirmed that an FD-999 was required for every disclosure from FBI files and that Loder was expected to comply with FBI policy.

91. On May 2, 2018, Loder met with AUSA R. Murphy at his office in Portland. Loder told Murphy about Johnston's directive to involve the MIAC staff in his criminal investigations by regularly disclosing and discussing case information with them. AUSA Murphy said he was concerned about the directive and that Loder would be violating Department of Justice policy if he chose to comply with it.

92. On May 5, 2018, Loder spoke with Johnston by phone and told him that he discussed his "share away" directive with the FBI's Assistant Chief Division Council and one of the Assistant U.S. Attorneys, and that both advised against it.

93. Specifically, Loder told Johnston the MIAC database was unlawful and in violation of the Privacy Act and other laws, gave specific examples described above, and that the routine sharing of case information with the MIAC without following proper procedure

would be illegal and could trigger discovery obligations (notes, information, opinion of experts, etc.).

94. Loder gave as a specific example of illegal activity by the MIAC the collection of data on individuals with connection to the Seeds of Peace summer camp without a nexus to criminal activity.

95. Johnston became angry and said, "I can tell you right now the Lieutenant doesn't want to hear that."  Johnston then demanded to know who Loder spoke with at the US Attorney's Office, and then changed his mind and said he would straighten the matter out with Halsey Frank if he needed to.

96. On May 15, 2018, Loder was summonsed to attend a meeting with Johnston and Lt. Ireland in his office at the MIAC. Loder was told he was being removed from the JTTF and reassigned to a fixed-duty desk job post at the MIAC in Augusta and expected to be present by 8am each morning and remain until 4pm, and that he would not be compensated for the additional travel time of over two hours a day from his home in Scarborough.

97. Also, on May 15, 2018, Johnston circulated a memo amending and restricting the MIAC's protocol going forward with respect to the collection, dissemination and retention of information related to the Seeds of Peace employees and counselors.

98. Loder's duties were reduced from that of a full-time criminal investigator and JTTF member based out of Portland to that of analyst/research clerk in Augusta. His new primary responsibilities were to conduct computer queries and help maintain the MIAC database – which made him extremely uncomfortable.

99. In the meeting with Ireland and Johnston on May 15, 2018, Loder was told henceforth he could only act as an investigator "as needed," and that he was being reassigned because he had been on the JTTF for five years.

100.     Loder reminded Ireland there was no five-year limit, that he was told by Johnston back in March his status on the JTTF was secure, and that his predecessor served on the JTTF for over seven years before taking a lateral transfer to Major Crimes.

101.     Lt. Ireland said he would ask the command staff if there were openings for a Detective elsewhere in the department.

102.     When Loder requested a lateral transfer to Major Crimes, unlike other detectives at the State Police, Loder was subject to a promotional interview and denied the request.

103.     On May 16, 2018, Loder received a call from Lt. Ireland and Johnston was also on the line. Loder was told his request for a lateral position was denied and that he was assigned the desk job at the MIAC.

104.     By denying Loder a lateral transfer contrary to civil service laws, personnel rules, the CBA and past practice, defendants discriminated against Loder and treated him differently because he blew the whistle on the MIAC. For example, the detective who took the Major Crimes position Loder expressed interest in to Johnston in March (see para. 79 above) was given the job without being subject to an interview or application process, unlike Loder.

105.     Loder told Ireland and Johnston on May 16, 2018 that by being assigned to a job that monitored the MIAC database he was being forced to engage in unlawful activity.

106.     Ireland threatened to charge Loder with insubordination if he would not do what was being asked of him.

107.     Loder told Ireland and Johnston if his only option was to participate in the MIAC's illegal activities or face progressive discipline, then they were forcing him out of the State Police and would force him to file a grievance.

108.     On May 29, 2018, Loder was ordered to Augusta where he met with Johnston and Ireland and told in no uncertain terms he needed to "get on board with the fusion center concept."

109.     Loder told Ireland and Johnston again about his concerns about the MIAC and its data base that where illegal (referencing the illegal gun registry) in violation of state and federal law and FBI policy.

