## UNITED STATES DISTRICT COURT
### FOR THE
### DISTRICT OF MAINE

| | |
|---|---|
| GEORGE LODER,<br><br>        Plaintiff<br><br>                v.<br><br>MAINE INTELLIGENCE ANALYSIS<br>CENTER, et al.<br><br>        Defendants. | CIVIL ACTION NO.: 2:20-cv-00157-JDL |

### DEFENDANTS' MOTION TO DISMISS COUNTS 3, 4, 5, and 6

This case arises out of an employment dispute.  Plaintiff George Loder alleges that during the time he worked at the Maine Intelligence Analysis Center, Defendants Maine Intelligence Analysis Center, John Cote, Scott Ireland, and Michael Johnston (collectively "Defendants") engaged in unlawful retaliation after Loder questioned the legality of some of Defendants' policies and actions.  Defendants will address these allegations, which are the subject of Counts 1 and 2 of the Complaint, in due course.

The Complaint also attempts to state several claims grounded in the federal Privacy Act, Constitutional Due Process, and Injunctive Relief (Counts 3-6).  Even taking all of his factual allegations as true, none of these latter Counts offer a plausible path to relief for Loder.  Therefore, pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants move to dismiss Counts 3, 4, 5, and 6 of the Complaint.

### MEMORANDUM OF LAW

### FACTUAL BACKGROUND

Although Loder has styled additional federal claims under 42 U.S.C. § 1983 and the federal Privacy Act, this lawsuit is fundamentally an employment dispute.  Loder has worked for the

Maine State Police since 1994, and states that he began working as a field agent for the Maine Information Analysis Center ("MIAC") in February of 2012.  Compl.  ¶¶ 25, 29.  Then in early 2013, he was accepted for a temporary assignment to the FBI's Joint Terrorism Task Force ("JTTF") in a position purportedly "under the supervision" of MIAC.  *Id.* ¶¶ 30, 32-33.

Loder alleges that in early to mid-2017, he learned that Defendant Johnston "made a policy change" related to the Maine Drug Enforcement Agency, and that in some respects the change was, in Loder's view, "made in error and violation of the law."  *Id.* ¶¶ 44-45.  Loder claims that in response to raising concerns about the policy change, he was instructed in November 2017 "to take part in weekly MIAC meetings via conference call" where he was asked to share information related to his JTTF activities, which he believed would be a violation of the Privacy Act.  *Id.* ¶¶ 46-50.  Loder also asserts that he discovered in these meetings that the MIAC was—in his opinion— violating the Privacy Act and possibly other state and federal laws.  *Id.* ¶¶ 57-64, 73-75.

After purportedly receiving counsel from United States Department of Justice officials, Loder allegedly informed Defendant Johnston that he could not share information with the MIAC about his JTTF activities, at least not without complying with certain procedures required by the FBI.  *Id.*  ¶¶ 80-94.  Loder alleges that based on the concerns he allayed to Defendant Johnston, he was removed from the JTTF and reassigned to a desk position.  *Id.* ¶¶ 95-98.  He further claims that he was denied his request to transfer to a different position when others were allowed similar transfers.  *Id.* ¶¶ 102-04.  Loder asserts that he continued to lodge complaints about the legality of the MIAC's recordkeeping and, as a result, was issued a negative performance record by Defendants Johnston and Ireland.  *Id.* ¶¶ 105-111.  Finally, Loder purportedly accepted a demotion to a Maine State Police Trooper position in order to stop working at the MIAC.  *Id.* ¶ 120.

On May 7, 2020, Loder filed this lawsuit against the MIAC, John Cote in his official capacity as Chief of the Maine State Police, and Loder's supervisors at the MIAC, Ireland and Johnston.   Loder seeks damages and an injunction based on alleged violations of Maine's Whistleblower Protection Act (Count 1), First Amendment retaliation (Count 2), violations of the federal Privacy Act (Counts 3-4), violations of the 14th Amendment's guarantees of Due Process, and a general claim for Injunctive Relief (Count 6).

## LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendant moves to dismiss Counts 3, 4, 5, and 6 of the Complaint for failure to state a claim upon which relief may be granted.   To survive a Rule 12(b)(6) motion to dismiss, the Complaint "must contain sufficient factual matter to state a claim to relief that is plausible on its face." *Reisman v. Associated Faculties of Univ. of Maine*, 356 F. Supp. 3d 173, 175 (D. Me. 2018) (quoting *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F. 3d 49, 53 (1st Cir. 2013)).   The Court is "required to 'accept as true all the factual allegations in the complaint and construe all reasonable inferences in favor of the plaintiff.'"  *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 41 (1st Cir. 2009) (quoting *Alt. Energy, Inc, v. St. Paul Fire & Marine Ins. Co*, 267 F.3d 30, 33 (1st Cir. 2001)).

