# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **GEORGE LODER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **2:20-cv-00157-JDL** |
| | ) | |
| **MAINE INTELLIGENCE** | ) | |
| **ANALYSIS CENTER, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER ON DEFENDANTS' MOTION TO DISMISS

Plaintiff George Loder brings this six-count Complaint against the Maine Intelligence Analysis Center ("MIAC"); Colonel John Cote, Chief of the Maine State Police (in his official capacity); Maine State Police Lieutenant Scott Ireland (in his personal capacity); and Maine State Police Sergeant Michael Johnston (in his personal capacity) (collectively, the "Defendants"), after Loder was allegedly retaliated against for reporting the collection and retention of confidential data by the MIAC (ECF No. 1). The Defendants now move to dismiss Counts Three through Six of the Complaint pursuant to Fed. R. Civ. P. 12(b)(6) (ECF No. 10). For the reasons that follow, I grant the Defendants' motion.[1]

## I. BACKGROUND

The following facts are alleged in Loder's Complaint, which I accept as true for the purpose of a motion to dismiss. *See Rodríguez-Reyes v. Molina-Rodríguez*, 711

---

[1] This opinion is SEALED until 5:00pm on March 6, 2021 to give the parties an opportunity to notify the Court, by sealed filings, whether any portions need to be redacted because of confidentiality restrictions.

F.3d 49, 52-53 (1st Cir. 2013).  Loder, a resident of Scarborough, Maine, was hired by the Maine State Police in 1994, where he remains employed as a State Trooper.  In early 2013, Loder was accepted for a fixed-duty position with the FBI's Joint Terrorism Task Force ("JTTF").  The JTTF position was a temporary assignment from the Maine State Police and was purported to be supervised in part by the Maine Intelligence Analysis Center ("MIAC").

The MIAC is a state agency consisting of both civilian and law enforcement personnel from several different state and federal agencies.  It was created by a gubernatorial Executive Order in 2006 for the purpose of ensuring that Homeland Security intelligence information is appropriately shared by federal, state, county, local, and tribal authorities.  It does not conduct law enforcement or criminal investigations, but rather receives, analyzes, and shares information between agencies and makes recommendations to the Governor and the Maine Homeland Security Council.  The MIAC is funded in part with federal dollars.  Defendants Scott Ireland, a Lieutenant with the Maine State Police, and Michael Johnston, a Sergeant with the Maine State Police, supervise the MIAC.

In 2017, Loder learned that Defendant Johnston made a policy change that gave State Police personnel direct access to Maine Drug Enforcement Agency files, many of which contain the identity of active confidential informants.  Loder expressed to Johnston his concern that these disclosures violated the law.  Johnston then "became annoyed and stated [that] '[confidential informants] chose to cooperate with the police.'"  ECF No. 1 ¶ 45.  After this discussion, on the morning of November 14, 2017, Loder was instructed by Johnston to take part in weekly MIAC meetings via

conference call, and to give the MIAC a summary of his active criminal and national security cases.  Loder told Johnston that he could not provide this information to the MIAC as it would be a violation of, among other things, the Privacy Act and related regulations.  Johnston became angry with Loder's refusal and told him that "at the end of the day [Loder was] still a member of the State Police and [Johnston was his] supervisor."  *Id.* ¶ 51. Johnston further "questioned the 'value of having a State Police Detective go around pretending to be an FBI agent.'"  *Id.*  According to the Complaint, "[t]he implication was that if Loder did not comply with the order to share information there would be retribution."  *Id.* ¶ 52.

Following the November 14, 2017 conversation, Johnston emailed Loder instructing him to acknowledge the directive that he attend the MIAC staff meetings. Johnston told Loder that he should share relevant information "in full compliance with any FBI policies, regulations or guidelines in addition to applicable federal laws," and stated that Johnston "defer[red] to [Loder's] judgment on what [he felt was] appropriate, relevant and reasonable to share."  *Id.* ¶ 54.   Accordingly, Loder began attending the MIAC staff meetings while doing his best not to make any disclosures that he believed violated the law or FBI policy.

