## UNITED STATES DISTRICT COURT
### FOR THE
### DISTRICT OF MAINE

| | |
|---|---|
| GEORGE LODER, | |
| Plaintiff, | |
| v. | CIVIL ACTION NO. 2:20-cv-00157-JDL |
| MAINE INTELLIGENCE ANALYSIS CENTER, et al., | |
| Defendants. | |

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
### WITH INCORPORATED MEMORANDUM OF LAW

Pursuant to Federal Rule of Civil Procedure 56, Defendants Maine Information and Analysis Center[1] ("MIAC") and Col. John Cote (collectively "Maine State Police" or "MSP"), as well as Lieutenants Scott Ireland and Michael Johnston hereby submit the following Motion for Summary Judgment with incorporated memorandum of law and request that summary judgment be entered in their favor on both of Plaintiff's remaining claims.

### *Nature of Claims*

After the Court granted Defendants' Motion to Dismiss (ECF No. 10), the claims that remain in the case are a retaliation claim under the Maine Whistleblowers' Protection Act ("WPA") (Count 1) against the MSP and a First Amendment retaliation claim brought under 42 U.S.C. § 1983 against Ireland and Johnston in their individual capacities (Count 2).

### *Facts*

The MIAC is a unit of the Maine State Police under the command of the MIAC Director, a Maine State Police Lieutenant appointed by the Colonel of the Maine State Police. Joint Stip.

---

[1] The lawsuit is captioned "Maine Intelligence Analysis Center," but the unit of the Maine State Police is in fact called the "Maine Information Analysis Center."

Facts ("JSF") ¶ 45. Defendant Col. John Cote is Chief of the MSP and is the commanding officer who oversees the entirety of the MSP. Def.s' Statement Mat. Facts ("DSMF") ¶ 1. Cote leads the four-person Command Staff of the MSP, which also includes the Lt. Col. as Deputy Chief, as well as an Operations Major and a Support Services Major. *Id.* ¶¶ 1-5. Defendant Lt. Scott Ireland is a 27-year employee of the MSP who served as the Director of the MIAC from January 2015 through October 2018. JSF ¶¶ 7-9. Defendant Lt. Michael Johnston is a 20-year employee of the MSP who served as the Sergeant overseeing the day-to-day operations of the MIAC from mid-2016 through October 2018. *Id.* ¶¶ 1-6. From October 2018 until 2021, Lt. Johnston served as the Director of the MIAC. *Id.* ¶ 6

Plaintiff George Loder is an employee of the Maine State Police ("MSP") who began his employment in 1994 and has worked most of his career as a Trooper on the interstate highway. JSF ¶¶ 20, 42. Loder's career with the MSP has been mixed. Loder has received at least four disciplinary suspensions during his career. DSMF ¶ 7. One of those suspensions occurred in 1998 after an internal investigation found that Loder had made a false statement to an internal investigating officer. *Id.* ¶ 7. In addition to his disciplinary suspension for that incident, Loder was determined to be "*Giglio*-impaired". *Id.* ¶ 8. A law enforcement officer is *Giglio*-impaired when there has been an adverse finding about his or her truthfulness, bias, or ability to accurately recall information, as occurred when Loder was found to have been untruthful in an official proceeding. *Id.* ¶ 133. The MSP is obligated to disclose to prosecutors any such *Giglio* impairments so that the State may fulfill its discovery obligations pursuant to *Brady* and *Giglio*.[2] *Id.* ¶¶ 133-34.

Nevertheless, Loder also made some advancements in his career over time. In March 2012, Loder was promoted to a Detective position in the MIAC, a position based in Augusta. JSF ¶¶ 21-

---

[2] *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972). *See also* M.R.U. Crim. P. 16(a)(2)(D); M.R. Prof. Conduct 3.8(b).

23; DSMF ¶¶ 8-9. Loder held the same Detective position within the MSP from March of 2012 until November 4, 2018, when he demoted back to being a Trooper. DSMF ¶ 15.

Soon after Loder began his Detective duties in the MIAC in 2012, he decided that he did not enjoy his new position in the MIAC. DSMF ¶ 11. Later in 2012 or 2013, Loder was given a Temporary Duty Assignment to the FBI's Joint Terrorism Task Force (JTTF). *Id.* ¶¶ 13-14; JSF ¶ 25. Loder believed that the minimum time he was likely to serve on the JTTF was three years. DSMF ¶ 17. But he also understood that his assignment to the JTTF was not permanent and that management could reassign him based on the operational needs of the MSP. *Id.* ¶ 16.

Although the JTTF is operated by the FBI, Loder remained employed by the MSP as a Detective throughout the time he was assigned to the JTTF and was never employed by the federal government. JSF ¶¶ 26-28. For purposes of his JTTF work, FBI Supervisory Senior Resident Agent ("SSRA") Aaron Steps was Loder's Supervisor. *Id.* ¶ 17. Loder also worked at times with the United States Attorney's Office for the District of Maine, specifically Assistant U.S. Attorney Richard "Rick" Murphy. JSF ¶ 18; DSMF ¶ 18. Loder continued to receive performance evaluations from his MSP supervisors in the MIAC. DSMF ¶¶ 25, 30-31, 59.

By 2016, Defendant Ireland was the Lieutenant responsible for overseeing the MIAC, and Defendant Johnston was the Sergeant responsible for overseeing the day-to-day operations of the MIAC. JSF ¶¶ 3-4, 9. Around November 2017, Johnston instructed Loder to attend weekly MIAC meetings via conference call. DSMF ¶ 25. Johnston made this decision for several reasons: 1) to better leverage Loder's position on the JTTF for the needs of the MIAC and MSP; 2) to integrate Loder more with his MIAC colleagues since Loder's Temporary Duty Assignment was based in Portland and the MIAC is based in Augusta; and 3) to comply with formal FBI guidance that fusion center directors examine their local JTTF office and determine how communication and

relationships could be improved between the two. *Id.* ¶¶ 25-26. In an email to Loder, Johnston noted that "[t]he purpose of this meeting is to share information with other members of the unit and to increase your situational awareness of MIAC's activities." DSMF ¶ 25.

