## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| GEORGE LODER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 2:20-cv-00157-JDL |
| | ) |
| MAINE INTELLIGENCE | ) |
| ANALYSIS CENTER, State | ) |
| of Maine, Department of | ) |
| Public Safety, et al., | ) |
| | ) |
| | ) |
| Defendants. | ) |

### ORDER ON MOTION FOR SUMMARY JUDGMENT[*]

Plaintiff George Loder, a Maine State Trooper, alleges in his complaint (ECF No. 1) that he was subjected to unlawful retaliation after informing his Maine State Police supervisors, including Sergeant Michael Johnston and Lieutenant Scott Ireland, that he believed that the Maine Information and Analysis Center ("MIAC"),[1] a "fusion center" that shares information among law enforcement agencies, was collecting and maintaining data illegally. The MIAC is part of the Maine State Police ("MSP"). The first two counts of Loder's complaint relate to the alleged workplace retaliation. Counts 3 through 6, which alleged claims grounded primarily in the Privacy Act, the Due Process Clause of the Fourteenth Amendment, and state

---

[*] This opinion is **SEALED** until 5:00 p.m. on August 16, 2022, to give the parties an opportunity to notify the Court, by sealed filings, whether any portion(s) need to be redacted because of confidentiality restrictions.

[1] Although the complaint names the "Maine Intelligence Analysis Center" as a defendant, the unit's correct name is the "Maine Information and Analysis Center." *See* Dep't of Pub. Safety, Me. State Police, *Maine Information and Analysis Center*, https://www.maine.gov/dps/msp/specialty-units/MIAC (last visited August 11, 2022).

firearms laws, were previously ordered dismissed.  *Loder v. Maine Intel. Analysis Ctr.*, No. 2:20-cv-00157, 2021 WL 816470, at *9 (D. Me. Mar. 3, 2021).

The Defendants now seek summary judgment (ECF No. 53) on Count 1 (retaliation claim under the Maine Whistleblowers' Protection Act ("WPA")) against the MSP and Count 2 (First Amendment retaliation under 42 U.S.C. § 1983) against Loder's supervisors, Sergeant Michael Johnston and Lieutenant Scott Ireland, in their personal capacities.  With respect to the Maine WPA claim, the MSP asserts that Loder cannot point to sufficient evidence in the record to establish a causal connection between his statements regarding the purported illegality of the MIAC's practices and the adverse employment action he alleges, because the MSP has provided evidence of legitimate, non-discriminatory reasons for taking the adverse employment actions and Loder cannot show that these reasons are pretextual.  In addition, Ireland and Johnston contend that Loder's First Amendment claim must also fail, because Loder's speech was not protected, nor was it a substantial or motivating factor in the adverse employment decision.  Johnston and Ireland also assert that they are entitled to qualified immunity on this claim.  For the reasons that follow, I deny in part and grant in part the MSP's motion as to Count 1, and I grant the motion as to Count 2.

## I.  FACTUAL BACKGROUND

Before addressing the facts, I consider two preliminary matters: (1) Loder's request to strike deposition testimony of three witnesses who were not identified in the Defendants' initial disclosure, and (2) the MSP's assertion that Loder failed to

comply with Local Rule 56, both in his response to the Defendants' Statement of Material Facts and in his own assertion of facts.  *See* D. Me. Loc. R. 56.

### A.   Loder's Motion to Strike Deposition Testimony

In Loder's response (ECF No. 61) to the Defendants' Statement of Material Facts (ECF 52), he argues that the declarations of Major Brian Scott, Commander Mark Holmquist, and Colonel John Cote should be stricken because they were not previously identified as witnesses in this case.  Loder does not cite a rule under which these declarations should be stricken, nor does he flesh out a legal argument on this point, but his request seems to fall under three rules of the Federal Rule of Civil Procedure: (1) Rule 26(a)(1), which requires that parties provide an initial disclosure of individuals likely to have discoverable information; (2) Rule 26(e), which requires that this disclosure be supplemented if it is incomplete and the opposing party is unaware of the new information; and (3) Rule 37(c)(1), which sets forth the availability of discovery sanctions when information or a witness was not properly provided or identified pursuant to Rule 26 and the failure was neither substantially justified nor harmless.

Loder is correct that these individuals were not named in the Defendants' initial disclosures; however, the identities of each of these witnesses were disclosed in the deposition testimony of Johnston and Ireland, and by Loder himself.  Both Holmquist and Cote interviewed Loder for the Major Crimes Unit-South Detective position.  Thus, Loder knew or should have known that both men were likely to have discoverable information regarding Loder's application for that position.  Because Loder was personally aware of each of these men, their roles in the hiring process for

the Major Crimes Unit-South Detective position, and their involvement in the case, the manner in which their connection to the case was disclosed was harmless and there is no sound basis to exclude their depositions.[2]  *See* Fed. R. Civ. P. 26 Advisory Committee's note to Subdivision (e), ("There is . . . no obligation to provide supplemental or corrective information that has been otherwise made known to the parties in writing or during the discovery process, as when a witness not previously disclosed is identified during the taking of a deposition"); *Rooney v. Sprague Energy Corp.*, 519 F. Supp. 2d 110, 116 (D. Me. 2007) (determining that deposition testimony of a witness who was not identified in the initial Rule 26(a)(1) disclosure should not be excluded for the purposes of summary judgment because deposition testimony of another witness disclosed the identity of the challenged witness and his involvement in the case).