110.     On May 31, Loder was called back to Lt. Ireland's office along with Sgt. Johnston and Sgt. Tyler Stevenson and was issued a document titled "Maine State Police Record of Employee Performance" regarding "Task which employee has done poorly" outlining Loder's alleged insubordination and violation of General Order E-24, Maine State Police Code of Conduct on May 16, 2018. (hereinafter the "Incident Report")

111.     Loder was told to sign the Incident Report, which states, among other things, "This job performance record shall not be put in your personnel file; it shall only go into your incident file. This record does not constitute any form of reprimand or discipline."

112.     Loder was told he could not grieve the Incident Report and that it would be added to his "incident file" and not included in his official personnel file.

113.     The incident file containing the disparaging Incident Report is, on information and belief, maintained in the unlawful system of records and database maintained by the MIAC.

114.    During the meeting on May 31st, Loder began having a severe headache and became nauseated. He told Lt. Ireland he was going to the restroom but Ireland ordered Loder to stay put and threatened him with insubordination if he left the room. Voices were raised and it became heated.

115.    Loder felt threatened and not at liberty to leave. He repeatedly told Johnston and Ireland he was having a medical crisis but not allowed to leave the room.

116.    Loder finally left the room in great distress and fear and went to the restroom. Sgt. Johnston and Lt. Ireland followed him into the hallway and demanded that he return to the office for further interrogation with raised voices and threatening gestures.

117.    On June 5, 2018, Loder was interviewed by the Lt. Anna Love and Sgt. Carleton Small of the State Police Office of Professional Standards regarding an allegation of "insubordination and rudeness" brought against him by Ireland and Johnston. Maine State Troopers Association Executive Director Craig Poulin was also present.

118.    During the interview, Loder told Lt. Love and Sgt. Carleton that per State Police policy, refusing to follow an order to engage in illegal activity did not constitute insubordination.

119.    Ultimately, the insubordination allegation was not sustained while the rudeness allegation was sustained.

120.    Loder took medical leave and eventually returned to the State Police. He took a demotion as a State Trooper after being denied any other positions except the desk job at the MIAC to oversee its database.

**Count 1 – Whistleblower Protection Act, 26 M.R.S.A. § 831, *et seq*.**

**Maine State Police**

121.      Plaintiff repeats and reallege the allegations contained in the foregoing paragraphs

as if set forth fully herein.

122.      Loder at all material times was an "employee" and the defendant Maine State

Police an "employer" under the Whistleblower Protection Act.

123.      Loder made a legally protected whistleblower report, or reports, in good faith of

what he reasonably had cause to believe were violations of law or rules of the State of

Maine and/or the United States.

124.      Reports included the unlawful collection, transmission, and retention of private

information in violation of state and federal law, as described herein.

125.      Loder's legally protected whistleblower report or reports were the cause, and/or a

substantial or motivating factor, in the defendants' threats, relocation, discipline, unfair

treatment and/or adverse employment actions described herein, including his removal

from the JTTF.

126.      Loder has fully complied with the procedural requirements of 5 M.R.S.A.

§ 4612(6).

127.      The actions of defendants violated 26 M.R.S.A. § 831, *et seq*.

**Count 2 – First Amendment – Retaliation, 42 U.S.C. § 1983**

**Johnston and Ireland in their personal capacities**

**128.**      Plaintiff repeats and reallege the allegations contained in the foregoing paragraphs

as if set forth fully herein.

129.     When Loder spoke up about the legality of the MIAC database with Johnston and Ireland, he spoke as a citizen on a matter of public concern.

130.     Concern about the MIAC and its potential violation of Maine citizens' privacy rights have been widely reported in the newspaper and on broadcast TV and radio news since 2015. See *Secretive fusion center to play key role in Maine drug crackdown,* Portland Press Herald, September 6, 2015, for instance.

131.     Loder exercised his First Amendment rights when he reported the MIAC's unlawful activity to the State Police, the FBI and the U.S. Attorney's Office as described herein.

132.     On balance the interests of Loder, as a citizen, in commenting upon matters of public concern outweigh the interest of the State Police in promoting the efficiency of the public services it performs through its employees.

133.     Loder's protected speech was a substantial or motivating factor in the adverse employment actions he suffered as described herein.

134.     Scot Ireland and Michael Johnston, acting in their individual capacities and under color of state law, violated Loder's First Amendment rights and unlawfully retaliated against him for exercising such rights in violation of 42 U.S.C. § 1983 by committing the aforementioned acts.

### Count 3 – 42 U.S.C. § 1983 and 28 C.F.R Part 23 and 5 U.S.C. § 552a

### Johnston and Ireland in their individual capacities

135.     Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if set forth fully herein.