Although a complaint need not contain detailed factual allegations to pass muster, the plaintiff must make "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In other words, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 & 557 (2007)); *see also Barchock v. CVS Health Corp.*, 886 F.3d 43, 48 (1st Cir. 2018) ("Well-pleaded facts must be 'non-conclusory' and

'non-speculative.'"). Assessing the plausibility of a claim is a "context-specific task," demanding that the Court "draw on its judicial experience and common sense." *Reisman*, 356 F. Supp. 3d at 175 (quoting *Iqbal*, 556 U.S. at 679).

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *MacDonald v. Town of Eastham*, 745 F.3d 8, 11 (1st Cir. 2014) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). It shields officials from liability where their decisions were "reasonable, even if mistaken," *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (per curiam), and "is designed to confer protection from the travails of suit as well as from the imposition of damages," *MacDonald*, 745 F.3d at 12. For that reason, it is appropriate for "courts [to] evaluate claims of qualified immunity at the earliest practicable stage of litigation." *Id*. at 12.

A state official is entitled to qualified immunity "unless (1) 'the facts that a plaintiff has alleged or shown make out a violation of a [federal] right' and (2) 'the right at issue was "clearly established" at the time of [their] alleged misconduct.'" *Walden v. City of Providence*, 596 F.3d 38, 52 (1st Cir. 2010) (alteration in original) (quoting *Pearson*, 555 U.S. at 232). In light of these considerations, "[t]he salient question is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional." *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009).

## ARGUMENT

### I.       Loder Makes No Colorable Privacy Act Claims (Counts 3-4)

The federal Privacy Act constitutes a comprehensive set of rules that governs federal agencies' collection, maintenance, dissemination, and use of certain personally identifiable information housed in an agency's "system of records."[1]  5 U.S.C. § 552a; *see also NLRB v. United States Postal Service*, 660 F.3d 65, 67 (1st Cir. 2011).  Under the Act, "record" is defined to mean "any instance of, grouping or collection of information about an individual containing that individual's name, identifying number, symbol, or any other identifiable particular assigned to the individual that is maintained by a <u>federal agency</u>."  *NLRB*, 660 F.3d at 67 n.3 (emphasis added); *see also* 5 U.S.C. § 552a(a)(4).  The Privacy Act specifically mandates that no federal agency may disclose any record housed in its system of records "by any means of communication, to any person or entity" unless that agency obtains prior written consent from the person to whom the records pertains or unless the disclosure would fall under one of several enumerated statutory exceptions.  *Id.* at 67; 5 U.S.C. § 552a(b).

"If an agency, acting intentionally or willfully, violates this command 'in such a way as to have an adverse effect on an individual,' Congress has authorized the filing of a civil action for damages by the affected individual."  *Orekoya v. Mooney*, 330 F.3d 1, 5 (1st Cir. 2003) (abrogated

---

[1] The federal Privacy Act of 1974 is comprised of two discrete substantive sections setting forth different mandates on governmental actors.  Section 3 of the Privacy Act sets up a comprehensive set of requirements on federal agencies, as well as a remedial scheme, related to recordkeeping and disclosure of individuals' private information.  *See* 5 U.S.C. § 552a.  Section 7 of the Privacy Act does not contain a remedial scheme and simply mandates that no federal, state, or local government may deny "any individual any right, benefit, or privilege provided by law because of such individual's refusal to disclose his social security account number."  *See Schwier v. Cox,* 340 F.3d 1284, 1288 (11th Cir. 2003) (explaining the difference between Section 3 of the Act, which precludes private remedies against state agencies under § 1983, and Section 7, which does not).  Loder's claim is brought under Section 3 of the Privacy Act, codified at 5 U.S.C. § 552a, and references to the federal "Privacy Act" in this brief refer to that section of U.S. Code unless otherwise noted.

on other grounds by *Doe v. Chao*, 540 U.S. 614 (2004)); *see also* 5 U.S.C. § 552a(g)(1)(D). The First Circuit has stated that the Act's "adverse effect" requirement of § 552a(g)(1)(D) constitutes a standing requirement that must be met in order for an "individual to bring a civil action to enforce civil remedies." *Id.* (citing *Quinn v. Stone*, 978 F.2d 126, 135 (3rd Cir. 1992)).

In Count 3, Loder sets forth two basic allegations against Defendants Johnston and Ireland. First, he states that the MIAC's database of information is maintained in violation of 28 C.F.R. § 23 and the federal Privacy Act. Compl. ¶ 137. Second, Loder argues that by maintaining the MIAC's database, Defendants Johnston and Ireland deprived Loder of certain rights guaranteed to him under the laws of the United States. *Id.* ¶ 138. Likewise, in Count 4 Loder alleges that the MIAC and/or Maine State Police maintains a database—which includes Loder's "incident file"— that is illegal under the federal Privacy Act. *Id.* ¶¶ 142-46. He further alleges that the MIAC's failure to comply with the Privacy Act has had an "adverse effect" on Loder and that it has caused him "substantial damage." *Id.* ¶ 148.