While attending these meetings, Loder learned that the MIAC retains and shares personal information on individuals who are not suspected of engaging in any criminal or terrorist activity, including information that would otherwise require a subpoena to obtain.  For instance, he learned that the MIAC uses minor offenses as pretexts to conduct background checks on and monitor the social media accounts of people who have engaged in lawful, peaceful protests.  The MIAC then retains the

collected data even after finding no indication of criminal activity.  For example, the MIAC might collect data on individuals associated with public protests, on the basis that littering may occur during those protests.  Additionally, Loder learned that the MIAC retains data collected by automated license plate recognition systems in other states and shared with the MIAC, despite Maine statutory restrictions on the collection of license plate data.  Loder also learned that the MIAC indefinitely maintains records about people who lawfully purchase firearms—including, presumably, Loder, who is the lawful owner and purchaser of firearms—which are collected by the Maine State Police as the designated point of contact for the FBI/National Instant Background Check System (NICS), but which are required by law to be destroyed.  Finally, Loder learned that the MIAC circumvents the accounting requirements of the Privacy Act and related laws in the maintenance of its database.

At a meeting on March 26, 2018, Johnston again instructed Loder to attend MIAC meetings, and to "share away" about the cases Loder was working on for the FBI.  *Id.* ¶ 84.  Loder informed Johnston that, per the Privacy Act and FBI policy, Johnston would need to submit a formal request for information before personally identifying information on the subjects of federal investigations could be disclosed, and that Loder was required to document all disclosures on FD-999 forms which would be inserted into the relevant case files.[2]  Loder also told Johnston that he had concerns about whether the MIAC database was in compliance with federal law.

---

[2] The complaint and the parties' memoranda do not explain what a FD-999 form is, or what agency generated or required the form.

Johnston later told Loder that certain federal regulations did not apply to the MIAC database.

In early April 2018, Loder spoke with the FBI's Assistant Chief Division Counsel for the Boston Division (the "ACDC"). He explained that he was being pressured by Johnston to "share away" FBI information with the MIAC, and that he was uncomfortable disclosing this information without following FBI protocol. *Id.* ¶ 89. The ACDC confirmed that an FD-999 form was required for every disclosure from FBI files, and that Loder was expected to conform with FBI policy. In early May 2018, Loder met with an Assistant United States Attorney (the "AUSA") about Johnston's directive to involve the MIAC staff in FBI investigations. The AUSA shared Loder's concerns about the directive and told Loder that he would be violating Department of Justice Policy should he comply with it.

On May 5, 2018, Loder told Johnston by phone about his discussions with the ACDC and the AUSA , and gave examples of how he believed the MIAC database was unlawful and in violation of federal law. Johnston became angry, telling Loder that "[Ireland] doesn't want to hear" that the MIAC database was unlawful, and demanding to know who Loder spoke to at the United States Attorney's Office. *Id.* ¶ 95. Johnston then changed his mind and said he would straighten the matter out with the United States Attorney if he needed to.

On May 15, 2018, Loder was informed by Johnston and Ireland that he was being removed from the JTTF and reassigned to a fixed-duty desk job at the MIAC in Augusta. Loder's new primary responsibilities would be to conduct computer queries and help maintain the MIAC database, which made Loder extremely uncomfortable.

Loder then requested a lateral transfer to the Major Crimes unit.  Unlike other detectives at the State Police who made such a request, he was required to complete a promotional interview, and on May 16, 2018, he was informed by Johnston and Ireland that his request for a lateral transfer was denied and that he was in fact being reassigned to the MIAC desk job in Augusta.

During this May 16, 2018 conversation, Loder told Ireland and Johnston that by being assigned to a job that monitored the MIAC database he was being forced to engage in unlawful activity.  Ireland then threatened to charge Loder with insubordination if he refused to do what was asked of him.  On May 29, 2018, Loder was summoned to a meeting with Johnston and Ireland and was told that he needed to "get on board with the fusion center concept."  Loder again reiterated his concerns about the MIAC and its database.  Finally, on May 31, 2018, Loder met with Johnston, Ireland, and another Sergeant with the Maine State Police, and was given a document titled "Maine State Police Record of Employee Performance" (the "Incident Report"), which outlined Loder's alleged insubordination.  *Id.* ¶ 110. According to the Complaint, the Incident Report is maintained in the MIAC's database.

Following Loder's return to work after a medical leave, he continued to be denied any position except the desk job at the MIAC overseeing its database.  Loder then took a demotion to serve as a State Trooper, presumably to avoid the MIAC position.