Loder resisted Johnston's instruction to share any information about his activities on the JTTF. *Id.* ¶ 21. Loder told Johnston that he was hesitant to share information because Loder felt that the information belonged to the FBI and the federal government. *Id.* Loder further told Johnston that he was not free to share certain information without following certain federal rules and regulations and that he could not share other information at all. *Id.* Loder told Johnston this despite the fact Loder understood that he could share at least some information with the MIAC while complying with all necessary federal laws, regulations, and rules. *Id.* ¶ 22. During this time period, Loder received advice from FBI Assistant Chief Division Council Alethea Harris regarding how to appropriately disclose information to the MIAC. *Id.* ¶ 29. Harris did not instruct Loder not to attend weekly MIAC meetings or to not disclose information to the MIAC, but merely advised that any disclosures he made should be Privacy Act compliant. *Id.*

On one occasion, Loder and Johnston had a phone conversation about Loder's concerns about sharing JTTF information with the MIAC. *Id.* ¶ 19. This and other calls that Johnston had with Loder about Loder's MSP and JTTF service took place on phones subsidized by MSP money, whose numbers were circulated among MSP officers in order to contact each other for MSP activity. *Id.* ¶ 24. Johnston followed up the phone call with Loder in an email to Loder's MSP and JTTF email address, stating that Loder's should "share relevant information that is in full compliance with any FBI policies, regulations, or guidelines in addition to applicable federal laws." *Id.* ¶ 73. Johnston further stated that he would "defer to [Loder's] judgment on what [Loder] feel[s] is appropriate, relevant, and reasonable to share." *Id*. Loder did not receive any instruction

from his FBI supervisor Aaron Steps barring him from attending MIAC meetings or sharing information with the MIAC. *Id.* ¶ 28.

Around March 25, 2018, Johnston met with Loder to go over his annual performance evaluation. *Id.* ¶ 30. Loder received a generally satisfactory evaluation, but two areas were flagged that needed improvement: 1) Loder's communication with the MIAC in order to better leverage his position on the JTTF; and 2) a need for more timely submission of reports to Loder's FBI supervisor Aaron Steps. *Id.* ¶ 31. At the time of this meeting, Johnston had no reason to believe that Loder's Temporary Duty Assignment to the JTTF would come to an end. *Id.* ¶ 30.

Throughout 2017 and into 2018, Loder and David Pelletier were the only two MSP Detectives holding permanent positions stationed at the MIAC. *Id.* ¶ 35. Pelletier's assignment included some MIAC analysis work, but also included the day-to-day work of the Weapons and Professional Licensing tasked to the MSP by Maine state law. *Id.* Pelletier had informally spoken as early as January 2018 about a desire to retire later that year. *Id.* ¶ 36. However, Pelletier did not specifically announce when he was retiring until two to three months before his actual retirement date of August 3, 2018. *Id.*

Upon notification that Pelletier would retire in August, MSP Command Staff member and Operations Major Christopher Grotton was forced to consider how to allocate personnel resources in response. *Id.* ¶¶ 37-38. Grotton was aware that there were already significant Trooper vacancies in the MSP and that no other unit under his command could afford to transfer a Detective into the MIAC. *Id.* ¶ 38. Further, Grotton and the rest of the Command Staff had been questioning for years the value of having a Detective assigned to the JTTF. *Id.* ¶ 41. Although there was some value in such an assignment, Grotton considered it a relatively low priority compared to the assignments tasked to Pelletier, which were mandated by Maine statute. *Id.* ¶¶ 41-42. Grotton knew Loder had

been assigned to the JTTF for five years, which was two years more than what Grotton considered an appropriate amount of time. *Id.* ¶ 47. Grotton determined the best way to fill the vacancy created by Pelletier's retirement was to call back to the MIAC the only other Detective who held a MIAC position in order to fill it. *Id.* ¶¶ 35, 47-48, 50. Grotton further determined that because there was not a significant amount of time before Pelletier's retirement, it would be best to call Loder back fairly quickly to train with Pelletier directly in order to retain Pelletier's institutional knowledge before his retirement. *Id.* ¶¶ 49-50. Grotton shared this information with fellow Command Staff members Col. John Cote and Maj. Brian Scott, who supported the decision. *Id.* ¶ 50. Grotton also discussed the decision with Lt. Scott Ireland, who likewise supported the decision and who carried it out upon Grotton's instruction. *Id.* ¶ 51. Once Grotton instructed Ireland to call Loder back from the JTTF, Ireland would have been insubordinate and subject to disciplinary action had he ignored Grotton's instructions. *Id.* ¶ 53. At the time that Grotton made this decision, neither he, the rest of the MSP Command Staff, Ireland, nor Johnston had any knowledge that Loder believed the MIAC was engaged in any illegal activity. *Id.* ¶¶ 54, 56.

On May 15, 2018, Ireland and Johnston called Loder to the MIAC office in Augusta in order to have Loder sign to acknowledge his annual performance evaluation. *Id* ¶ 59. The purpose of this meeting was also to inform Loder that due to the operational needs of the MSP, Loder was being called back from the JTTF part-time in order to train with Pelletier so that Loder could fully replace Pelletier upon his retirement. DSMF ¶ 59. On May 22, Ireland followed up by email to Loder that Loder would start working one day per week at the MIAC until Pelletier retired to prepare Loder to take over Pelletier's work. *Id.* ¶ 65.

May 29, 2018 was the first day Loder was supposed to return part-time to the MIAC to train with Pelletier. *Id*. When Loder did not show up to work, Ireland called Loder and told him to

report to the MIAC. *Id.* ¶ 66. Upon arrival, Loder met with Ireland and Johnston, and they gave Loder an updated job description, which included Pelletier's former duties related to weapons permits and professional licensing as well as MIAC duties. *Id.* ¶ 69. During this meeting, Loder expressed a number of reservations about working at the MIAC, including commute time, a desire to work outside an office setting, and also a belief that the MIAC was in violation of federal privacy law. *Id.* ¶ 70. This was the first time Johnston, Ireland, or anyone with the MSP became aware of Loder's mistaken belief that the MIAC was violating federal law.[3] *Id.* ¶ 71.

In response to being told that he would be working in Augusta, Loder requested approximately two months of vacation time. *Id.* ¶ 74. Ireland and Johnston told Loder that he would be able to use his accrued vacation time, but Loder would need to report to the MIAC for part of this period in order to train with Pelletier before Pelletier's retirement. *Id.* ¶ 75. On May 31, Johnston emailed Loder about the time he would be required to work before Pelletier retired in order for Loder to learn Pelletier's job in the MIAC and with the Weapons and Professional Licensing Unit. *Id* ¶ 78.

Shortly thereafter Loder requested to take medical leave under the Family Medical Leave Act ("FMLA"). JSF ¶ 31. Loder took his twelve full weeks of FMLA leave time, as well as some additional sick time. *Id.* ¶ 33. Pelletier retired on August 3, 2018 while Loder was still on medical leave. *Id.* ¶ 11. On September 28, a position was posted for a MCU-S Detective, which Loder applied for. *Id.* ¶¶ 37-38; DSMF ¶ 89. The following week Loder was cleared to return to work by his doctors, and he returned to working in the MIAC on October 3. JSF ¶¶ 35-36.