## B.   Loder's Noncompliance with District of Maine Local Rule 56

The evidence that this Court considers in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the local rules of this district.  *See* D. Me. Loc. R. 56.  The moving party must first file a statement of material facts that it claims are not in dispute.  *See* D. Me. Loc. R. 56(b). Each fact must be set forth in a numbered paragraph and supported by a specific record citation.  *See id.*  The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving

---

[2] Thus, I deem the following paragraphs from the Defendants' statement of material facts (ECF No. 52) admitted and deny Loder's request to strike: 4, 6, 38, 45, 46, 56, 94, 97-101, 103, 106, 107, 114, 115, 123, 125, 131, 132, 135-37, 143.

party's statement of material facts[.]"  D. Me. Loc. R. 56(c).  The nonmovant likewise must support each denial or qualification with an appropriate record citation.  *See id.*  The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation.  *See id.*  The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement.  *See* D. Me. Loc. R. 56(d).  Again, each denial or qualification must be supported by an appropriate record citation.  *See id.*

District of Maine Local Rule 56(f) directs that "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."  In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact."  *Id.*; *see also, e.g., Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010); Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

The Defendants contend that Loder's memorandum (ECF 62) in response to their motion for summary judgment does not comply with Local Rule 56 because it asserts facts not set out in the stipulated facts or in either party's statement of

material facts, fails to support argued facts with record citations, and does not cite to the parties' statements of material facts.  Thus, the Defendants argue, the Court should disregard facts included in Loder's response that were not also included in any of the statements of material facts and that are unsupported by record citations.  The Defendants contend that consideration of these facts would prejudice the Defendants because they did not have an opportunity to deny or otherwise respond to the facts as allowed under Local Rule 56.

The Defendants also argue that Loder failed to comply with Local Rule 56 in his responses (ECF No. 61) to the Defendants' statement of material facts, citing multiple instances in which Loder purports to "deny" or "qualify" facts set out in the Defendants' statement of material facts without providing record citations as required by the Local Rule.[3]  For those instances in which Loder failed to provide record citations as required by the Local Rules, the Defendants' facts will be deemed admitted for the purposes of the summary judgment motion.  *See* D. Me. Loc. R. 56(c), (f).  Finally, in multiple instances Loder introduces new facts in his responses to the Defendants' statements of material facts, rather than properly setting out these facts in his own additional statement of facts so that the Defendants could have responded under Local Rule 56.  "A qualified response is not an appropriate vehicle for introducing new facts. Rather, the qualification should offer record citations that

---

[3] For example, paragraph 23 of the Defendants' statement of material facts asserts that "Michael Johnston consistently instructed George Loder that when it came to sharing information with the MIAC obtained from the JTTF, Loder was to share information in compliance with the law, FBI directives, FBI policies, and FBI procedures.  Johnston Dep. (ECF 49-1) 66:1-8; Johnston Decl. (ECF 52-6) ¶¶ 7, 16; Johnston Email (ECF 49-48) at 1351."  ECF No. 52 ¶ 23.  Loder's response is, simply, "**DENIED**."  ECF No. 61 ¶ 23.  Thus, the following paragraphs from the Defendants' statement of material facts (ECF No. 52) are deemed admitted based on Loder's failure to provide record support: 23, 127, 139, 140.

show that the statement must be modified in some way to be accurate—or explain why such citations are not available.  The proper place for additional contextual facts, if necessary for the summary judgment decision, is in the Statement of Additional Material Facts." *Goldenson v. Steffens*, No. 2:10-cv-00440, 2014 WL 12788001, at *2 n.3 (D. Me. Mar. 7, 2014).

A district court has discretion to forgive a party's violation of a local rule, or to refuse to do so.  *Crowley v. L.L. Bean, Inc.*, 361 F.3d 22, 25 (1st Cir. 2004).  Here, in keeping with Local Rule 56, I will not consider facts asserted by Loder that he failed to properly present or support.  Consideration of these facts would be prejudicial to the Defendants because they have not had an opportunity to deny or qualify the factual assertions that Loder makes solely in his qualifications and denials to the Defendants' statements of material fact and not, as required by the Local Rule, in his own statement of additional material facts.  Moreover, Loder failed to offer any response to the Defendants' arguments regarding his failure to comply with Local Rule 56's requirements.  Thus, I do not consider the additional facts that Loder included in his denials and qualifications to the Defendants' statements of material facts that were not also affirmatively set out in his own statement of material fact or additional statement of material fact.

## C.    Background Facts

Plaintiff George Loder, a resident of Scarborough, Maine, was hired in 1994 by the MSP as a Trooper and has worked for the MSP since that date.  During Loder's tenure as a Trooper, he received four separate disciplinary suspensions for: (1) making a false statement to an internal investigator in 1998; (2) transportation of an

unauthorized passenger in 2001; (3) rude behavior toward a civilian in 2002; and (3) filing late reports in 2002.   Because of Loder's false statement to an internal investigator, the MSP considers him to be impaired under *Giglio v. United States*, 405 U.S. 150 (1972).   A law enforcement officer is considered *Giglio*-impaired following an adverse finding regarding his truthfulness, bias, or ability to accurately recall information, and the MSP is obligated to disclose any *Giglio* impairments to prosecutors so that they may fulfill their discovery obligations pursuant to *Brady* and *Giglio*.   *See id* at 153-54 (holding that a prosecutor must disclose evidence impacting a witness's credibility when that witness's testimony can be determinative of guilt or innocence).