136.     The executive order establishing the MIAC incorporates Section 28 of the Code

of Federal Regulations.

137.     The maintenance of the MIAC's unlawful database, including records related to Loder's Incident Report and the so-called "incident file" pertaining to him; records relating to NICS background checks and the lawful purchase of firearms, and records related to the lawful political and social activity of Loder and other individuals,  is a violation of 23 CFR §23 and the Privacy Act.

138.     By committing the above described acts, Johnston and Ireland, acting under color of state law, deprived Loder of the rights, privileges, or immunities secured by the Constitution and laws of the United States in violation of 42 U.S.C. § 1983.

## Count 4 – Privacy Act – 5 U.S.C § 552a

## State Police/MIAC

**139.**     Plaintiff repeats and reallege the allegations contained in the foregoing paragraphs as if set forth fully herein.

**140.**     As a member of the JTTF, Loder was obligated to comply with the Privacy Act.

**141.**     Loder is the lawful owner and purchaser of firearms.

**142.**     As the POC for the FBI for purposes of the NICS program, the MIAC is an "agency" and/or the agent of the FBI, and therefore subject the Privacy Act.

**143.**     The actions of State Police and MIAC related to the maintenance of an illegal database that retains records relating to citizens lawful activity (including Loder) is a violation of the Privacy Act.

**144.**     By ordering Loder to share confidential information and otherwise maintain an illegal database would subject him to criminal penalties under 5 U.S.C. § 552a(i).

**145.**     Conditioning Loder's position on the JTTF on his willingness to violate the Privacy Act is a violation thereof.

**146.**     The unlawful retention of Loder's "incident file" containing the Incident Report, in addition to the above described information related to the lawful purchase of firearms and political and social activity of him and other Maine citizens is a violation of the Privacy Act.

147.     Retaliating against Loder for refusing to violate the Privacy Act is unlawful.

148.     As an "agency" by contract with the FBI, and/or an agent of an "agency MIAC's intentional and willful failure to comply with the Privacy Act as an agent of the FBI has had an adverse effect on Loder and caused substantial damage.

### Count 5– Due Process under the 14th Amendment, 42 U.S.C. § 1983

### Johnston and Ireland in their personal capacities

**149.**     Plaintiff repeats and reallege the allegations contained in the foregoing paragraphs as if set forth fully herein.

**150.**     Loder had a property right in his job as a member of the JTTF.

151.     Acting under color of state law, Johnston and Ireland deprived Loder of rights secured to him by the 5th and 14th Amendment to the U.S. Constitution by denying him due process of the law.

### Count 6 – Injunctive Relief

**152.**     Plaintiff repeats and reallege the allegations contained in the foregoing paragraphs as if set forth fully herein.

**153.**     The actions described herein are in in violation of 25 M.R.S. § 2014 that prohibits them from keeping or causing to be kept a registry of privately owned firearms.

**154.**     The maintenance of the MIAC data base including the maintenance indefinitely of records regarding the lawful purchased firearms during a state of emergency violates 25

M.R.S. § 2011(5)(A)(3)

**155.**    The activities of defendants are in violation of 28 CFR Part 23, the Privacy Act, the constitution, and other federal and state laws, it should be enjoined.

**WHEREFORE,** George Loder respectfully requests that this Honorable Court:

A.    Enter judgment declaring that the defendants' practices complained of herein are unlawful and in violation of Loder's rights.

B.    Grant a permanent injunction enjoining the defendants, its officers, agents, successors and assigns, from engaging in any employment policy or practice which retaliates further against Loder for exercising his rights under federal and state law.

C.    Reinstate Loder to his position on the JTTF or provide compensation in lieu of reinstatement.

D.    Order the defendants to pay compensatory, nominal and punitive damages.

E.    Order defendants to pay pre-judgment and post judgment interest, reasonable attorney's fees, and costs; and

F.    Grant such other and further relief as this Court deems just and appropriate.

Dated: May 7, 2020                    /s/ Cynthia A Dill_____
                                       Cynthia A. Dill, Esq.
                                       Attorney for Plaintiff George Loder
                                       Bar No. 007055

CYNTHIA A. DILL, ESQ.
511 Congress Street
Portland, Maine 04101
(207) 749-7749
cynthia@dillesquire.com