1. <u>Loder fails to state a claim for which relief can be granted because the Privacy Act does not apply to state agencies or employees.</u>

Counts 3 and 4 of the Complaint hinge upon the premise that the MIAC and its employees have violated the federal Privacy Act.[2] *Id.* ¶¶ 137, 144-48. But the statutory language of the Privacy Act is unambiguous—the Act only provides for a cause of action against <u>federal</u> agencies.

---

[2] To the extent that Claim 3 attempts to identify a valid claim for relief pursuant to 28 C.F.R. § 23, the "Criminal Intelligence Systems Operating Policies," the cited regulations do not provide for any cause of action to seek such relief. *See, e.g.*, *Colonial Penn Group, Inc. v. Colonial Deposit Co.*, 834 F.2d 229, 234 (1st Cir. 1987) (noting that plaintiffs cannot maintain suit if there is no federal cause of action); *see also Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) ("[P]rivate rights of action to enforce federal law must be created by Congress.") (citing *Touche Ross & Co. v. Redington*, 442 U.S. 560, 578 (1979) ("[R]emedies available are those 'that Congress enacted into law.'")). Nor would a plaintiff be entitled to relief under the Privacy Act for violations of 28 C.F.R. § 23 as "any rule promulgated thereunder," 5. U.S.C. 552a(g)(1)(D), as the regulations were not promulgated pursuant to the Privacy Act but instead the Omnibus Crime Control and Safe Streets act of 1968. *See* 28 CFR § 23.1.

6

*See* 5 U.S.C. § 552a(1)(a); 5 U.S.C. § 551(1) ("'agency' means each authority of the <u>Government</u> <u>of the United States</u>, whether or not it is within or subject to review by another agency . . .") (emphasis added).[3]

A myriad of federal courts of appeals, including the First Circuit, agree that the Privacy Act does not apply to state agencies, or to state officials and employees in their individual or official capacities. *See Perez-Santos v. Malave*, 23 Fed. Appx. 11, 12 (1st Cir. 2001) (per curiam) ("The private right of action created by § 552a(g) of the Privacy Act is limited to actions against agencies of the federal government and does not apply to state agencies or individuals…in their personal or official capacities") (affirming dismissal); *see also Pennyfeather v. Tessler*, 431 F.3d 54, 56 (2d Cir. 2005) ("[U]nder the Privacy Act as well—'there is no private right of action against' an official or employee of a municipal or state, rather than a federal, agency." (citation omitted) (affirming dismissal); *Schwier v. Cox*, 340 F.3d 1284, 1287 (11th Cir. 2003) ("Section 3 of the Privacy Act <u>applies only to federal agencies</u> and, among other things, delineates an individual's right to records of federal agencies and right to be protected from disclosure of records by federal agencies.") (emphasis in original); *Unt v. Aerospace Corp.*, 765 F.2d 1440, 1447 (9th Cir. 1985) ("The private right of civil action created by the Act is specifically limited to actions against agencies of the United States Government. The civil remedy provisions of the statute do not apply

---

[3] Note that in the United States Code the Privacy Act mistakenly cross-references its definition for "agency" to 5 U.S.C. § 552(e), where no such definition can be found. However, the definition can be found at 5 U.S.C. § 552(f), which points to the definition of "agency"—limited to the federal government—as laid out in the Administrative Procedure Act. *See Pennyfeather v. Tessler*, 431 F.3d 54, 56 n.1 (2d Cir. 2005) ("We note, however, that § 552a(a)(1) of the Privacy Act incorrectly cross-references 5 U.S.C. § 552(e) of FOIA, which was renumbered to 5 U.S.C. § 552(f) in 1986. *See* Freedom of Information Reform Act of 1986, Pub.L. No. 99–570, § 1802(b), 100 Stat. 3207–48, 3207–49. The current version of § 552(f) defines an 'agency' for purposes of FOIA, 5 U.S.C. § 552, and in turn incorporates the 'agency' definition found in the [APA], 5 U.S.C. § 551(1). By their express terms, both FOIA and the APA apply only to federal government agencies; the provisions of the Privacy Act at issue here, therefore, are similarly limited. *See* 5 U.S.C. § 552(f).").

against private individuals, state agencies, private entities, or state and local officials.") (citations omitted); *Polchowski v. Gorris*, 714 F.2d 749, 752 (7th Cir. 1983) ("[The Privacy Act] applies only to agencies of the United States Government.").[4]

Perhaps understanding the barrier he faces in bringing a claim against a state agency and state employees under the Privacy Act, Loder attempts to sidestep this caselaw by arguing that the MIAC is an "agent of the FBI" or possibly an "'agency' by contract with the FBI." Compl. ¶¶ 144, 148. But here, too, federal caselaw stacks universally against him.