Loder filed his Complaint against the MIAC, Johnston, Ireland, and Cote on May 7, 2020.  The first two Counts of the Complaint relate to the alleged unlawful

retaliation that Loder experienced after questioning the legality of the MIAC's activities and reporting those activities to the Maine State Police, the FBI, and the United States Attorney's Office.  Counts Three through Six allege claims grounded primarily in the Privacy Act, the Due Process Clause, and state firearms laws.  On September 11, 2020, the Defendants filed their motion to dismiss Counts Three through Six for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) (ECF No. 10).  A hearing on the motion was held on December 15, 2020 (ECF No. 20).

## II. LEGAL STANDARDS

### A.    Federal Rule of Civil Procedure 12(b)(6)

A court reviewing a motion to dismiss for failure to state a claim must "accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the pleader's favor."  *Rodríguez-Reyes*, 711 F.3d at 52-53 (quoting *Santiago v. Puerto Rico*, 655 F.3d 61, 72 (1st Cir. 2011)).  To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the complaint "must contain sufficient factual matter to state a claim to relief that is plausible on its face." *Id.* at 53 (quoting *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 44 (1st Cir. 2012)).

Courts apply a two-pronged approach in resolving a motion to dismiss under Rule 12(b)(6).  *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011). First, courts must identify and disregard statements in the complaint that merely offer legal conclusions couched as factual allegations.  *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Second, courts "must determine whether the remaining factual content allows a reasonable inference that the defendant is liable for the misconduct alleged." *A.G. ex rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 80 (1st Cir.

2013) (quotation marks and citation omitted).  Determining the plausibility of a claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 80 (quoting *Iqbal*, 556 U.S. at 679).

## B.    Qualified Immunity

Defendants Johnston and Ireland contend that they are entitled to qualified immunity on Counts Three and Five.  "The qualified immunity doctrine protects . . . state officials from civil liability in the performance of 'discretionary functions insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Martínez-Rodríguez v. Guevara*, 597 F.3d 414, 419 (1st Cir. 2010) (alteration omitted) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982)).  The qualified immunity inquiry involves a "two-part test: '(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was clearly established at the time of the defendant's alleged violation.'" *Penate v. Hanchett*, 944 F.3d 358, 366 (1st Cir. 2019) (quoting *Rocket Learning, Inc. v. Rivera-Sánchez*, 715 F.3d 1, 8 (1st Cir. 2013)).  "Courts need not engage in the first inquiry and may choose, in their discretion, to go directly to the second."  *Id.* (citing *Eves v. LePage,* 927 F.3d 575, 584 (1st Cir. 2019)).

"A rule is clearly established either when it is dictated by controlling authority or a robust consensus of cases of persuasive authority."  *Irish v. Fowler*, 979 F.3d 65, 76 (1st Cir. 2020) (internal quotation marks omitted).  The crucial inquiry is "whether the precedent is 'clear enough that every reasonable officer would interpret it to establish the particular rule the plaintiff seeks to apply' and whether '[t]he rule's

contours [were] so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)).

## III.  DISCUSSION

Because the Defendants raise several of the same arguments with respect to both Count Three and Count Four, I address these counts together.  I then address Counts Five and Six individually.

### A.    Counts Three and Four

In Count Three of the Complaint, which names Johnston and Ireland in their individual capacities, Loder alleges that "[t]he maintenance of the MIAC's unlawful database, including records related to Loder's Incident Report . . . [,] records relating to NICS background checks and the lawful purchase of firearms, and records related to the lawful political and social activity of Loder and other individuals, is a violation of [28 C.F.R. ch. 1 pt. 23] and the Privacy Act."  ECF No. 1 ¶ 137.  Accordingly, Loder contends that Johnston and Ireland, by committing these acts, acted under color of state law to deprive Loder of his federal constitutional or statutory rights in violation of 42 U.S.C.A. § 1983 (West 2021).

Similarly, in Count Four of the Complaint, which names the State Police (presumably meaning Defendant Cote in his official capacity as Chief of the Maine State Police) and the MIAC, Loder contends that that the Maine State Police and the MIAC's retention of Loder's Incident File and information regarding Loder's lawful purchase of firearms and his political and social activity violates the Privacy Act, 5 U.S.C.A. § 552a (West 2021).  Additionally, he contends that the Maine State Police

and the MIAC violated the Privacy Act by ordering Loder to maintain an illegal database, conditioning Loder's position with the JTTF on his willingness to violate the Privacy Act, and retaliating against Loder for refusing to violate the Privacy Act.