Loder interviewed for the MCU-S Detective position on October 22, 2018. *Id.* ¶ 39. As the Command Staff has done on other occasions in similar circumstances, Loder—the only candidate

---

[3] As decided by the Court in its order dismissing Loder's Privacy Act claims, the federal Privacy Act does not apply to state agencies such as the MIAC. Order on Defendants' Motion to Dismiss (ECF 32) at 10-13.

of the four who was seeking to transfer from a different detective position—was interviewed as were the three Troopers seeking a promotion to MCU-S Detective. DSMF ¶ X. The interview panel members for Loder and the three Troopers were Col. Cote, Lt. Col. Harwood, Major Scott, and the then-commander of MCU-S, Lt. Mark Holmquist. JSF ¶ 39: DSMF ¶ 144. Loder was not selected for the position. JSF ¶ 40. Instead, the panel unanimously agreed that the applicant they selected, Trooper Coflesky, was the best candidate for the position. DSMF ¶¶ 90, 102-03.

The panel looked for the candidates to demonstrate the skills necessary to perform well as a MCU-S Detective. *Id.* ¶¶ 96, 98-99, 107, 121. Specifically, they were looking for experience that would translate well to the types of investigations that MCU-S Detectives encounter most frequently—homicides, child abuse, sexual assaults, and other serious, mostly violent crimes. *Id.* They were also looking for candidates who had shown that they could work well as part of a team, including taking direction; that they could lead a team; and that they could conduct investigations other than homicide from start to finish without much supervision. DSMF *Id.*

The selected candidate, Coflesky, had significant experience as a Troop Investigator with primary responsibility for investigating property crimes (including armed home invasion) and drug overdoses. *Id.* ¶¶ 122, 124, 127. Coflesky had worked alongside officers from other federal, state, and local law enforcement, including the MCU-S. *Id.* ¶ 122. The MCU-S had chosen him to assist with homicide investigations; in one of these investigations, his work was pivotal in identifying the suspect who was ultimately convicted of the crime. *Id.* Coflesky provided specific examples in his interview of cases in which he was the initial responder or co-responder and worked the investigations from the initial interviews, crime scene processing, evidence control, working with the crime lab and crash reconstruction experts, working with other agencies, and continuing to see the cases through grand jury and prosecution. *Id.* ¶ 123. He thoroughly explained the specific steps

he would follow to investigate a child sexual abuse allegation. *Id.* ¶ 126. He showed that he could not only take full ownership of an investigation but could also be relied on to do whatever a team leader needed him to do. *Id.* ¶¶ 122, 124, 127. In addition to managing his primary responsibilities, Coflesky was a member of the MSP's tactical team. *Id.* ¶ 127. His experience was impressive and was directly relevant to the work that MCU-S Detectives do. *Id.* ¶¶ 127-29.

Loder failed to impress the interviewers. *Id.*  ¶¶ 108-19. Loder had spent most of his career as a Trooper on the Interstate. *Id.* ¶ 110. Unlike Coflesky, he did not have experience as a Troop Investigator. *Id.* ¶ 125. Most of his investigative experience came from his time on the JTTF, but in his interview, he only discussed one or two cases that he worked on at the JTTF. *Id.* ¶ 111. He indicated that he had worked primarily in an assistive capacity on the JTTF and did not talk about being primarily responsible for any cases from start to finish. *Id.* ¶¶ 112-13. Loder had little experience with child abuse, suspicious death cases or working crime scenes. *Id.* ¶¶ 108-09, 114-16. He had difficulty answering a question about how he would handle a child sexual abuse allegation and acknowledged that he did not have much experience in that area. *Id.* ¶¶ 114-16. While Loder had experience on the JTTF involving fraud and embezzlement, the MCU-S Detectives rarely handle such cases. *Id.* ¶ 117. The interviewers perceived that Loder simply did not have the experience Coflesky had, either in taking primary responsibility for investigations, or in working on homicides, suspicious deaths, child abuse, or other violent crimes, which are the most common types of cases handled by MCU-S Detectives. *Id.* ¶¶ 109, 115, 119, 121, 124, 129.

Additionally, Loder has been deemed to be *Giglio*-impaired. *Id.* ¶¶ 8, 138, 141. Harwood and Cote knew about the *Giglio* impairment and thought it was an impediment to being an effective MCU-S Detective. *Id.* ¶¶ 138-41. Cote, the Chief and the ultimate decision-maker, would not have supported hiring Loder as an MCU-S Detective for this reason alone. *Id.* ¶¶ 139-40. Scott did not

know whether Loder was *Giglio*-impaired but thought he might be based on something Loder brought up in his interview. *Id.* ¶¶ 130-31. Had Loder otherwise been a top choice for the position, Scott would have wanted to know more about it because he knew *Giglio* impairment could hinder a MCU Detective's effectiveness. *Id.* ¶ 132. Holmquist did not know that Loder was *Giglio*-impaired but he would not have supported hiring Loder if he had known. *Id.* ¶¶ 135-37. No current MCU Detectives are *Giglio*-impaired. *Id.* ¶ 142.

The substance of any statements Loder had made about his opinion of the legality of the MIAC's activities did not cause any of the interviewers' decisions to select Coflesky for the MCU-S Detective position. *Id.* ¶ 143. Instead, it was the comparative skills, knowledge and experience of the candidates, and how they demonstrated these at their interviews (and, for Harwood and Cote, the *Giglio* problem). *Id.* ¶¶ 129, 143. Whatever Loder thought about the MIAC's activities was not a factor in their assessment of the candidates' qualifications. *Id.* ¶ 143.

Shortly after he was informed that he was not selected for the MCU-S position, Loder requested a demotion to Trooper in Troop G (the Maine Turnpike), which was granted on November 5, 2018. JSF ¶¶ 40-41. This suit followed.

## *Argument*

### I.  Standard of Review on Summary Judgment

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014). For summary judgment purposes, "genuine" means that "a reasonable jury could resolve the point in favor of the nonmoving party," and a "material fact" is one whose "existence or nonexistence has the potential to change the outcome of the suit." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (citations omitted). "[A]s to any essential factual element of its

claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel,* 260 F.3d 27, 31 (1st Cir. 2001). The Court must draw all reasonable inferences in the non-moving party's favor, but it must not "draw *unreasonable* inferences or credit bald assertions, empty conclusions," or "rank conjecture." *Brandt v. Fitzpatrick*, 957 F.3d 67, 75 (1st Cir. 2020). "Even in employment discrimination cases where elusive concepts such as motive or intent are at issue, summary judgment is appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Id.* (quoting *Ray v. Ropes & Gray LLP*, 799 F.3d 99, 116-17) (1st Cir. 2015)).

## II.  The Maine State Police Is Entitled to Summary Judgment on Plaintiff's Claims of Retaliation under the WPA.

To prevail on a WPA retaliation claim, a plaintiff must show that 1) he engaged in activity protected by the WPA; 2) he was the subject of an adverse employment action; and 3) there was a causal link between the protected activity and the adverse employment action. *See Brady v. Cumberland Cty.*, 2015 ME 143, ¶ 14, 126 A.3d 1145. For purposes of this motion, the MSP[4] assumes Loder engaged in protected activity when he said that he thought the MIAC engaged in illegal activity. The MSP also assumes for the purposes of this motion that Loder experienced adverse employment actions when his JTTF temporary assignment ended and when he was not selected for the MCU-S Detective position. Nevertheless, Loder cannot point to sufficient evidence in the record to establish a causal connection between his statements and either of these actions.