In March 2012, Loder was promoted to the position of Detective and was assigned to the MIAC.   The MIAC is a unit of the Maine State Police located in Augusta that serves as Maine's "fusion center" and, as such, is part of a national network of fusion centers that analyze, gather, and share threat-related information between state, local, tribal and territorial, federal, and private sector parties.[4]   Loder discovered that he did not enjoy working at a desk, which the MIAC job required.

Later in 2012, Loder was temporarily assigned to the Joint Terrorism Task Force ("JTTF"), which is operated by the FBI.   Loder remained an MSP and MIAC employee throughout the assignment and was based in Portland.   Michael Johnston became Loder's supervisor within the MSP chain of command during the summer of

---

[4] Colonel John Cote, Lieutenant Colonel William Harwood, Major Brian Scott, and Major Christopher Grotton served as the four members of the MSP Command Staff during 2018.   The MIAC Director is an MSP Lieutenant appointed by the Colonel of the Maine State Police; from January 2015 to October 2018 Scott Ireland was the MIAC Director, and Michael Johnston became the MIAC Director in November 2018.

2016.  Scott Ireland was senior to both Johnston and Loder within the MSP chain of command and served as the MIAC Director from January 2015 to October 2018. Loder was also supervised by a Supervisory Senior Resident Agent of the FBI while he was assigned to the JTTF.  Loder's JTTF assignment was a Temporary Duty Assignment, meaning that he did not have a contractual right to remain assigned to the JTTF and could be reassigned based on the operational needs of the MSP.  Loder understood the temporary nature of the assignment and expected that his minimum tenure with the JTTF would likely be three years.  During his JTTF assignment, Loder occasionally worked with the office of the United States Attorney for the District of Maine.

### 1. Loder's Concerns Regarding the MIAC

In November 2017, Johnston asked Loder to start attending weekly conference call meetings with the MIAC both to better leverage Loder's position on the JTTF for the MIAC's needs and to foster stronger working relationships between Loder and his other MSP colleagues, who were based out of Augusta.  In addition, Johnston believed that, under formal guidance he had received from the FBI, fusion center directors were required to improve the relationship and communication between the fusion center and the local JTTF.  To that end, Johnston asked Loder to share relevant information, in compliance with the law, FBI directives, policies, and procedures.

Loder attended the MIAC meetings sporadically and never shared any substantive information he had learned while working with the JTTF.  Loder was reluctant to share information he learned through his JTTF work because he believed that he could not do so without violating federal rules and regulations.  However,

Loder believed that there was some information obtained through his JTTF work that he could lawfully share with the MIAC during MIAC weekly meetings as long as he followed the correct FBI procedures.  His FBI supervisor never instructed him not to attend the MIAC meetings or not to share information during the meetings.

On November 14, 2017, Loder reported to Johnston over the phone that he believed Johnston's directive to share information at the weekly meetings was a violation of FBI policy and was therefore illegal.[5]   Johnston and Loder's phone conversations regarding Loder's MSP and FBI responsibilities were conducted on cellular phones paid for by an MSP stipend.  Following this conversation, and in response to Loder's stated concerns, Johnston sent Loder an email instructing Loder to share relevant information with the MIAC in compliance with FBI guidelines and policies.  Johnston copied Loder's FBI supervisor on the email.

Johnston and Loder met on March 26, 2018, to discuss Loder's annual performance evaluation.  Although Loder's overall performance rating was "exceeded expectations," he was told that he needed improvement in two areas: (1) communication with the MIAC, to better leverage his position on the JTTF, and (2) timely submission of reports to his FBI supervisor.

---

[5] The Defendants dispute that Loder told Johnston, or any other MSP supervisors, that he believed the MIAC's information-sharing practices were illegal prior to May 29, 2018, and contend that "[t]he first time Scott Ireland or Michael Johnston became aware that George Loder was alleging that the MIAC was engaging in illegal activity was on May 29, 2018, two weeks after Ireland and Johnston had informed Loder that Loder was being called back from the JTTF to work at the MIAC."  ECF No. 52 ¶ 71.  The record evidence Loder cites is sufficient to generate a genuine dispute as to this fact, in keeping with the requirement that the Court view disputed facts in a light most favorable to Loder as the nonmoving party.

### 2. Termination of Loder's JTTF Assignment

Task force assignments are typically rotated after a few years, because even though the MSP continues to employ members assigned to task forces, they are directly supervised by different entities, which results in a loss of contact between the MSP and these employees.  Thus, members assigned to task forces are generally returned to the MSP after a few years to bring them back to regular MSP service and supervision, and to ensure that the MSP benefits from the skills the employee gained during the task force assignment.

During Loder's performance review in March 2018, Johnston told Loder he was not aware of any operational needs of the MSP that would require calling Loder back to the MIAC and that there was no reason to believe that Loder would not continue to be assigned to the JTTF.[6]  At the time of the meeting, Johnston was aware that Pelletier, the only other Detective stationed in the MIAC, planned to retire later that year, although Johnston did not yet know Pelletier's planned retirement date, as Pelletier had not provided the MSP with formal notice of his intent to retire.  The statements of material facts do not provide specific dates associated with the events that followed, which I now address.