In *St. Michael's Convalescent Hosp. v. State of Cal.*, 643 F.2d 1369, 1373 (9th Cir. 1981), plaintiff health care providers filed suit against two California state agencies pursuant to the Privacy Act, alleging that the state agencies were bound by the Privacy Act and could be held liable for violations because the agencies received federal funding through the federal Medicaid program. The Ninth Circuit disagreed. Instead, the court noted that even when federal regulations bind the actions of state agencies, "those regulations do not convert acts of local and state governmental bodies into federal governmental acts." *Id.* at 1374 (affirming dismissal). The court added that "[e]xtensive, detailed and virtually day-to-day supervision" by the federal government is required before federal "agency" status could attach to the state entities. *Id.* (quoting *Forsham v. Harris*, 445 U.S. 169, 180 (1980)). The court also drew upon the Supreme Court's reasoning in *United States v. Orleans*, which noted that "[a] critical element in distinguishing an agency from a contractor is the power of the Federal Government 'to control the detailed physical performance

---

[4] If statutory text and caselaw were not enough, the legislative history of the Privacy Act likewise indicates that Congress intended for it to only apply to federal agencies. *See Polchowski*, 714 F.2d at 752 ("Congress, when considering this legislation, specifically limited its scope to federal agencies. Indeed, the bill, as originally introduced, contained a remedy for improper disclosures by state authorities; these provisions were deleted, however, because of the uncertain effect of such a provision and because Congress felt that it lacked the necessary information for devising a remedial scheme in this context.") (citations omitted).

of the contractor.'"  425 U.S. 807, 814 (1976) (quoting *Logue v. United States*, 412 U.S. 521, 528 (1973)).

In *Forsham,* the Supreme Court addressed the APA's definition of agency as it applies to the Freedom of Information Act—the same statutory definition that is integrated into the federal Privacy Act.  *See supra* note 3.  In *Forsham*, plaintiffs sought records under FOIA from a private organization of doctors conducting diabetes research under a grant set up by the United States Department of Health, Education, and Welfare.  445 U.S. at 176.  Among other theories, the plaintiffs argued that they had a right to the data under FOIA because the data constituted an "agency record" since the doctors' organization received funds from a federal agency.  *Id.* at 177.

The Supreme Court flatly rejected this argument.  It noted that the clear statutory language of the definition of "agency" was limited to the federal government.  *Id.* at 179.  Nor would a sweeping definition of "agency" comport with other areas of federal law.  As the Court reasoned, "Grants of federal funds generally do not create a partnership or joint venture with the recipient, nor do they serve to convert the acts of the recipient from private acts to governmental acts absent extensive, detailed, and virtually day-to-day supervision."  *Id.* at 180.  Moreover, it added that "[b]efore characterizing an entity as "federal" for some purpose, this Court has required a threshold showing of substantial federal supervision . . . and not just the exercise of regulatory authority necessary to assure compliance with the goals of the federal grant."  *Id.* at 180 n.11.

Defendants are not aware of a single court finding that any <u>state agency</u> meets this extraordinarily high bar to constitute a "federal agency" for purposes of the Privacy Act.  Loder's cursory allegations regarding MIAC's status as a federal agency fail to compare even to those rejected in *St. Michael's* and *Forsham*, much less meet the stringent requirement of "extensive, detailed, and virtually day-to-day supervision" from the federal government.  Loder's only

allegations are that the MIAC and Maine State Police are an "agent" of the FBI because 1) the Maine State Police acts as the "point of contact" for the National Instant Criminal Background Check System, Compl. ¶¶ 8, 142; and 2) the MIAC is "an 'agency' by contract with the FBI," Compl. ¶¶ 9, 148.  Rather than alleging federal day-to-day supervisory <u>control</u> over the MIAC, Loder's allegations imply that the MIAC <u>rejected</u> any attempts by the FBI or Department of Justice to influence its actions.  Compl. ¶¶ 89-95.

Because clear statutory language and universal federal caselaw state that neither the MIAC nor the Maine State Police qualify as an "agency" for purposes of the Privacy Act, Loder is barred from making such claims against either entity or any State of Maine employees.  For this reason alone, each of Loder's Privacy Act claims (Counts 3 and 4) should be dismissed.

> 2. <u>Even if the Privacy Act applied to the MIAC, Counts 3 and 4 fail to place Defendants on notice of any viable claims to relief.</u>

Loder's Privacy Act claims are undermined by a second fatal flaw:  He has failed to place Defendants on notice of what Privacy Act harms he has suffered or what violations Defendants have committed.  Defendants do not suggest that this is a case of inartful pleading where Loder has provided a general overview of his allegations without diving into minute evidentiary details.  Rather, Loder has left Defendants completely in the dark.  He has failed to state <u>what</u> provisions of the Privacy Act he believes they have violated.  Nor has he described <u>how</u> Defendants' purported violations have adversely affected him.  Loder's Privacy Act claims constitute "'naked assertion[s]' devoid of 'further factual enhancement'" that cannot survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

A plaintiff is entitled to relief under the Privacy Act only when the individual alleges that a federal agency "fails to comply with [the Act], or any rule promulgated thereunder, in such a

way as to have an adverse effect on an individual." 5 U.S.C. § 552a(g)(1)(D).[5] But Loder fails to aver anything beyond conclusory allegations of ambiguous Privacy Act violations. Moreover, he fails to allege any plausible link between those conclusory allegations and any purported adverse harm that he has suffered.