The Defendants raise a number of challenges to these claims. With regard to both claims, they contend that the Privacy Act does not apply to state agencies or employees.[3] With respect to Count Three, the Defendants further argue that § 1983 does not provide relief for Privacy Act violations, that 28 C.F.R. ch. I, pt. 23 ("Part 23") does not provide for any cause of action upon which to seek relief, and that even if there is a viable claim against Johnston and Ireland they are entitled to qualified immunity. I address each argument in turn.

### 1. The Application of the Privacy Act to State Agencies/Employees

The federal Privacy Act of 1974, 5 U.S.C.A. § 552a, "gives agencies detailed instructions for managing their records and provides for various sorts of civil relief to individuals aggrieved by failures on the Government's part to comply with the requirements." *Doe v. Chao*, 540 U.S. 614, 618 (2004). The Act was designed "to protect the privacy of individuals identified in information systems maintained by Federal agencies" by "regulat[ing] the collection, maintenance, use, and dissemination of information by such agencies." *Id.* (quoting Privacy Act of 1974, Pub. L. No. 93-579, § 2(a)(5), 88 Stat. 1896, 1896).

As the Defendants note, the First Circuit—along with a number of other circuits—has noted that "the private right of action created by . . . the Privacy Act is

---

[3] The Defendants also argue that Counts Three and Four fail to place the Defendants on notice of what Privacy Act harms Loder has suffered or what violations the Defendants have committed. Because I grant the Defendants' motion on other grounds, I do not address this argument.

limited to actions against agencies of the federal government and does not apply to state agencies or individuals." *Perez-Santos v. Malave*, 23 F. App'x 11, 12 (1st Cir. 2001) (per curiam) (citing *Dittman v. California,* 191 F.3d 1020, 1026 (9th Cir. 1999); *Polchowski v. Gorris,* 714 F.2d 749, 752 (7th Cir. 1983); *Wren v. Harris,* 675 F.2d 1144, 1148 n.8 (10th Cir. 1982)); *see also* 5 U.S.C.A. §§ 552a(a)(1), 551(1) (" 'agency' means each authority of the Government of the United States . . . ."). [4] However, Loder argues that because the Maine State Police and the MIAC acted as agents of the FBI in conducting NICS background checks on firearm purchasers, they are essentially agencies of the federal government subject to the Privacy Act's restrictions.

"Before characterizing an entity as 'federal' for some purpose, [the Supreme] Court has required a threshold showing of substantial federal supervision of the private activities, and not just the exercise of regulatory authority necessary to assure compliance with the goals of [a] federal grant." *Forsham v. Harris*, 445 U.S. 169, 180 n.11 (1980). This federal supervision must be "extensive, detailed, and virtually day-to-day." *Id.* at 180. Loder contends that the State Police and the MIAC meet this high standard.

The Complaint alleges that the MIAC accepts federal funds. It further alleges that the Maine State Police is the designated state point of contact for initiating NICS background checks for firearm transfers, and that the NICS is mandated by federal law and was developed by the FBI. In Maine, according to the Complaint, Federal

---

[4] *See Pennyfeather v. Tessler*, 431 F.3d 54, 56 n.1 (2d Cir. 2005) (noting that § 552a(a)(1) "incorrectly cross-references 5 U.S.C.A. § 552(e)," and explaining why the definition of "agency" in 5 U.S.C.A. § 551(1) applies to § 552a(a)(1)).

Firearms Licensees contact the NICS through the Maine State Police to initiate NICS background checks. The Maine State Police conduct the NICS background checks and determine whether the transfers would violate state or federal law.[5] In his response to the Defendant's motion to dismiss, Loder attaches an exhibit titled "PROTOCALL [sic] FOR FBI NICS CALLS," which appears to indicate the Maine State Police's involvement in NICS background checks.[6] ECF No. 14-3.

Loder does not cite any case in which a court has treated a state agency as a federal agency for purposes of the Privacy Act, nor does he cite any statute with an equivalent definition of "agency." The Defendants, meanwhile, point to *St. Michael's Convalescent Hospital v. State of California*, where the Ninth Circuit noted that even though a state agency received federal funding and was "highly regulated by the federal government," "those regulations do not convert acts of local and state governmental bodies into federal governmental acts." 643 F.2d 1369, 1374 (9th Cir. 1981).