---

[4] In the Complaint, the heading for Count I states the count is against the "Maine State Police." Defendants construe Count I to be brought against the named Defendant John Cote in his official capacity as Chief of the Maine State Police. To the extent the claim is asserted against the MIAC, the MIAC is simply a unit of the Maine State Police. For ease of reference, Defendants refer to the Maine State Police (MSP) as the defendant named in Count I.

A.  <u>Loder cannot establish either that the MSP would not have ended his assignment to the JTTF, or that it would have hired him for the MCU-S position, but for any statements he made about the MIAC's activities.</u>

To withstand summary judgment, Loder must point to evidence in the record that would allow a factfinder to reasonably infer that his protected activity "was a substantial, even though perhaps not the only, factor motivating [the adverse action]." *Caruso v. Jackson Lab.*, 2014 ME 101, ¶ 13, 98 A.3d 221 (quoting *Walsh v. Town of Millinocket*, 2011 ME 99, ¶ 25, 28 A.3d 610) (affirming summary judgment); *see also Theriault v. Genesis Healthcare LLC*, 890 F.3d 342, 349 (1st Cir. 2018). Loder must show that an unlawful retaliatory motive "in fact… made a difference" in the MSP's decision-making. *Caruso* 2014 ME 101, ¶ 13, 98 A.3d 221 (quoting *Wells v. Franklin Broad. Corp.*, 403 A.2d 771, 773 (Me. 1979)). "Put simply, '[his] protected whistleblowing activity must be a but-for cause of the employer's decision to [take the adverse action].'" *Murray v. Kindred Nursing Centers W. LLC*, 789 F.3d 20, 26 (1st Cir. 2015) (quoting *Caruso*, 2014 ME 101, ¶ 17, 98 A.3d 221). It is not enough to show a causal nexus between the protected activity and an adverse employment action if a reasonable factfinder could not find that the but-for standard was met. *See Abril-Rivera v. Johnson*, 806 F.3d 599, 608-10 (1st Cir. 2015) (affirming summary judgment on Title VII discrimination claim where record showed "benign and logical reason" for employer's actions).

Where the MSP has shown evidence of legitimate non-retaliatory reasons for its actions, Loder "must show pretext by establishing 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons.'" *Theriault*, 890 F.3d at 353 (quoting *Cookson v. Brewer Sch. Dep't*, 2009 ME 57, ¶ 17, 974 A.2d 276). Loder must show that "either (1) the circumstances underlying the [MSP's] articulated reason are untrue, or (2) even if true, those circumstances were not the actual cause of the employment decision."

*Cookson*, 2009 ME 57, ¶ 16, 974 A.2d 276. "[T]he presence of the issue of motivation or intent does not relieve the plaintiff of [his]…burden of producing evidence sufficient to create a question of fact on that issue." *Id.* ¶ 17 (quoting *Stanley v. Hancock Cty. Comm'rs*, 2004 ME 157, ¶ 25, 864 A.2d 169).

       i.    <u>Loder cannot meet his burden as it relates to the decision to call him back from his Temporary Duty Assignment to the JTTF.</u>

Appraisal of the record as a whole reveals a lack of evidence sufficient to support a finding that MSP would not have ended Loder's assignment to the JTTF in May 2018 but for his statements about the MIAC's activities. First, he cannot establish "that the decisionmaker knew of [the] protected conduct when he or she decided to take the adverse employment action." *Pomales v. Celulares Telefonica, Inc.*, 447 F.3d 79, 85 (internal citations omitted). The people who decided to end Loder's assignment to the JTTF were Ireland and Ireland's superior, Grotton, with the agreement of Maj. Scott and then-Lt. Col. Cote on the Command Staff. They did not know about Loder's opinions about the legality of the MIAC's activities until after Loder was told that his assignment to the JTTF was ending. The record contains no evidence to the contrary.

Second, the record establishes ample evidence of the MSP's legitimate non-retaliatory reasons for ending Loder's temporary assignment to the JTTF in May 2018. The record shows that Detective Pelletier started saying in January 2018 that he would retire later that year; he informed the MSP of his retirement date approximately two to three months before that date, which was August 3, 2018; his duties included concealed weapons permitting and professional licensing as well as MIAC analysis; Pelletier's Weapons and Professional Licensing duties were required by law for the MSP to perform; when the MSP learned when Pelletier was retiring, they had to figure out how they would replace Pelletier so that these duties would continue to be performed; Loder was the only other detective assigned to the MIAC at the time; Loder had no contractual rights to

remain assigned to the JTTF; there was no requirement for the MSP to keep anyone assigned to the JTTF; the MSP's Command Staff perceived little value to the MSP from keeping someone assigned to the JTTF; Loder had already served five years on the JTTF, which Command Staff members considered to be an adequate amount of time for a temporary assignment to a task force; posting Pelletier's position would only encourage a transfer of a Detective from another unit that could not afford to lose one, or promotion of a road Trooper where there were already too many road vacancies; Loder could be reassigned from the JTTF to the MIAC quickly, allowing him to learn the Weapons and Professional Licensing duties directly from Pelletier before Pelletier retired; and Loder could also perform MIAC analysis duties.

These facts are entirely consistent with what MSP told Loder when it ended his assignment to the JTTF in May 2018. On May 15, Ireland and Johnston told Loder that his temporary assignment to the JTTF was ending and he would return to the MIAC to work on MIAC duties as well as Pelletier's licensing and weapons duties. On May 22, Ireland followed up by email to Loder that Loder would start working one day per week at the MIAC until Pelletier retired to prepare Loder to take over Pelletier's work. On May 29, Ireland and Johnston gave Loder an updated job description, which included Pelletier's former duties related to weapons permits and professional licensing as well as MIAC duties. On May 31, Johnston emailed Loder about the time he would be required to work before Pelletier retired in order to learn his job in the MIAC and with the licensing and weapons unit.

The record reveals nothing "idiosyncratic or questionable" about this straightforward decision to reassign an employee where he was needed most at the time. *Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 101 (1st Cir. 2007) (affirming summary judgment on ADA claim for lack of evidence of pretext).

ii.     Loder cannot meet his burden as it relates to the non-selection of Loder for a
        Major Crimes Unit-South Detective position.

Appraisal of the entire record also reveals a lack of evidence sufficient to support a finding that MSP would have selected Loder for the MCU-S Detective position in October 2018, but for his statements about the MIAC's activities. Four people—Col. Cote, Lt. Col. Harwood, Maj. Scott, and Lt. Holmquist—interviewed the four applicants for the MCU-S position, and they unanimously agreed that the applicant they selected, Trooper Coflesky, was the best candidate for the position. To defeat summary judgment, Loder would have to show not just that their judgment in selecting Coflesky was flawed—which would not be unlawful—but that retaliatory animus was the real reason behind the selection. *See Henderson v. Mass. Bay Transp. Auth.*, 977 F.3d 20, 30 (1st Cir. 2020). Loder cannot do so.