After Detective Pelletier provided notice of his intent to retire to the MSP, Grotton considered the MSP's resources and determined that because Loder was

---

[6] David Pelletier was a detective assigned to the MIAC and the Weapons and Professional Licensing Division of the MSP.  In January 2018, Pelletier informally decided to retire later that year and shared this information with Ireland and Johnston.  Pelletier provided Johnston, Ireland, and the MSP formal notice of his intent to retire approximately two to three months in advance of August 3, 2018, his planned retirement date.

already within the MIAC, he could be trained to perform Pelletier's duties.[7]  Grotton, Scott, and Cote also knew that the MSP had significant vacancies at the Trooper level, and that no other unit could readily lose a Detective to the MIAC, particularly when Loder was available and could replace Pelletier.  Grotton also determined that Pelletier's position should not be filled by an external applicant, and Ireland agreed with Grotton that Pelletier's work was essential and that filling the job required calling Loder back from the JTTF.  Grotton also thought that returning Loder to the MIAC at this time would re-engage him with the MSP.

At this time, the Command Staff were also questioning the value of continuing to have a Detective assigned to the JTTF, believing it did not add significant value to the MSP and the MSP did not have a duty to make this assignment.  However, the MSP is required by law to perform the weapons and licensing tasks that had been conducted by Detective Pelletier.  Grotton, Scott, and Cote all agreed that the operational needs created by Detective Pelletier's retirement meant that the best use of the MSP's resources required the termination of Loder's assignment to the JTTF so that he could return to the MIAC to train for and take over Pelletier's role.

After speaking with Grotton, who instructed Ireland to terminate Loder's JTTF assignment, Ireland agreed that Loder should be called back from the JTTF to the MIAC.

---

[7]  Loder denies this paragraph of the Defendants' statement of material facts, but the argument and record citations he supplies do not address the substance of the fact asserted by the Defendants, and thus it is deemed admitted under Local Rule 56(f), and (g).

Across the board, the MSP has reduced the number of assignments to task forces, and the decision to end Loder's assignment with the JTTF aligned with the MSP's ongoing effort to reduce the number of personnel assigned to task forces. The MSP has not assigned anyone to the JTTF since it ended Loder's assignment and has no intention to do so.

On May 15, 2018, Johnston and Ireland met with Loder to discuss his annual performance evaluation and to inform him that his JTTF assignment was ending.[8] The parties dispute whether Ireland was aware of Loder's concerns about the potential illegality of the MIAC's information-sharing practices at this time. Loder asked that he be transferred to a detective position with the Major Crimes Unit South ("MCU-S") rather than be returned to the MIAC, and Ireland told Loder that he would investigate that possibility. Following the meeting, Ireland checked with Grotton, who confirmed that there were no detective openings south of Augusta and that Loder would be assigned to the MIAC.

Johnston, Ireland, and Loder then had a telephone call on May 16, in which Johnston and Ireland reiterated that Loder would be returning to the MIAC and that there were no detective openings south of Augusta. Loder lost his temper several times during the conversation, interrupted Ireland, and complained about the commute between his home in Scarborough and the MIAC in Augusta.

On May 22, 2018, Ireland emailed Loder instructing him to start working one day per week at the MIAC, starting May 29, 2018, through Pelletier's retirement

---

[8] Loder denies this paragraph of the Defendants' statement of material facts, but the argument and record citations he supplies do not address the substance of the fact asserted by the Defendants, and thus it is deemed admitted under Local Rule 56(f), and (g).

date, to prepare to take over Pelletier's duties.  Loder did not report to the MIAC on May 29, 2018, as scheduled, and Johnston and Ireland called him.  Loder yelled at Johnston and Ireland during this conversation, and Ireland ordered Loder to immediately come to the MIAC.  Johnston and Ireland spoke with Grotton before Loder arrived at the MIAC regarding Loder's insubordinate behavior, and Grotton approved Ireland's request to expedite Loder's reassignment to the MIAC because of Loder's unprofessionalism in expressing his desire not to return to Augusta to work.

On May 29, 2018, Loder, Johnston, and Ireland met to discuss Loder's job expectations and requirements going forward.  Loder told Johnston and Ireland that he did not want to work in an office or commute to Augusta, that he believed Johnston's prior requests that Loder share information from his JTTF work with the MIAC were illegal, and that Loder believed that the MIAC was operating in violation of its privacy policy and the Code of Federal Regulations.

Loder emailed Johnston on May 31, 2018, to request two months of vacation. That same day, Johnston, Ireland, a sergeant in the weapons and licensing unit, and Loder met to discuss how Loder would receive the required training from Pelletier given his vacation request, a question that was not resolved that day.  Ireland also called Loder's JTTF FBI supervisor on May 31, to confirm that it would not be disruptive to the FBI to recall Loder to the MIAC more quickly.  The FBI supervisor confirmed that this was not a problem.  Johnston emailed Loder on May 31 to inform him that he would need to work three five-day weeks before July 27, 2018, to train with Pelletier.

In early June 2018, Loder requested and was granted leave from the MSP under the Family Medical Leave Act. Following four months of leave pursuant to the Family Medical Leave Act and additional accrued sick leave, Loder returned to his detective position at the MIAC in Augusta on October 3, 2018. While Loder was out on leave, the Command Staff advertised the detective position being vacated by Pelletier's retirement and filled the position to ensure that the mandated weapons and professional licensing work would continue to be completed.