Counts 3 and 4 set forth a series of alleged actions that Loder claims violated the Privacy Act. First, Loder alleges that Defendants maintained an "illegal database" that retains records in violation of the Privacy Act. Compl. ¶¶ 137, 143. In addition to not explaining how such a database might be violative of the Privacy Act, Loder fails to explain how the maintenance of such a database has had an "adverse effect" on him. Simply claiming that maintenance of the database violates the Privacy Act is not enough.[6]

Second, Loder alleges that conditioning his continued placement on the JTTF on his willingness to violate the Privacy Act is itself a violation of the Act. Compl. ¶ 145. Third, Loder alleges that the MIAC's retention of his "incident file" containing his "incident report" constitutes a violation of the Privacy Act. ¶ 146. Again, these two conclusory allegations do not begin to explain <u>how</u> such actions violate the Act. Loder must point to something more specific than the entire section of U.S. Code where the Privacy Act resides in order to place Defendants on notice of what Privacy Act violations they are being accused of committing. Without more, these "bald

---

[5] There are three other discrete causes of action provided by the Privacy Act related to 1) an individual's right to seek an amendment of a record related to that individual; 2) an individual's right to access one's own records; and 3) a failure of a federal agency to maintain accurate and complete records related to an individual that results in a determination which is adverse to that person. *See* 5 U.S.C. § 552a(g)(1)(A), (B), (C). The Complaint seeks relief only under § 552a(g)(1)(D). Compl. ¶ 148. Loder has not alleged any violation of a rule promulgated under the Privacy Act. *See supra* note 2.

[6] For example, a plausible Privacy Act claim might allege specific facts about a harmful disclosure of a plaintiff's personal information that did not comply with § 552a(b). *See, e.g.*, *Orekoya*, 330 F.3d at 2 (release of personal banking information); *Quinn*, 978 F.2d at 132 (disclosure of home address); *NLRB*, 660 F.3d at 67-68 (disclosure of employee test scores).

assertions" and "unsupportable conclusions" are appropriate for dismissal. *Peñalbert-Rosa v. Fortuño-Burset*, 631 F.3d 592, 595 (1st Cir. 2011).

Finally, Loder alleges Defendants violated the Privacy Act by unlawfully retaliating against him when Loder, himself, refused to violate the Privacy Act. Compl. ¶ 147. This is Loder's only allegation where he describes a possible adverse effect of Defendants' purported Privacy Act violation. But as before, Loder fails to point to any provision of the Privacy Act that explains <u>why</u> or <u>how</u> such alleged retaliation would violate the Act, simply stating without explanation that such retaliation is "unlawful." *Id.* The allegations set forth in Count 4 are precisely the kind of "the-defendant-unlawfully-harmed-me accusation," *Iqbal*, 556 U.S. at 678, that is deemed inadequate to survive a motion to dismiss.

Loder's factual allegations—as they relate to the Privacy Act—are "too meager, vague [and] conclusory to remove the possibility of relief from the realm of mere conjecture," and therefore warrant dismissal. *Rodríguez-Reyes*, 711 F.3d at 53 (quoting *SEC v. Tambone*, 597 F.3d 436, 441 (1st Cir. 2010) (en banc)).

3.   <u>Loder may not seek remedies for Privacy Act violations pursuant to § 1983 (Count 3).</u>

Count 3 should be dismissed for a third independent reason: Plaintiffs are barred from using § 1983 as a vehicle to seek remedies for Privacy Act violations. Supreme Court precedent has made clear "that § 1983 does not provide an avenue for relief every time a state actor violates a federal law." *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 119 (2005). This is particularly true when a statute creates a "comprehensive enforcement scheme" for rectifying violations of law. *Id.* at 120 (quoting *Blessing v. Freestone*, 520 U.S. 329, 341 (1997)).

The Privacy Act sets forth such a comprehensive enforcement scheme. *See* 5 U.S.C. § 552a(g). It provides four specific circumstances in which a plaintiff may bring a civil action for

violations of the Act. *Id.* § 552a(g)(1). It also spells out the types of relief that federal courts may grant to prevailing Privacy Act plaintiffs. *Id.* § 552a(g)(2). Similarly, it describes penalties that federal courts may impose upon agencies for certain violations of the Act. *Id.* § 552a(g)(3), (4). And finally, the Privacy Act provides a list of acceptable venues where plaintiffs may file suit. *Id.* § 552a(g)(5).