While Loder attempts to distinguish *St. Michael's* from the instant case by repeating the legal conclusion that the Maine State Police and the MIAC "work[] as . . . agent[s]" of the federal government, ECF No. 14 at 3, he does not allege any additional federal involvement that can fairly be characterized as "extensive,

---

[5] In his response to the Motion to Dismiss, Loder states that "The FBI/ NICS calls the State Police and asks it to complete a state criminal history to use in conjunction with other NICS information gathering from other jurisdictions." ECF No. 14 at 3. I have used the description of the Maine State Police/ NICS interactions contained in the Complaint.

[6] The Defendants argue that this exhibit should not be considered, as it was not attached to the Complaint or incorporated therein. *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993). Loder contends that the document falls into an exception for "documents central to plaintiffs' claims." *Id.* I do not reach this issue, as the document does not substantially affect the merits of Loder's claims.

detailed, and virtually day-to-day," *Forsham*, 445 U.S. at 180.  In fact, the Complaint suggests that the Maine State Police conducts NICS background checks largely independent of federal oversight.  Accordingly, the Complaint does not sufficiently allege facts that would allow this Court to determine that the Privacy Act applies to the actions of the Maine State Police, the MIAC, Johnston, or Ireland that are at issue in this case.

### 2.    42 U.S.C.A. § 1983

The Defendants further argue that Loder cannot rely on § 1983 as a vehicle to seek remedies for Privacy Act violations, and that Count Three should therefore be dismissed.

"[Section] 1983 does not provide an avenue for relief every time a state actor violates a federal law.  As a threshold matter, the text of § 1983 permits the enforcement of "*rights,* not the broader or vaguer 'benefits' or 'interests.'"  *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 119-20 (2005) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002)).  Moreover, even if an enforceable right exists, "there is only a rebuttable presumption that the right is enforceable under § 1983."  *Id.* at 120 (quoting *Blessing v. Freestone*, 520 U.S. 329, 341 (1997)).  Such a presumption may be defeated where, among other things, "congressional intent may be found directly in the statute creating the right, or inferred from the statute's creation of a 'comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.'"  *Id.* (quoting *Blessing*, 520 U.S. at 341).

The Defendants focus on the second part of this test, and argue that the comprehensive enforcement scheme of the Privacy Act is incompatible with § 1983

enforcement.  At least two Circuit Courts that have addressed this issue agree that "Congress, by enacting the Privacy Act . . . has provided comprehensive private remedies for unwarranted disclosures of personal information" which "foreclose[] the use of Sec. 1983 as a remedy." *Polchowski*, 714 F.2d at 752; *see also Dittman*, 191 F.3d at 1029 ("[W]ere we to hold that Plaintiff could pursue a Privacy Act claim under § 1983, we would circumvent the intent of Congress that the rights secured by the Privacy Act be enforceable only against federal agencies.").  Furthermore, two additional Circuit Courts have also noted that "Congress created a comprehensive Privacy Act scheme." *Wilson v. Libby*, 535 F.3d 697, 710 (D.C. Cir. 2008); *see also Schwier v. Cox*, 340 F.3d 1284, 1287 (11th Cir. 2003) ("Section 3 of the Privacy Act . . . contains a comprehensive remedial scheme which includes the right to bring a civil action against a federal agency."

Loder does not meaningfully counter the argument that the Privacy Act's comprehensive enforcement scheme is incompatible with § 1983 enforcement. Instead, he points simply to the general proposition that § 1983 "means what it says," *Maine v. Thiboutot*, 448 U.S. 1, 4 (1980).  While § 1983 does indeed "encompass violations of federal statutory as well as constitutional law," *id.*, this does not foreclose the fact that § 1983 does not apply to every possible violation of federal law. Accordingly, I conclude that § 1983 does not provide a remedy for Privacy Act violations, and that Count Three should be dismissed on this basis as well.

3.    **28 C.F.R. ch. 1 pt. 23: the "Criminal Intelligence Systems Operating Policies"**

The Defendants further argue that to the extent that Count Three attempts to state a claim for relief pursuant Part 23—the "Criminal Intelligence Systems Operating Policies"—those regulations do not provide any cause for relief. "Private rights of action to enforce federal law must be enacted by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).