The four interviewers were looking for the candidates to demonstrate the skills necessary to perform well as a MCU-S Detective. Specifically, they were looking for experience that would translate well to the types of investigations that MCU-S Detectives encounter most frequently— homicides, child abuse, sexual assaults, and other serious, mostly violent crimes. They were also looking for candidates who had shown that they could work well as part of a team, including taking direction; that they could lead a team; and that they could conduct investigations other than homicide from start to finish without much supervision.

The selected candidate, Coflesky, had significant experience as a Troop Investigator with primary responsibility for investigating crimes such as property crimes (including armed home invasion) and drug overdoses. He had worked alongside officers from other federal, state, and local law enforcement, including the MCU-S. The MCU-S had chosen him to assist with homicide investigations; in one of these investigations, his work was pivotal in identifying the suspect who was ultimately convicted of the crime. Coflesky provided specific examples in his interview of

cases in which he was the initial responder or co-responder and worked the investigations from the initial interviews, crime scene processing, evidence control, working with the crime lab and crash reconstruction experts, working with other agencies, and continuing to see the cases through grand jury and prosecution. He thoroughly explained the specific steps he would follow to investigate a child sexual abuse allegation. He showed that he could not only take full ownership of an investigation but he could also be relied on to do whatever a team leader needed him to do. In addition to managing his primary responsibilities, Coflesky was a member of the MSP's tactical team. His experience was impressive and directly relevant to the work that MCU-S Detectives do.

Loder failed to impress the interviewers. Loder had spent most of his career as a Trooper on the Interstate. Unlike Coflesky, he did not have experience as a Troop Investigator. Most of his investigative experience came from his time on the JTTF, but in his interview, he only discussed one or two cases that he worked on at the JTTF. He indicated that he had worked primarily in an assistive capacity on the JTTF and did not talk about being primarily responsible for any cases from start to finish. He had little experience with child abuse, suspicious death cases or working crime scenes. He had difficulty answering a question about how he would handle a child sexual abuse allegation and acknowledged that he did not have much experience in that area. While Loder had experience on the JTTF working on cases involving fraud and embezzlement, the MCU-S Detectives rarely investigate such crimes. The interviewers perceived that Loder did not have the experience Coflesky had, either in taking primary responsibility for investigations, or in working on homicides, suspicious deaths, child abuse, or other violent crimes, which are the most common types of cases handled by MCU-S Detectives.

In addition to Loder's comparative lack of relevant skills and experience, he is *Giglio*-impaired. Harwood and Cote knew about his *Giglio* impairment and thought it was an impediment

to being an effective MCU-S Detective. Cote—who, as Chief, was the ultimate authority—would not have selected Loder because of the *Giglio* problem alone, even if Loder had otherwise been the most qualified candidate. Scott did not know whether Loder was *Giglio*-impaired but thought he might be based on something Loder said in his interview. Had Loder otherwise been a top choice for the position, Scott would have wanted to know more about it because he knew *Giglio* impairment could hinder a MCU Detective's effectiveness. Holmquist did not know that Loder was *Giglio*-impaired, but he would not have supported hiring Loder if he had known. While the panelists did not need to reach the *Giglio* issue to conclude that Loder was not their top choice, the *Giglio* issue alone would have led to the same result.

The substance of any statements Loder had made about his opinion of the legality of the MIAC's activities did not cause any of the interviewers' decisions to select Coflesky for the MCU-S Detective position. Instead, they made their decisions based on the comparative skills, knowledge and experience of the candidates, and how they demonstrated these at their interviews. The mere fact that Loder questioned the legality of the MIAC's activities within a few months of the MCU-S hiring process does not get Loder past summary judgment. "[T]emporal proximity 'is not sufficient, by itself, to forge a causal link strong enough to create an inference of causation and thus satisfy [the standard set forth in *Brady*] in the face of an employer's asserted legitimate non-retaliatory reason for the adverse employment action.'" *Pushard v. Riverview Psych. Ctr.*, 2020 ME 23, ¶ 27, 224 A.3d 1239, 1246 (quoting *Theriault*, 890 F.3d at 352) (affirming summary judgment). "Chronological proximity does not by itself establish causality, particularly if the larger picture undercuts any claim of causation." *Ponte v. Steelcase Inc.*, 741 F.3d 310, 322 (1st Cir. 2014) (quotations omitted). "Timing may bear on the question of causation in a retaliation claim, but we have also warned that a 'narrow focus [on timing may] ignore[ ] the larger sequence of

17

events and also the larger truth.'" *Freadman*, 484 F.3d at 100-01 (quoting *Soileau v. Guilford of Me. Inc.,* 105 F.3d 12, 16 (1st Cir. 1997)). The larger picture is that four individuals independently assessed Coflesky as a better candidate for the MCU-S Detective position than Loder for reasons directly relevant to the position they were trying to fill. Whatever Loder thought about the MIAC's activities was not a factor in their assessment of the candidates' qualifications. In any event, Loder's *Giglio*-impairment would have sunk his candidacy no matter what.

For all of these reasons, the MSP is entitled to summary judgment on Loder's claims of unlawful retaliation under the WPA.

## III.   Lieutenants Ireland and Johnston Are Entitled to Summary Judgment on Plaintiff's Claim of Retaliation under 42 U.S.C. § 1983 and the First Amendment.

The First Circuit has set out a three-part test for determining whether an adverse employment action violated a public employee's First Amendment right to freedom of speech. *See McGunigle v. City of Quincy*, 835F.3d 192, 202 (1st Cir. 2016) (citing *Decotiis v. Whittemore*, 635 F.3d 22, 29 (1st Cir. 2011)). First, Loder must establish that he spoke as a citizen on a matter of public concern. *See id.* Second, Loder must demonstrate that his interests in speaking must outweigh the MSP's interest in functioning efficiently. *See id.* Third, Loder must show that his protected speech was a substantial or motivating factor in the adverse employment action. *See id.* Finally, even if Loder can establish all three parts of the test, Ireland and Johnston may not be held liable if they can show that the MSP would have reached the same decisions regarding Loder's employment status, even absent the protected speech. *See id.* For purposes of this summary judgment motion, Defendants need not address the second prong of the test, as Loder cannot meet his burden on either the first or third prong; and, even if he could, the record establishes that the MSP would have reached the same decisions even absent the protected speech.