In August 2018, during Loder's leave, Loder applied for a corporal position in Troop B. Lieutenant Colonel Harwood served on the interview panel. Loder did not appear for his interview for the corporal position, and Colonel Harwood called him to determine whether Loder was still interested in the position. Loder told Harwood that he was not interested in the position and also that he had no interest in returning to the MIAC and that he did not want to commute to Augusta and work in a cubicle. Loder also made remarks about the MIAC and the Code of Federal Regulations to Harwood, which Harwood told Loder he did not understand. Loder did not clarify what he meant and instead laughed and told Harwood that he did not want to commute to Augusta and work in a cubicle.

### 3. MCU-S Detective Position Hiring Process

The position of MCU-S Detective was posted for transfer or promotion on September 28, 2018. Loder applied for this position, as did three troopers seeking promotion to the detective rank. Johnston, Ireland, and Grotton were not involved in the hiring decision for the MCU-S Detective position. Cote, Harwood, Scott, and Holmquist interviewed the candidates and made the hiring decision for the position.

In situations in which a lateral candidate seeks to transfer across units that have the same job duties, the Command Staff is likely to grant the transfer without interviewing promotional candidates. However, the Command Staff agreed that when lateral applicants were coming from positions with different duties or requisite skill sets, they should be considered along with promotional applicants.

MCU-S Detectives are primarily responsible for handling homicides, suspicious deaths, child abuse, sexual abuse, and other violent crimes, and must be able to work in teams and follow directions, as well as lead teams through investigations and conduct investigations without substantial assistance. Scott determined that even though Loder was a detective, the MCU-S Detective position had different duties, and a different requisite skill set from Loder's current detective job. Loder was interviewed for the MCU-S Detective job on October 22, 2018, by Scott, Cote, Holmquist, and Harwood.

The interviewers determined that the types of cases Loder described working on at the JTTF were not the types of cases that MCU-S Detectives usually investigate and that Loder's investigative experience was almost entirely limited to his tenure with the JTTF. The interview revealed that Loder did not have as thorough an understanding of child sexual abuse cases as the other three candidates. Loder had also never worked on a death crime scene, and although he had some experience investigating fatal crashes, the breadth and depth of Loder's experience was notably less than that of the Trooper candidate ultimately selected for the position, who had previously investigated property crimes, suspicious deaths, and drug overdoses.

Loder, in contrast, had worked primarily on financial crimes including embezzlement and fraud while on the JTTF—types of cases rarely handed by MCU-S.

During Loder's interview, he disclosed that he had been suspended after a complaint was sustained against him 21 years earlier, and that if it had happened today, he would have been fired.  Based on this comment, Scott wondered if Loder had a *Giglio* issue, and Scott would have explored this further if Loder had been the top candidate because a *Giglio*-impaired detective in MCU-S could be restricted in his assignments because reliance on a *Giglio*-impaired officer's testimony to establish material facts at trial can put a case at risk.  Cote and Harwood were aware at the time of the interview that Loder was *Giglio*-impaired and considered this in their assessment of Loder's application.  As of the date that the Defendants submitted their motion for summary judgment, there were no MCU Detectives who were *Giglio*-impaired.  Additionally, in reviewing Loder's evaluations, Holmquist observed that the FBI had noted in two of Loder's performance evaluations that it needed to prod Loder to produce written reports.  This was notable because MCU-S requires hard deadlines for written reports, and failure to meet those deadlines can negatively impact a case.

The interviewers unanimously selected another candidate for the MCU-S Detective position because they believed he was objectively the most qualified candidate for the job, given his prior investigative experience as a trooper, including working with the MCU-S on a recent homicide case and experience as a troop

investigator.[9]   Loder was informed that he was not selected for the position by October 25, 2018.

On October 25, 2018, Loder requested a demotion from detective to trooper and a transfer to Troop G, which was granted.  Loder continues to hold that job.  On March 11, 2019, Loder filed a complaint with the Maine Human Rights Commission.

## II.  LEGAL ANALYSIS

### A.  Standard of Review

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Taite*, 999 F.3d at 92-93.  "An issue is 'genuine' if it can 'be resolved in favor of either party,' and a fact is 'material' if it 'has the potential of affecting the outcome of the case.'"  *Feliciano-Muñoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir. 2020) (quoting *Tang v. Citizens Bank, N.A.*, 821 F.3d 206, 215 (1st Cir. 2016)).  To prevail, the moving party must "'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'"  *Ocasio-Hernández v. Fortuño-Burset*, 777 F.3d 1, 4-5 (1st Cir. 2015) (alteration in original) (quoting *Carmona v.*

---

[9] Loder denies the Defendants' paragraphs 121-122, which state the interviewers' conclusions regarding the candidate ultimately selected for the position.  In his denial, Loder sets forth disparaging information regarding the qualifications of the candidate selected.  Loder's denial was nonresponsive to these paragraphs and thus does not properly controvert the Defendants' facts under Local Rule 56. Because Loder did not properly present the facts which he believes made the candidate less qualified than him as a statement of material fact which complies with the Local Rule, I do not consider the facts asserted in support of his denial.

*Toledo*, 215 F.3d 124, 132 (1st Cir. 2000)).  A court views the evidence in the light most favorable to the non-moving party when determining whether summary judgment should be granted.  *Taite*, 999 F.3d at 92.  The court must "proceed with caution and restraint when considering summary judgment motions where . . . issues of pretext, motive, and intent are in play."  *Id.* at 93.