"The provision of an express, private means of redress in the statute itself is ordinarily an indication that Congress did not intend to leave open a more expansive remedy under § 1983." *Rancho Palos Verdes*, 544 U.S. at 121. It does not matter if the relief crafted by Congress is more limited than what § 1983 would otherwise offer. The Supreme Court has thus deemed "the existence of a more restrictive private remedy for statutory violations" to ordinarily act as a "dividing line between" statutory rights that can be litigated pursuant to § 1983 and those that cannot. *Id.* There is nothing that Loder can point to that would allow him to overcome the "ordinary inference that the remedy provided in the statute is exclusive." *Id.* at 122.

In reviewing the Privacy Act, two Courts of Appeals have conclusively held the statute's remedial scheme is comprehensive and forecloses the type of relief provided by § 1983. *See Wilson v. Libby*, 535 F.3d 697, 710 (D.C. Cir. 2008) ("[Because Congress created a comprehensive Privacy Act scheme that did not inadvertently exclude a remedy for the claims brought against these defendants, we will not supplement the scheme with *Bivens* remedies.")[7]; *cf. Polchowski*, 714 F.2d at 752 (describing 5 U.S.C. § 552a as providing "comprehensive private remedies" and therefore foreclosing other forms of enforcement). Count 3 should therefore be dismissed.

---

[7] It is noteworthy that the plaintiff in *Wilson* sought relief for Privacy Act violations pursuant to a *Bivens* action and not § 1983 because—as explained in Section 1 above—the statute applies only to <u>federal</u> agencies and officials.

4. <u>Even if Count 3 was not fatally flawed, Defendants Johnston and Ireland would be entitled to qualified immunity</u>.

In addition to the independent reasons set forth above, Defendants Johnston and Ireland are entitled to a qualified immunity defense on Count 3.  Qualified immunity protects defendants when caselaw has not clearly established the illegality of their alleged misconduct at the time it occurred.  *See Walden*, 596 F.3d 38, 52 (1st Cir. 2010).  During the relevant time period (and still today), there was no clearly established law that the federal Privacy Act forbade Johnston or Ireland from asking Loder to disclose information related to his JTTF activities.  Nor was there clearly established law that the Privacy Act governed Johnston and Ireland's activities at the MIAC, including maintaining a database.  *See, e.g., St. Michael's*, 643 F.2d at 1373 (holding that the Privacy Act does not apply to state agencies, even when state agencies receive federal funding).  Therefore, Defendants Johnston and Ireland would be entitled to dismissal of Count 3 even if this Court found both that the Privacy Act applied to them and that Loder had articulated a potential violation of a right guaranteed to him by the Act.

I. **Loder Suffered No Due Process Violations Because He Enjoyed No Property Interest in His Temporary Assignment to the JTTF (Count 5)**

Count 5, which is titled, "Due Process under the 14th Amendment, 42 U.S.C. § 1983," purports to state a procedural due process claim against defendants Johnston and Ireland.  Loder claims that he "had a property right in his job as a member of the JTTF," and that Johnston and Ireland deprived Loder of this right "by denying him due process of the law."  Compl. ¶¶ 150-51.  Loder has alleged insufficient facts to support a procedural due process claim based on his removal from his temporary assignment to the JTTF.

"To state a procedural due process claim under § 1983, the plaintiff must allege facts which, if true, establish that the plaintiff (1) had a property interest of constitutional magnitude and (2)

was deprived of that property interest without due process of law.  *Clukey v. Town of Camden*, 717 F.3d 52, 54–55 (1st Cir. 2013).  "The threshold issue in a procedural due process action is whether the plaintiff had a constitutionally protected property interest at stake."  *Id.* at 55 (quoting *Mard v. Town of Amherst*, 350 F.3d 184, 188 (1st Cir.2003) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538–41 (1985))).  Whether a property interest has been created is a question of state law.  *See id.* (citing *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 771 (2005) (Souter, J. concurring) ("[T]he federal process protects the property created by state law.")).  In considering whether state law creates a property interest, the court looks "primarily to the discretion state law accords state actors to withhold the entitlement from individuals.  In general, 'a benefit is not a protected entitlement if government officials may grant or deny it in their discretion.'"  *Id.* at 56 (quoting *Town of Castle Rock*, 545 U.S. at 756).

In Maine, "a public employee has no property interest sufficient to invoke the Fourteenth Amendment's due process guarantees unless the applicable statute or employment contract requires that employment may be terminated only on a showing of 'cause.'"  *Cook v. Lisbon Sch. Comm.*, 682 A.2d 672, 676 (Me. 1996).  A "similar rationale" applies in cases that do not involve termination of employment.  *Archer v. Town of Houlton*, No. 00-244-B-H, 2001 WL 1057708, at *17 (D. Me. Sept. 12, 2001).  For example, applying Maine law, the First Circuit held that a plaintiff had a property interest in the right to be recalled only because the employer's collective bargaining agreement gave the employer <u>no</u> discretion not to rehire the plaintiff.  *See Clukey*, 717 F.3d at 58-59.  Similarly, the Law Court has expressly held that a public employee has no property right in particular job duties.  *See Pratt v. Ottum*, 2000 ME 203, ¶ 20, 761 A.2d 313.