Loder does not address this argument. There is nothing in the text of Part 23 to indicate that it was intended to create a private right of action. Additionally, Loder is not entitled to relief for violation of Part 23 under the Privacy Act as "any rule promulgated thereunder," 5 U.S.C. § 552a(g)(1)(D), because the Criminal Intelligence Systems Operating Policies were promulgated under the Omnibus Crime Control and Safe Streets Act of 1968, not the Privacy Act. *See* 28 C.F.R. § 23.1. This presents an additional basis for the dismissal of Count Three.

4.    **Qualified Immunity**

Finally, the Defendants argue that even if Count Three were not flawed, Johnston and Ireland are entitled to qualified immunity, because, as noted above, there is no clearly established law that the Privacy Act governed the acts of Johnston and Ireland, who are state officials. Loder does not address this argument in his response, and the Defendants contend that this waiver provides an independent ground for dismissal as to the claims against Johnston and Ireland. At oral argument, Loder's counsel responded to the Defendants' qualified immunity argument as simple "boilerplate" and did not meaningfully address the argument.

Loder fails to allege any basis by which this Court could conclude that Johnston and Loder violated a clearly established right with respect to Count Three. Meanwhile, as discussed above, there is ample support for the conclusion that the Privacy Act does not apply to state officials, and there is no clearly established law indicating that Johnston and Ireland's activities present an exception to that conclusion.  Thus, even if Johnston and Ireland's conduct did violate Loder's rights under the Privacy Act, a reasonable officer in either Johnston or Ireland's position would not have been aware that his or her conduct violated that law.  Accordingly, Johnston and Ireland are entitled to qualified immunity as to Count Three.

## B.    Count Five: Procedural Due Process

Count Five of Loder's complaint briefly alleges a procedural due process claim against Johnston and Ireland under § 1983, stating only that "Loder had a property right in his job as a member of the JTTF" and that "[a]cting under color of state law, Johnston and Ireland deprived Loder of rights secured to him by the 5th and 14th Amendment[s] to the U.S. Constitution by denying him due process of the law."  ECF No. 1 ¶¶ 150-51.

"To state a procedural due process claim under § 1983, the plaintiff must allege facts which, if true, establish that the plaintiff (1) had a property interest of constitutional magnitude and (2) was deprived of that property interest without due process of law." *Clukey v. Town of Camden*, 717 F.3d 52, 54-55 (1st Cir. 2013). "The threshold issue in a procedural due process action is whether the plaintiff had a constitutionally protected property interest at stake.  The Due Process Clause guarantees individuals procedural protections from state actions that deprive those

individuals of their property interests in certain entitlements and benefits." *Id.* (internal quotation marks and citations omitted).

"In considering whether state law creates an entitlement, [a court] look[s] primarily to the discretion state law accords state actors to withhold the entitlement from individuals.  In general, 'a benefit is not a protected entitlement if government officials may grant or deny it in their discretion.'" *Id.* (quoting *Town of Castle Rock v. Gonzales,* 545 U.S. 748, 756 (2005)).  A collective bargaining agreement that "uses mandatory language" may create a constitutionally protected property interest in continued employment.  *Id.* Where a property interest in a public employee's continued employment exists, it may extend to their rank, "such that they may not be demoted without due process."  *Id.* (citing *Acosta-Orozco v. Rodriguez-de-Rivera*, 132 F.3d 97, 98, 104 (1st Cir. 1997)).

The Defendants argue that the Complaint "does not allege facts that could establish that [Loder] had a constitutionally protected property interest in continuing his temporary duty assignment on the JTTF."  ECF No. 10 at 16.  In response, Loder argues that he "is a member of the Maine State Troopers Association" and has rights created "by the collective bargaining agreement it has with the State of Maine."  ECF No. 15 at 4.  He includes in his response a hyperlink to a 2019-2021 Agreement between the State of Maine and the Maine State Troopers Association.

The Defendants contend that the 2019-2021 Agreement should not be considered as it was not attached to the Complaint or incorporated therein.  *See Watterson*, 987 F.2d at 3.  However, I do not reach this issue, as none of the events outlined in the Complaint are alleged to have taken place between 2019 and 2021.