Loder asserts that he engaged in constitutionally protected speech when he complained about certain MIAC activity to Ireland, Johnston, his JTTF supervisor Aaron Steps, and a member of the U.S. Attorney's Office. Whether or not Loder's purported statements were about a "matter of public concern," which Defendants are not addressing in this motion, such comments could only reasonably be construed as being made by Loder in his capacity as a public employee and not as a private citizen. That alone bars Loder's claim. Second, even if Loder had been speaking as a private citizen, a comprehensive review of the record reveals insufficient evidence for Loder to establish that his purportedly protected speech was a substantial or motivating factor in removing him from the JTTF, again dooming his First Amendment claim.[5] Even if Loder could show evidence of a causal link, the record demonstrates that the MSP would have reached the same conclusion to reassign Loder from the JTTF to Pelletier's duties in the MIAC in Augusta, whether he made any purportedly protected First Amendment comments or not. That, too, is sufficient to foreclose the claim. Finally, even if Loder could prevail on the underlying merits of his triply flawed First Amendment claim, Ireland and Johnston are entitled to qualified immunity.

A. Loder's statements about purported MIAC illegal activity were made in his capacity as a public employee, not in his capacity as a private citizen.

As the Supreme Court has noted, "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Garcetti v. Ceballos*, 547 U.S. 410, 421-22 (2006).

---

[5] As discussed elsewhere in this motion, neither Ireland nor Johnston was a decision-maker in the selection for the MCU-S Detective position. To the extent Loder claims that the hiring decision was somehow affected by Loder's statements, there is no evidence in the record to suggest that either Ireland or Johnston was responsible for the decision. But even if Ireland and Johnston could be construed to have made the decision not to hire Loder for the MCU-S position, the fatal flaws in Loder's claim as it relates to causation, described *supra* at II.A.ii., apply to Ireland and Johnston, just as they apply to the MSP. Likewise, the fact that Loder spoke as a public employee and not as a private citizen (*see infra* at III.A.) prevents any relief under the First Amendment for the non-selection of the MCU-S position, just as it does with Loder's reassignment from the JTTF.

Put simply, *Garcetti* installed a threshold barring First Amendment retaliation claims when the speech at issue relates to the plaintiff's employment and not their off-work activity as a private citizen. For example, a public employer's action taken in response to an employee writing a letter to the editor of a local newspaper might trigger First Amendment scrutiny, while an action taken in response to an employee writing an internal memo might not. *See id.* at 422.

Rejecting an action brought by an assistant district attorney who had internally criticized his office's decisions in obtaining a search warrant, the Supreme Court's decision in *Garcetti* created the modern paradigm for applying the First Amendment to public employees by unequivocally holding that "precedents do not support the existence of a constitutional cause of action behind every statement a public employee makes in the course of doing his or her job." 547 U.S. at 426. Therefore, in First Amendment retaliation cases, plaintiffs are only eligible for relief if courts first determine that the "employee spoke as a citizen on a matter of public concern." *Decotiis*, 635 F.3d at 29-30 (quoting *Curran v. Cousins*, 509 F.3d 36, 45 (1st Cir. 2007)). In other words, if the plaintiff's speech is better categorized as employee speech rather than private-citizen speech, then the claim cannot prevail.

To determine whether a public employee spoke as a private citizen, the First Circuit has laid out a "two-step, context-specific inquiry" that asks "'what are the employee's official responsibilities?' and second, 'was the speech at issue made pursuant to those responsibilities?'" *Id.* at 31 (quoting *Mercado-Berrios v. Cancel-Alegria*, 611 F.3d 18, 26 (1st Cir. 2010)). To ascertain whether an employee's speech is part of his official duties, the First Circuit has further stated that:

> Although no one contextual factor is dispositive . . . several non-exclusive factors, gleaned from the case law, are instructive: whether the employee was commissioned or paid to make the speech in question; the subject matter of the speech; whether the speech was made up the chain of command; whether the

employee spoke at [his] place of employment; whether the speech gave objective observers the impression that the employee represented the employer when [he] spoke (lending it "official significance"); whether the employee's speech derived from special knowledge obtained during the course of [his] employment; and whether there is a so-called citizen analogue to the speech.

*Id.* at 32 (internal citations omitted). In other words, "[t]he more intertwined the speech is with the employee's work station the less likely it is that the speech is protected as citizen speech." *Id.* at 33 n.12.

*Foley v. Town of Randolph*, 598 F.3d 1 (1st Cir. 2010) provides an illustrative application of the First Circuit's test. In *Foley*, the chief of a town fire department brought a § 1983 claim against his government employer, alleging that he suffered wrongful retaliation in violation of his free speech rights. *Id.* at 2-4. The speech at issue in *Foley* consisted of public statements the fire chief made to the media at the scene of a fatal fire, specifically criticizing inadequate funding and staffing of the fire department. *Id.* There, the First Circuit found that the plaintiff failed to articulate a viable First Amendment claim, because although his remarks were made in public, they were nevertheless made as an employee and not as a private citizen. *Id.* at 10.

First, the court found that even though the fire chief's statement to the media was not required by his job or his job description, it was done through the course of his employment, distinguishing it from a scenario in which a public school teacher might write a letter to the editor of a newspaper criticizing education policy. *Id.* at 6-7. It further highlighted that the fire chief was "in uniform and on duty" at the time he made the statements. *Id.* at 7. Likewise, the court noted an objective observer would view the fire chief as making the statements in his professional capacity, highlighting that there was no "relevant analogue to speech by citizens" to his statements. *Id.*

Like the fire chief in *Foley*—and the ADA in *Garcetti*—First Circuit precedent dictates that Loder's purported complaints about the MIAC can only be viewed as speech "made pursuant

to employment duties." *Decotiis*, 635 F.3d at 30. Viewed most generously, Loder's speech about the MIAC seems to fall into two general buckets: 1) discussions with Johnston, SSRA Steps, and AUSA Murphy about Loder's inability to share information with the MIAC that Loder learned while working on the JTTF; and 2) allegations Loder made to Johnston and Ireland that Loder believed the MIAC was engaged in illegal activity. Both categories of speech indisputably constitute speech by a public employee, not a private citizen.

The first question in the context-specific analysis—"What were Loder's official responsibilities"—is straightforward. Loder was temporarily assigned to the JTTF as an employee of the MSP. He retained his rank, pay, and responsibilities to the MSP chain-of-command throughout his time on the JTTF. As a member of the JTTF, Loder worked on criminal investigations under his FBI supervisor Aaron Steps. When necessary, Loder also worked with the local U.S. Attorney's Office in the District of Maine, including Assistant U.S. Attorney Rick Murphy, on grand jury matters and criminal prosecutions. Throughout his time at the JTTF, Loder had clear obligations to both the U.S. Department of Justice and the MSP as a result of his job.