A plaintiff opposing summary judgment "bears 'the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe.'"  *Miceli v. JetBlue Airways Corp.*, 914 F.3d 73, 81 (1st Cir. 2019) (quoting *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003)).  In doing so, "[t]he nonmovant must point to materials of evidentiary quality," *Irobe v. U.S. Dep't of Agric.*, 890 F.3d 371, 377 (1st Cir. 2018), and cannot rely on "mere allegation or denials" to sustain their burden, *Thomas v. Harrington*, 909 F.3d 483, 490 (1st Cir. 2018) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 256 (1986)).

## B.   The MSP's Alleged Retaliation Under the WPA

The WPA prohibits discrimination against employees because of good faith whistleblowing reports.  26 M.R.S.A. § 833 (West 2022).  To prevail on a WPA claim, the plaintiff must establish three elements: (1) that he engaged in a protected activity; (2) that he suffered an adverse employment action; and (3) that "there was a causal connection between the protected activity and the adverse action."  *Lennan v. Healthcare Servs. Grp., Inc.*, No. 2:20-cv-00057, 2022 WL 504113, at *7 (D. Me. Feb. 17, 2022) (quoting *Benson v. Wal-Mart Stores E., L.P.*, 14 F.4th 13, 30 (1st Cir. 2021)).

The Law Court considers WPA claims at the summary judgment stage using a "Maine-specific retaliation paradigm," under which "a plaintiff must present evidence

of causation up front, not wait for the defendant to introduce evidence of its legitimate reason for terminating her." *Theriault v. Genesis HealthCare LLC*, 890 F.3d 342, 350 (1st Cir. 2018). "Under this paradigm, the Court asks 'whether the record as a whole would allow a jury to reasonably conclude that the adverse employment action was motivated at least in part by retaliatory intent.'" *Lennan*, 2022 WL 504113, at *8 (quoting *Brady v. Cumberland Cnty.*, 2015 ME 143, ¶ 37, 126 A.3d 1145). "Only if the plaintiff in a WPA retaliation case satisfies this new paradigm will she be able to survive the defendant's motion for summary judgment." *Theriault*, 890 F.3d at 350. When making this assessment, the court must, "in a seamless inquiry, 'recognize any evidence that the employer had a lawful reason for the adverse action taken against the employee, and any evidence that the proffered reason is merely a pretext.'" *Id.* (quoting *Brady*, 2015 ME 143, ¶ 37, 126 A.3d 1145).

"[I]f the employee presents evidence of a causal connection between protected activity and adverse employment action, then the employee has created a record sufficient to defeat an employer's motion for summary judgment." *Brady*, 2015 ME 143, ¶ 33, 126 A.3d 1145. "An employee's protected activity is causally connected to the adverse employment action 'when the alleged retaliation was a substantial, even though perhaps not the only, factor motivating the adverse employment action.' Any relevant evidence, including temporal proximity, may be considered in determining whether there is an arguable causal nexus." *Johnson v. York Hosp.*, 2019 ME 176, ¶ 23, 222 A.3d 624 (quoting *Brady*, 2015 ME 143, ¶ 16, 126 A.3d 1145). "A plaintiff may show pretext by establishing 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons' for the

challenged employment action." *Theriault*, 890 F.3d at 353 (quoting *Cookson v. Brewer Sch. Dep't*, 974 A.2d 276, 282 (Me. 2009)).

For the purposes of the summary judgment motion, the MSP assumes both that Loder engaged in protected activity when he voiced his concerns about the legality of the MIAC's operations and information sharing policies, and that he suffered adverse employment actions when (1) his JTTF assignment was terminated and (2) he was not laterally hired into the MCU-S Detective job. Thus, the only issue for decision on summary judgment is whether Loder can establish a causal connection between his statements and the adverse employment actions.

Loder contends that he has generated a genuine dispute of material fact regarding causation that precludes summary judgment on his retaliation claim under the Maine WPA; namely, that he has shown evidence of pretext surrounding his complaints of the MIAC's purported illegality and the two adverse employment actions he suffered. The MSP counters that Loder has not supported his causation argument with sufficient evidence in the record and that Loder cannot show that the MSP's legitimate, non-retaliatory reasons for ending Loder's JTTF assignment and choosing a different candidate for the MCU-S Detective job were pretextual. For the following reasons, I conclude that there is an arguable causal nexus that precludes summary judgment on Loder's WPA claim as it pertains to the termination of his JTTF assignment but not with respect to the MCU-S Detective hiring decision.

### 1. Termination of JTTF Assignment

The MSP makes two arguments in support of its motion for summary judgment on Loder's WPA claim: first, that Loder cannot show that Ireland and Grotton, who

made the decision to terminate Loder's JTTF assignment and return him to the MIAC, knew that Loder had engaged in protected conduct when they made that decision; and second, that the record demonstrates that Loder was reassigned to the MIAC for legitimate, non-discriminatory reasons. The MSP contends that it reassigned Loder to the MIAC because: Loder had served on the JTTF task force for five years and it was time for him to return to the direct supervision of the MSP; the MSP Command Staff considered assigning a detective to the JTTF a low priority because it questioned the value of such an assignment; and operational needs required Loder to return to the MIAC to fill Detective Pelletier's position.