First Circuit cases consistently hold that an employee may have a property interest in a certain employment benefit only if a state statute or a public employer's collective bargaining

agreement contains mandatory language entitling the employee to that benefit.  *See Clukey*, 717 F.3d at 56-57 (discussing cases).  For example, in *Mard*, Massachusetts law and the employer's collective bargaining agreement gave employees who were injured on the job a right to injury leave benefits.  *See Mard*, 350 F.3d at 186, 188-89.  In *Lowe v. Scott*, 959 F.2d 323, 338 (1st Cir. 1992), the First Circuit held that the physician plaintiff could have had a property interest in privileges at a public hospital only if the hospital's regulations or Rhode Island law had guaranteed that the privileges would not be revoked without cause or a hearing.  In *Laborde-Garcia v. Puerto Rico Telephone Co.*, 993 F.2d 265, 267 (1st Cir. 1993) (Breyer, J.), the First Circuit held that Puerto Rico law narrowed the employer's discretion to decide against reinstating an employee to such a degree that it created an entitlement to continued employment.

Loder does not allege facts that could establish that he had a constitutionally protected property interest in continuing in his temporary duty assignment on the JTTF.  He does not allege that he suffered any decrease in pay or benefits as a result of his removal from the JTTF.  He cites no state law or regulation that says he could not be removed from a temporary duty assignment except for cause or without a hearing.  He does not allege that an applicable collective bargaining agreement required that his temporary assignment to the JTTF be continued absent cause.  Without such allegations, Loder may have had an "abstract concern" in continuing in his assignment to the JTTF, "but he did not have a property interest sufficient to require [Defendants] to give him a hearing" when they ended his temporary assignment to the JTTF.  *Board. of Regents of State Colleges v. Roth*, 408 U.S. 564, 578 (1972).

In a case with allegations similar to Loder's, the District Court for the District of Columbia granted a motion to dismiss the plaintiff's procedural due process claim.  *See Coleman v. Napolitano*, 65 F. Supp. 3d 99, 108 (D.D.C. 2014).  The plaintiff was a criminal investigator within

Homeland Security Investigations in the Department of Homeland Security.  *See id.* at 100.  The plaintiff received a temporary promotion to a position in another DHS department, the Office of Professional Responsibility.  *See id.*  The position was posted as a "temporary assignment."  *See id.* at 101.  When the plaintiff was reassigned from the Office of Professional Responsibility back to Homeland Security Investigations, he claimed that the reassignment violated his due process rights.  *See id.*  After establishing that "the general rule is that no protected property interest is implicated when an employer reassigns or transfers an employee absent a specific statutory provision or contract term to the contrary," the court found that the plaintiff's assignment to the Office of Professional Review was clearly described as "temporary" and there was no indication that the department was required to have "just cause" before reassigning the plaintiff back to his permanent position.  *See id.* at 106-07.  In sum, the court concluded that because "the plaintiff has failed to point to a specific statute or contract term to the contrary granting him a property interest in a permanent assignment to OPR, the reassignment of his position from one department of DHS to another cannot be violative of his due process rights."  *Id.* at 107.

The *Coleman* court quoted an earlier D.C. Circuit case to illustrate the "important policy reasons" for rejecting the plaintiff's argument that a unilateral reassignment of his duties, with no alleged loss of grade or pay, could violate his right to due process:

> To hold that plaintiff has a property interest in all aspects of his job, and therefore that due process must be extended whenever any of his specific duties or responsibilities are changed, would essentially convert any personnel decision made by a public employer into a constitutional case. This would deprive employers of the flexibility they need to make staffing decisions and to assign particular tasks to particular employees. It would allow courts to usurp the role of employers in deciding how employees are to be allocated and when workers with particular assets, or particular liabilities, should perform one set of tasks and not others.

*Id.* at 107 (quoting *Humberson v. United States Atty.'s Office for D.C.*, 236 F.Supp.2d 28, 34 (D.D.C. 2003)).  The *Coleman* court proceeded to cite federal courts across several other circuits

that "have routinely rejected claims that a mere reassignment or change of duties, without a corresponding reduction in rank or pay, amounts to a divestment of a property interest." *Id.* (citing cases). The First Circuit has agreed that a change in job duties does not trigger due process. *See Rosado-Quiñones v. Toledo*, 528 F.3d 1, 5 (1st Cir. 2008) ("because Puerto Rico law does not recognize any property interest in the performance of particular job functions in the course of an employee's continued employment, there was no constitutionally protected interest requiring a due process hearing"). As discussed earlier, the Law Court has agreed that under Maine law, an employee has no property right in specific job duties. *See Pratt*, 2000 ME 203, ¶ 20, 761 A.2d 313 (citing cases).