Thus, the 2019-2021 Agreement does not benefit Loder's argument. Moreover, the Complaint itself makes no allegations regarding any "mandatory language" in the Agreement that would entitle Loder to due process prior to his alleged demotion. *Clukey*, 717 F.3d at 56. The Complaint makes passing reference to "the CBA" only once, arguing that "[b]y denying Loder a lateral transfer contrary to civil service laws, personnel rules, *the CBA* and past practice, defendants discriminated against Loder and treated him differently because he blew the whistle on the MIAC." ECF No. 1 ¶ 104 (emphasis added). This passing, abbreviated reference—with no explanation of the actual content of the Collective Bargaining Agreement—does not rise to the level of factual specificity required for a plaintiff to adequately plead a procedural due process claim.

I conclude that the Complaint does not make a plausible claim for a violation of procedural due process. Without wading into the questions of whether the attached Agreement actually creates a property interest in Loder's rank or whether Loder was actually constructively demoted—both of which the Defendants dispute—the Complaint simply does not contain factual allegations sufficient to support the conclusion that state law or the Collective Bargaining Agreement forbade Loder's superiors from demoting him in their discretion. Accordingly, Count Five must be dismissed.

## C.    Count Six: Injunctive Relief

Count Six of the Complaint—titled simply "Injunctive Relief"—argues that the Defendants violated 25 M.R.S.A. § 2014, which prohibits the State from keeping a firearms registry; 25 M.R.S. § 2011(5)(A)(3), which prohibits the State from requiring

registration of firearms during a state of emergency; Part 23; the Privacy Act; and "other federal and state laws."  ECF No. 1 ¶ 155.  Count Six then asks that "the activities of defendants" be enjoined.  *Id.*  The Defendants argue that this claim must be dismissed because injunctive relief cannot be a separate cause of action.

"[A] general claim for equitable relief may not stand alone and is merely an appendage of some other cause of action," because "[i]njunctive relief is just that, relief."  *Diamond Phoenix Corp. v. Small*, No. 05-79-P-H, 2005 WL 1530264, at *4 (D. Me. June 28, 2005) (internal quotation marks omitted); *see also Litton Indus., Inc. v. Colon*, 587 F.2d 70, 74 (1st Cir. 1978) (noting that injunctive relief "must be based on a valid cause of action alleged in the complaint").  Accordingly, even if Loder could move forward with his Privacy Act and procedural due process claims, a nebulous separate claim for injunctive relief cannot stand.[7]

Loder attempts to frame this claim as one alleging a violation of 25 M.R.S.A. §§ 2011(5)(A)(3) and 2014.  Section 2014 does not create a private cause of action to seek relief, but section 2011(5)(A)(3) does allow aggrieved individuals to seek injunctive relief where, "[d]uring a state of emergency," a state authority "require[s] registration of a firearm . . . for which registration is not otherwise required by state law."  25 M.R.S.A. § 2011(5)(A)(3); *see id.* § 2011(5)(B).  However, even accepting the idea that Count Six is grounded in section 2011, the facts alleged in the Complaint are insufficient to state a claim under this statute.

---

[7] This Order does not preclude Loder from seeking injunctive relief under Counts One and Two of the Complaint.

The Complaint makes no allegation that Loder was required to register a firearm for which registration was not otherwise required during a state of emergency.  At best, it alleges that data acquired during lawful background checks (which, in Loder's case, presumably took place before the state of emergency caused by the COVID-19 pandemic) was unlawfully retained, and that it continues to be retained unlawfully.  This conduct is fundamentally different from the conduct proscribed by section 2011(5)(A)(3).  Accordingly, even generously construing this claim as one arising under section  2011, Count Six must be dismissed.[8]

## IV. CONCLUSION

For the reasons stated above, it is ORDERED that the Defendants' Motion to Dismiss (ECF No. 10) is **GRANTED**, and that Counts Three through Six of the Complaint (ECF No. 1) are **DISMISSED**.

**SO ORDERED.**

**Dated:  March 3, 2021**

_____/s/ **JON D. LEVY**_____
**CHIEF U.S. DISTRICT JUDGE**

---

[8]  At the hearing conducted on December 15, 2020, Loder's counsel raised a potential equal protection claim for the first time.  As neither the Complaint nor the parties' memoranda of law address an equal protection claim, I do not address such a claim in this Order.