Next, the First Circuit's balancing test asks whether the speech at issue is "made pursuant to [Loder's] employment duties"—here, his obligations to the MSP and DOJ. Virtually every non-exclusive factor laid out by the First Circuit in *Decotiis* tips toward an answer of "yes":

- ***First***, the subject matter of Loder's concerns about sharing information with the MIAC from the JTTF—that Loder felt the information belonged to the FBI and that it was his duty as a JTTF member to prevent any disclosure of the information under the federal Privacy Act and other FBI rules—related directly to his job duties, both as a Detective in the MSP and as a member of the JTTF;

22

- **Second**, Loder's allegations that the MIAC was acting contrary to law in the way it handled information directly related to the job expectations of a Detective in the MIAC, and even though Loder was on loan to the FBI, he was still hired to be a MIAC Detective in 2012 and remained a MIAC Detective during his assignment to the JTTF;

- **Third**, both Loder's concerns about sharing information and his allegations about the MIAC's activities were made to colleagues up the chain of command. This is a critical factor in the First Circuit's analysis. *See Gilbert v. City of Chicopee*, 915 F.3d 74, 83 (1st Cir. 2019) ("This type of communication—complaints or concerns made up the chain of command—is the quintessential example of speech that owes its existence to a public employee's official responsibilities and thus is not protected under the First Amendment.")

- **Fourth**, Loder's complaints were made in the context of his place of employment—either in the physical offices of the MIAC and the MSP in Augusta, or by phones paid for with employer funds and whose numbers are circulated among colleagues for purposes of contacting them for employment related activity;

- **Fifth**, Loder's concerns about sharing information with the MIAC would leave an objective observer with the impression that Loder's concerns carried "official significance," as he purportedly represented to Johnston that FBI policy and other federal requirements prevented Loder from disclosing certain information that properly belongs to the U.S. Department of Justice;

- **Sixth**, whether it is the information Loder learned on the JTTF or the information he learned about the MIAC, all of Loder's speech was derived from special knowledge obtained during the course of his employment; and

- **Seventh**, because Loder made his statements to his supervisor in the FBI, Aaron Steps, to FBI Asst. Chief Division Council Alethea Harris,[6] to his prosecuting colleague at the U.S. Attorney's Office, Rick Murphy, and up the chain of command in the MSP to Johnston and Ireland, there is no relevant "citizen analogue" to the speech the Loder alleges he was retaliated for making.[7]

All of the above factors lead to the conclusion that the purported speech for which Loder claims he was retaliated against by Ireland and Johnston was not made in a context protected by the First Amendment, but rather as an employee of the MSP assigned to work with the FBI. "[W]hile the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'" *Garcetti*, 547 U.S. at 420 (quoting *Connick v. Myers*, 461 U.S. 138, 154 (1983)). Loder therefore cannot hold Ireland or Johnston personally responsible for a First Amendment violation for any actions that he claims were taken in response to the speech at issue in this case.

B. <u>Loder cannot show that his speech was a substantial or motivating factor in an adverse employment action.</u>

Count 2 already fails because the purported speech at issue in this case was made in Loder's capacity as an employee. But even if the Court were to assume that Loder's purported speech was made as a private citizen, the record provides no evidence that the speech at issue was a substantial or motivating factor in any adverse employment action taken against Loder.

---

[6] The record is unclear as to whether Loder complained about the MIAC to Harris or whether he merely sought her advice on whether or how to disclose information to the MIAC, but in either event there is no direct citizen analogue to such a conversation.

[7] The only factor that does not obviously tip against Loder's argument is whether Loder was commissioned or paid to make the speech in question. But even on this point, Loder made the speech as part of work-related conversations, phone calls, and email exchanges, as well as—at least according to Loder—at the behest of his FBI supervisors.

As an initial matter, Loder's First Amendment claim has been brought against Johnston and Ireland only, in their individual capacities. The decision to end Loder's Temporary Duty Assignment to the JTTF was made by Ireland and Grotton, not Johnston. This reason alone is sufficient to demonstrate that Johnston cannot be found to have violated Loder's First Amendment rights for the decision to end Loder's assignment to the JTTF. In addition, neither Johnston nor Ireland took part in selecting a candidate for the MCU-S Detective position. Therefore, neither Johnston nor Ireland could be found to have violated Loder's First Amendment rights when the four members of the MSP who made that decision chose another candidate. That leaves only Loder's First Amendment claim against Ireland for the decision to end Loder's Temporary Duty Assignment to the JTTF.

In order to prevail on his First Amendment retaliation claim, Loder "must introduce sufficient evidence to allow a finding that his speech was a substantial or motivating factor behind the adverse employment action." *McGunigle*, 835 F.3d at 203; *see also Collins v. Nuzzo*, 244 F.3d 246, 251–52 (1st Cir. 2001). To do this, Loder "must produce some facts linking his employer's adverse employment actions to his protected conduct." *McGunigle*, 835 F.3d at 203; *Rosaura Bldg. Corp. v. Mun. of Mayaguez*, 778 F.3d 55, 67 (1st Cir. 2015). The record reveals that it in this case that is simply not possible.

First, Loder cannot show that either Johnston or Ireland knew about Loder's protected speech when Ireland and Grotton decided to end Loder's assignment to the JTTF. This alone entitles Ireland and Johnston to summary judgment on Loder's First Amendment claim. "It is only intuitive that for protected conduct to be a substantial or motiving factor in a decision, the decisionmakers must be aware of the protected conduct." *Ambrose v. Twp. of Robinson, Pa.*, 303 F.3d 488, 493 (3d Cir. 2002). Although Loder had previously said to Johnston that he did not want

to share certain information with the MIAC, he did not tell either Johnston or Ireland that he thought the MIAC was engaging in illegal activity until May 29, 2018—two weeks after they had informed him that the MSP was ending his temporary assignment to the JTTF.

Second, even if Johnston or Ireland had understand Loder to have claimed that anything the MIAC was doing was illegal before the decision to end his assignment to the JTTF was made, the record contains ample evidence that the decision to end his JTTF assignment was made solely because of the operational needs and resources of the MSP at that time. *See* II.A.i., *supra.*

Because Ireland and Johnston were not aware of Loder's purportedly protected First Amendment speech until well after the decision to reassign him from the JTTF was made, and because the decision to call Loder back from the JTTF was made solely for legitimate non-retaliatory reasons, Ireland and Johnston are entitled to summary judgment on Count 2.

C. <u>The MSP has produced sufficient evidence that it would have taken the same actions regardless of Loder's speech.</u>

Loder's claim of unconstitutional retaliation fails if the record demonstrates that the MSP "would have reached the same decision even in the absence of the protected conduct." *Collins*, 244 F.3d at 252 (quoting *Wytrwal v. Saco Sch. Bd.,* 70 F.3d 165, 170 (1st Cir. 1995). The record in this case demonstrates that the MSP would have made the same decisions had Loder not complained about the MIAC to Ireland, Johnston, or employees of the U.S. Department of Justice.