Loder contends that the MSP's stated reasons for ending his JTTF assignment are pretextual and that the decision was substantially motivated by retaliatory animus. Loder contends that pretext is demonstrated by the disconnect between Johnston and Ireland's assurances to Loder in March 2018 that there was no reason to believe that his JTTF assignment would end, and the decision just two months later to terminate the assignment. Loder argues that the MSP's assertion that Loder's JTTF assignment was terminated due to operational needs was pretextual, because Johnston and Ireland were aware in January 2018 that Pelletier intended to retire later that year and yet in March 2018 assured Loder that there was no reason to think that his JTTF assignment would end.[10] Johnston and Ireland were also aware in March 2018 that Loder had served on the JTTF task force for nearly five

---

[10] Loder also argues that his return to the MIAC must have been motivated by retaliatory animus because it was accelerated after the May 29, 2018, meeting in which Loder had a heated conversation with Johnston and Ireland both about his desire not to return to the MIAC due to the commute and because of his concerns about the MIAC's information sharing. However, the record makes clear that the decision to end Loder's JTTF assignment had already been made and communicated to Loder by this date.

years, and yet did not express any concerns to Loder that this would result in termination of the assignment. Loder asserts that his conversations with Johnston regarding Loder's concerns that MIAC's information-sharing practices were illegal, combined with Ireland's position as Johnston's superior within the MSP's chain of command, plausibly demonstrate that Ireland was aware of Loder's protected activity before the decision was made to terminate Loder's JTTF assignment.

Viewing the record in the light most favorable to Loder, Loder first told Johnston in November 2017 that he believed that he could not legally share information from the JTTF with the MIAC as directed. Ireland was a decisionmaker with respect to the termination of Loder's JTTF assignment and was also Johnston's supervisor. Thus, a reasonable jury could infer that Johnston told Ireland about Loder's allegation that the information-sharing directive that Loder was given was illegal. "[A] reasonable jury can infer that decision-makers were aware of an employee's complaints if the complaints 'could or should have been reported to' them." *Young v. Shaw's Supermarkets, Inc.*, No. 2:18-cv-00320, 2020 WL 2475875, at *5 (D. Me. May 13, 2020) (quoting *Cormier v. Genesis Healthcare LLC*, 2015 ME 161, ¶ 20, 129 A.3d 944); *see also Brady*, 2015 ME 143, ¶ 21, 126 A.3d 1145 (concluding that a reasonable jury could find that complaints made by a detective would have been communicated up the chain of command to the decisionmaker who was alleged to have retaliated against the detective).

The MSP contends that Loder's JTTF assignment was terminated and he was reassigned to the MIAC for operational needs—namely, that he had served five years in what was always intended to be a temporary assignment and that he was needed

in the MIAC to replace Pelletier.  A reasonable jury might consider these justifications to be pretextual based on Johnston and Ireland's representation to Loder in March 2018 that there was no reason to believe that his JTTF assignment would end, even though they were aware at that time that Pelletier would be retiring later that year and were also aware at that time that Loder had held the assignment for nearly five years.  Because there is a genuine dispute of material fact on the issue of whether there was a causal connection between Loder's alleged protected activity and the termination of his JTTF assignment, the MSP is not entitled to summary judgment with respect to Loder's WPA claim as it relates to the termination of Loder's JTTF assignment.

## 2.  MCU-S Detective Position

The MSP argues that it is entitled to summary judgment on Loder's WPA claim with respect to its decision not to hire Loder into the MCU-S Detective position because there is no plausible causal link between Loder's complaints in May 2018 regarding the MIAC and the decision to hire a different candidate in October 2018. The MSP asserts that Loder's deficiencies as a candidate, and not retaliatory animus, governed the decision.  As I will explain, my conclusion that there is a genuine issue of material fact as to the MSP's motivation for terminating Loder's JTTF assignment does not end the analysis as it relates to the motion for summary judgment on Loder's additional claim that the MSP's decision not to hire him into the MCU-S Detective role was retaliatory discrimination.

Loder contends that he should have been hired into the MCU-S Detective role over the other three candidates who applied because he was the only detective of the

four and he had already been performing the same role successfully for six years. But the record shows that Loder had primarily worked on financial crimes including embezzlement and fraud during his JTTF assignment. These types of cases are rarely handled by the MCU-S, which instead focuses on homicides, suspicious deaths, child abuse, sexual abuse, and other violent crimes. Although Loder asserts that the job descriptions for the two positions are identical, he supported this contention by including two identical copies of the December 2011 posting for the JTTF assignment in the summary judgment record and did not provide a description for the MCU-S Detective position.

Loder also admits that he is *Giglio*-impaired and that in the past he failed to file timely reports. These issues objectively made Loder much less suitable for the position, which requires testifying at trials to establish material facts—a task that *Giglio*-impaired officers cannot reliably perform—and that requires hard deadlines for written reports to ensure that cases are not negatively impacted. In contrast to Loder, the candidate hired for the MCU-S Detective position had prior investigative experience, including recent work with the MCU-S on a homicide investigation.

The individuals who decided to terminate Loder's JTTF assignment and return him to the MIAC were not the same individuals who made the hiring decision for the MCU-S Detective position. For that reason, the fact that a reasonable jury may find that Johnston and Ireland may have had a retaliatory motive for ending Loder's JTTF assignment does not carry over to the MCU-S Detective hiring decision. Loder has not offered additional facts that would permit a jury to plausibly infer that the MSP's

hiring decision was pretextual.  The MSP is entitled to summary judgment on Loder's WPA claim with respect to the MCU-S Detective hiring decision.