Because Loder has not alleged facts that could allow this Court to conclude that he had a constitutionally protected property interest in his assignment to a Temporary Duty position on the JTTF, he has failed to state a claim for a procedural due process violation. Count 5 of the Complaint should be dismissed for this reason alone, but in addition, Defendants Johnston and Ireland are entitled to qualified immunity. There is no clearly established constitutionally protected property right in a temporary duty assignment such that a reasonable official in Johnston or Ireland's position would have known that it was unlawful to remove Loder from the JTTF assignment without giving him due process. Qualified immunity protects the defendants from liability unless there was binding caselaw at the time they took action that put the constitutionality of that action "beyond debate." *Belsito Commc'ns, Inc. v. Decker*, 845 F.3d 13, 24 (1st Cir. 2016). That was not the case when Defendants Johnston and Ireland called Loder back from his temporary duty assignment to the JTTF. *See Pratt*, 2000 ME 203, ¶¶ 20, 24, 761 A.2d 313 (holding defendants entitled to qualified immunity in absence of legal authority to support claimed property interest in particular job duties). Therefore, Defendants Johnston and Ireland would be entitled to

dismissal of Count 5 even if the Court found that Loder had a property interest in his temporary assignment to the JTTF.

## II.       Loder Fails to State a Valid Claim for General Injunctive Relief (Count 6)

Loder's final claim (Count 6) is for "Injunctive Relief."  An "injunction" constitutes a form of equitable relief—which may be sought pursuant to a valid claim—rather than the basis of an independent claim or cause of action.  "This does not and cannot mean that [a plaintiff] may not seek injunctive relief in connection with the other substantive counts in the complaint. Injunctive relief is just that, relief; it is not a separate cause of action."   *Diamond Phoenix Corp. v. Small*, No. 05-79-P-H, 2005 WL 1530264, at *4 (D. Me. June 28, 2005) (citing *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004) ("There is no such thing as a suit for a traditional injunction in the abstract.") and *Litton Indus., Inc. v. Colon*, 587 F.2d 70, 74 (1st Cir. 1978)).

To the extent that Count 6 seeks to bring an independent claim pursuant to 25 M.R.S.A. § 2014, that statute does not provide a private cause of action to seek relief.  The Maine Law Court has expressed great hesitancy to "judicially legislate" new causes of action where one does not exist in statute or under the common law, noting that it is improper for courts "to usurp legislative authority."  *Potter v. Schafter*, 161 Me. 340, 341, 343, 211 A.2d 891 (1965); *Hardy v. St. Clair*, 1999 ME 142, ¶ 8, 739 A.2d 368 (quoting *Potter*) (overruled on other grounds by *Brown v. Crown Equipment Corp.*, 2008 ME 186, 960 A.2d 1188); *see also Hottentot v. Mid-Maine Med. Ctr.*, 549 A.2d 365, 367 (Me. 1988) ("[W]e will recognize a private cause of action to enforce a statute only where the legislative intent to create such a remedy is clear.").  The Court should not recognize such a cause of action here.

19

Finally, to the extent that Count 6 seeks to bring an independent claim pursuant to 25 M.R.S.A. § 2011(5)(A)(3), that provision states that "During a state of emergency . . . a person acting on behalf or under the authority of the State or a political subdivision of the State may not . . . [r]equire registration of a firearm or ammunition for which registration is not otherwise required by state law."  Loder's Complaint neither alleges that he has been "required" to register a firearm or ammunition by the MIAC, nor that he was subjected to such a requirement "during a state of emergency."  *Id.* § 2011(5)(A).  Therefore, Loder does not qualify as an "individual aggrieved by a violation" of 25 M.R.S.A. § 2011(5)(A)(3).

Loder is free to pursue injunctive relief to the extent that it is a proper remedy to his viable claims set forth in the Complaint, but because Count 6 fails to state a cognizable stand-alone claim upon which relief may be granted, it should be dismissed.

## CONCLUSION

Defendants respectfully request that this Court dismiss Counts 3, 4, 5, and 6 of the Complaint because there is no plausible path for relief for any of these claims.

Dated:  September 11, 2020                    Respectfully Submitted,

                                            AARON M. FREY
                                            Attorney General


                                            /s/ Paul E. Suitter
                                            Paul E. Suitter
                                            Assistant Attorney General
                                            paul.suitter@maine.gov
                                            Valerie A. Wright
                                            Assistant Attorney General
                                            valerie.a.wright@maine.gov
                                            Six State House Station
                                            Augusta, Maine 04333-0006
                                            Tel.  (207) 626-8800
                                            Fax (207) 287-3145

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this, the 11th day of September, 2020, I electronically filed the

above document with the Clerk of Court using the CM/ECF system which will send notification

of such filing to the following:

Cynthia A. Dill
dillesquire@gmail.com

<div style="margin-left:50%">

/s/ Paul E. Suitter
Paul E. Suitter
Assistant Attorney General
Six State House Station
Augusta, Maine  04333-0006
Tel.  (207) 626-8800

</div>