Even if Loder could point to sufficient evidence to establish causation—which he cannot— there was no constitutional violation because Loder's temporary assignment to the JTTF would have been ended in May 2018 absent any purportedly protected speech. *See McGunigle*, 835 F.3d at 203; *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). The record reveals that regardless of what Loder said about the MIAC, Maj. Grotton—who knew nothing about any speech by Loder about the legality of the MIAC—decided that the best way to cover the

26

Weapons and Professional Licensing duties after Det. Pelletier's retirement was to assign Loder to those duties, for the reasons discussed in Part II.A.i. above.

Moreover, Maj. Scott and then-Lt. Col. Cote—who also knew nothing about any speech by Loder about the legality of the MIAC—agreed with this decision for the same reasons. Det. Pelletier's retirement, the problem it created, and the reasons why Loder's reassignment was the best solution to that problem, provide not only an independent non-retaliatory basis for ending Loder's reassignment to the JTTF, but also show that this decision would have been made <u>regardless</u> of Loder's speech because the MSP needed Loder to take over Pelletier's duties. Because the record shows that Loder's temporary assignment to the JTTF would have been ended in May 2018 irrespective of what he said about the MIAC, and because Loder cannot show this non-retaliatory basis is pretextual, Defendants Johnston and Ireland are entitled to summary judgment. *C.f. Gutwill v. City of Framingham, Mass.*, 995 F.3d 6, 14 (1st Cir. 2021) (affirming summary judgment on state whistleblower claim).

Finally, Maj. Grotton <u>instructed</u> Ireland to end Loder's time on the JTTF based on the operational needs of the MSP. Regardless of Ireland's participation in conversations with Grotton about the decision—even if Ireland might have agreed with or supported Grotton's instructions— Ireland would not have been at liberty to ignore the orders from his superior officer. Because the ultimate decision to reassign Loder was made above Ireland's (and likewise Johnston's) rank, a First Amendment retaliation claim cannot be maintained against Ireland or Johnston.

    D.  <u>Ireland and Johnston are entitled to qualified immunity.</u>

Public officials sued for money damages in their individual capacities under § 1983 are entitled to qualified immunity unless (1) the facts alleged demonstrate that the individual defendant's conduct violated a statutory or constitutional right, and (2) the contours of that right were "clearly established" under then-existing law so that a reasonable official would have known

that his or her conduct was unlawful. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 741 (2011); *Morales v. Chadbourne*, 793 F.3d 208, 214 (1st Cir. 2015). "Such immunity provides a shield 'to all but the plainly incompetent or those who knowingly violate the law.'" *Philip v. Cronin*, 537 F.3d 26, 34 (1st Cir. 2008) (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)). The First Circuit uses "a three-part test to determine whether an official is entitled to qualified immunity: whether the plaintiff's allegations, if true, establish a constitutional violation, whether the right was clearly established at the time of the alleged violation, and whether a reasonable officer, similarly situated, would understand that the challenged conduct violated that established right." *Philip*, 537 F.3d at 34 (internal quotations omitted). Therefore, an individual defendant is entitled to qualified immunity as long as he reasonably could have believed on the facts before him, even if that belief was mistaken, that his conduct did not violate the First Amendment. *See id.*

Parts III.A.-C., *supra*, demonstrate why Loder cannot win on the merits of his First Amendment Count, causing Loder to fail the first element of the First Circuit's three-part qualified immunity test. But even if First Amendment law provided a path for Loder to prevail—which it does not—qualified immunity further bars his claims against Ireland and Johnston in their personal capacities. Where binding First Circuit case law provides a compelling basis to conclude that Loder was not engaging in protected First Amendment Activity because he was speaking as a public employee, Ireland and Johnston were not on notice that any action they purportedly took in response to Loder's speech violated his constitutional rights.

For example, in a factual scenario not unlike the one alleged by Loder, the First Circuit noted in *Curran* that a plaintiff's comments "were made not as a citizen, but were made in the course of his duties within the Department, to his superiors, and during a discussion of official Department policy. Thus, the first event in the history leading to [the plaintiff's] termination

involved speech which had no First Amendment protection." 509 F.3d 36 at 45-46. In a more recent case, the First Circuit has underscored that "[t]his type of communication—complaints or concerns made up the chain of command—is the quintessential example of speech that owes its existence to a public employee's official responsibilities and thus is not protected under the First Amendment." *Gilbert,* 915 F.3d at 83.

In the face of this First Circuit precedent strongly supporting the conclusion that Loder spoke as a public employee, and the concomitant lack of clearly established law dictating the opposite conclusion that he spoke as a private citizen, Johnston and Ireland must be entitled to qualified immunity. There is also no clearly established law that would have put Ireland or Johnston on notice that implementing their superior officers' non-retaliatory decision to end Loder's assignment to the JTTF could constitute a constitutional violation.

No matter how generously one construes the record facts in Loder's favor, Ireland and Johnston fall well outside the category of public officials described as "plainly incompetent or those who knowingly violate the law" who otherwise do not enjoy qualified immunity. Almost every First Amendment retaliation case brought by a public employee is granted qualified immunity because defendants could have reasonably believed that there was no First Amendment protection under the specific circumstances they found themselves in. *See Diaz-Bigio v. Santini*, 652 F.3d 45, 52-53 (1st Cir. 2011) (citing cases). As the First Circuit has emphasized: "[O]nly in the extraordinary case will it have been clearly established that a public employee's speech merited constitutional protection." *Id.* at 53. "Immunity exists even where the abstract 'right' invoked by the plaintiff is well-established, so long as the official could reasonably have believed 'on the facts' that no violation existed." *Id.* at 50 (quoting *Dirrane v. Brookline Police Dep't*, 315 F.3d 65, 69 (1st Cir. 2002)). Even if Loder's First Amendment claim against Ireland and Johnston had merit—

which it does not—precedent dictates that it cannot be allowed to proceed because 1) Johnston and Ireland could have reasonably believed that Loder was speaking as a public employee, not as a private citizen; and separately 2) they could commit no constitutional violation by following an order given by their superior officers for non-retaliatory reasons.

### *Conclusion*

For the foregoing reasons, Defendants respectfully request that the Court enter summary judgment in favor of the Defendants on all of Plaintiff's remaining claims in the Complaint.

DATED: October 15, 2021                      Respectfully submitted,

AARON M. FREY
Attorney General

/s/ Valerie A. Wright
Valerie A. Wright
Assistant Attorney General
valerie.a.wright@maine.gov
/s/ Paul E. Suitter
Paul E. Suitter
Assistant Attorney General
paul.suitter@maine.gov
Six State House Station
Augusta, Maine 04333-0006
Tel.  (207) 626-8800
Fax (207) 287-3145

Attorneys for Defendants

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 15 2021, I electronically filed the Defendants' Motion for

Summary Judgment with Incorporated Memorandum of Law with the Clerk of the Court using the

CM/ECF system, which will send notification of such filing(s) to the following:

Cynthia A. Dill
dillesquire@gmail.com

/s/ Paul E. Suitter
Paul E. Suitter
Assistant Attorney General
Six State House Station
Augusta, Maine  04333-0006
Tel.  (207) 626-8800