## C.    First Amendment Retaliation Under § 1983

Loder also contends that Johnston and Ireland retaliated against him, in violation of the First Amendment, and are liable in their personal capacities under 42 U.S.C.A. § 1983 (West 2022).  A public employer may not retaliate against a public employee for engaging in protected speech, and "claims of retaliation for the exercise of First Amendment rights are cognizable under § 1983." *Rosaura Bldg. Corp. v. Mun. of Mayagüez*, 778 F.3d 55, 66 (1st Cir. 2015) (quoting *Centro Médico del Turabo, Inc. v. Feliciano de Melecio,* 406 F.3d 1, 9 (1st Cir. 2005)).  First, the employee must establish that he spoke "as a citizen on a matter of public concern." *Díaz-Bigio v. Santini*, 652 F.3d 45, 51 (1st Cir. 2011) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).  An employee does not speak as a private citizen when he "make[s] statements pursuant to [his] official duties." *Decotiis v. Whittemore*, 635 F.3d 22, 30 (1st Cir. 2011) (quoting *Garcetti*, 547 U.S. at 421)).  The First Circuit has established a context-specific inquiry to determine whether speech is made pursuant to official duties, which requires that "[f]irst, a court must ask, 'what are the employee's official responsibilities?,' and second, 'was the speech at issue made pursuant to those responsibilities?'" *Id.* at 31 (quoting *Mercado-Berrios v. Cancel-Alegría*, 611 F.3d 18, 26 (1st Cir. 2010)).  The court should look to multiple factors to determine whether a public employee's speech was made in a professional or private capacity, including:

> whether the employee was commissioned or paid to make the speech in question; the subject matter of the speech; whether the speech was made up the chain of command; whether the employee spoke at her place of

> employment; whether the speech gave objective observers the impression that the employee represented the employer when she spoke (lending it "official significance"); whether the employee's speech derived from special knowledge obtained during the course of her employment; and whether there is a so-called citizen analogue to the speech.

*Gilbert v. City of Chicopee*, 915 F.3d 74, 82 (1st Cir. 2019) (quoting *Decotiis*, 635 F.3d at 32).

If the first element is established, the court must then balance the interests of the plaintiff and the public in the protected speech against the "government's interest in functioning efficiently." *Borrás-Borrero v. Corporación del Fondo del Seguro del Estado*, 958 F.3d 26, 35 (1st Cir. 2020) (quoting *Rosado-Quiñones v. Toledo*, 528 F.3d 1, 5 (1st Cir. 2008)).

If the plaintiff and public's interest in the protected speech outweighs the government's interest in functioning efficiently, the employee must then show "that the protected expression was a substantial or motivating factor in the adverse employment decision." *Delaney v. Town of Abington*, 890 F.3d 1, 6 (1st Cir. 2018) (quoting *Curran v. Cousins*, 509 F.3d 36, 45 (1st Cir. 2007)). "The plaintiff's burden in establishing motivation 'is more substantial than the burden of producing prima facie evidence in, for example, the first stage of a Title VII discrimination case.'" *Rosaura Bldg. Corp.*, 778 F.3d at 67 (quoting *Díaz-Bigio*, 652 F.3d at 51 n.3). Finally, the employer may still avoid liability by demonstrating "that it would have undertaken the adverse employment action regardless of the plaintiff's protected conduct." *Delaney*, 890 F.3d at 6.

Loder contends that his complaints to Johnston and Ireland about potential unlawful activity at the MIAC are protected speech because he was discussing a

matter of public concern in his capacity as a private citizen.  Loder also asserts that, for the reasons described above, his protected speech was a substantial or motivating factor in the decisions to end his JTTF assignment.  Johnston and Ireland argue that Loder's speech is not protected by the First Amendment because when Loder raised his concerns about the legality of the MIAC's operations he did so in his capacity as a public employee, and that Loder cannot show pretext in the MSP's decision to end Loder's JTTF assignment.

Loder is correct that there has been substantial public interest in the MIAC's handling of private information, so his allegations that the MIAC was operating in violation of federal law with respect to information privacy addressed a matter of public concern.  However, for the reasons that follow, he has not plausibly shown that he spoke as a private citizen.

Loder asserts that, because his job on the JTTF was to investigate terrorism, his expression of concerns about the MIAC's compliance with privacy laws was not part of his job.  However, Loder was a MIAC Detective during this period, and his concerns that MIAC's information practices were in violation of the law were directly related to his role as a MIAC employee.  Loder gained knowledge of the MIAC information sharing practices as a direct result of his detective position.  He voiced his concerns about the MIAC information sharing policy directly up the chain of command.  Loder also made all of his complaints within the context of the workplace—either in person at the MIAC and MSP offices in Augusta or by cellular phones paid for by the MSP.  Based on the summary judgment record, it is an undisputed fact that Loder's speech was that of an MSP employee and not that of a

private citizen. Thus, Johnston and Ireland are entitled to summary judgment, and I do not reach the remaining elements of Loder's First Amendment claim or the affirmative defense of qualified immunity.

### III.  CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment (ECF No. 53) is **GRANTED IN PART** and **DENIED IN PART** as follows:

A. The motion is **GRANTED** as to Count 1 (WPA claim) regarding the MSP's decision not to hire Loder into the MSU-S Detective position and Count 2 (First Amendment retaliation under 42 U.S.C. § 1983).

B. The motion is **DENIED** as to Count 1 (WPA claim) regarding the termination of Loder's JTTF assignment.


**SO ORDERED.**

**Dated: August 11, 2022.**


                                    _____/s/ JON D. LEVY_____
                                    **CHIEF U.S. DISTRICT JUDGE**