```
 1              UNITED STATES DISTRICT COURT

 2                   DISTRICT OF MAINE

 3    _____

 4    GEORGE LODER,                          CIVIL ACTION

 5              Plaintiff            Docket No:  2:20-157-JDL

 6

 7         -versus-

 8
                                        PLAINTIFF'S CLOSING
 9                                          ARGUMENT
      MAINE DEPARTMENT OF
10    PUBLIC SAFETY,

11              Defendant

12    _____

13              Transcript of Proceedings

14    Pursuant to notice, the above-entitled matter came on for Jury
      Trial held before THE HONORABLE JON D. LEVY, United States
15    District Court Judge, in the United States District Court,
      Edward T. Gignoux Courthouse, 156 Federal Street, Portland,
16    Maine, on the 2nd day of December 2022 at 8:00 a.m. as
      follows:
17

18    Appearances:

19    For the Plaintiff:   Cynthia A. Dill, Esquire

20

      For the Defendants:   Paul E. Suitter, Esquire
21                          Kelly L. Morrell, Esquire

22

              Lori D. Dunbar, RMR, CRR
23            Official Court Reporter

24         (Prepared from manual stenography and
              computer aided transcription)
25
```

```
 1                          *   *   *   *   *
 2              MS. DILL:  How's that?  Can everybody hear me?
 3         Here we are at last.  Thank you very much for your time
 4    and attention this week.  And thank you, Your Honor, and thank
 5    you to the assistant --
 6              THE COURT:  One moment.  Can we just turn the volume
 7    up a bit or perhaps if you have the microphone a little bit
 8    closer to you?
 9              THE CLERK:  Move it up a little bit higher on your
10    coat.
11              THE COURT:  That would be better, thank you.
12              MS. DILL:  Is that better?
13              THE COURT:  That is better.
14              MS. DILL:  Hopefully you remember when I first spoke
15    with you I described a quilt, and I said if we were in
16    Hollywood we would have seen the story unfold in pictures and
17    color and in chronological order, but instead because this is
18    Maine we're going to put together information in piecemeal
19    fashion and at the end try to thread it together.  And I'm
20    sure given the temperature in the courtroom you had hoped that
21    I might put this quilt together a little sooner, but I'm
22    pleased now to try to make sense of the information that
23    you've received.
24         And I think we'll begin with the beginning and that is
25    the evidence that you'll have in the jury room includes the
```

1    law that established the MIAC, and that's Plaintiff's Exhibit

2    2.  And it's the law that was signed by the governor who had

3    the authority to sign it, and the evidence shows that it has

4    the weight of law.  It is in fact a law.  And the defendant,

5    the Department of Maine Public Safety, and the people who

6    represent that organization, the high-ups, the people who

7    testified in this trial, are all representatives.  They speak

8    for the defendant.  Their actions are the actions of the

9    defendant.  And the defendant, the Department of Public

10   Safety, the MIAC, is obligated by the order to follow certain

11   laws.

12        And one of the laws is the federal regulation.  And

13   you'll have that in evidence, and that's Plaintiff's Exhibit

14   4.  And when you -- you don't need to be a lawyer to look at

15   this regulation and see that the operating principles

16   essentially -- not essentially, are very clear, and that is

17   that the project shall collect and maintain criminal

18   intelligence information concerning an individual only if

19   there is reasonable suspicion that the individual is involved

20   in criminal conduct or activity and the information is

21   relevant to that criminal conduct or activity.  And it goes

22   on.

23        And you'll now have assistance in interpreting this

24   regulation by looking at one of the last exhibits in the

25   trial, and that's the Defense Exhibit 54.  And when you look

1    at this 54 in conjunction with the federal regulation, you can

2    go right to the second page and it pretty clearly states what

3    you're not supposed to do.  And what you're not supposed to do

4    is you're not supposed to automatically enter the names of

5    individual members or organizations without first making a

6    determination that the organization is a criminal enterprise

7    or front.  You're not supposed to create and maintain a record

8    of an individual or an organization unless there's a

9    reasonable suspicion of involvement in a current criminal

10   enterprise.  And you're not supposed to include criminal

11   intelligence record in the name of any individual or

12   organization that's not reasonably suspected of criminal

13   activity, and it goes on.  And all that information was

14   available to Sergeant Johnston when he took over the MIAC.

15   And all this information is going to be available to you.

16        And even though the federal regulation imposes a

17   requirement to have federal funding from the omnibus

18   criminal -- omnibus law, the Maine law does not require that.

19   And the governor of the state of Maine has the authority to

20   impose on the state agencies requirements when it comes to

21   information sharing.  And what's at its core is our rights to

22   privacy as United States citizens, your rights, my rights,

23   everyone's rights to privacy, that we have a right to not have

24   information about us, personal information, personal

25   identifying information, our names, our dates of birth, our

1    phone numbers, our addresses, in a system that's maintained by

2    the government, a secret database that it can search by name

3    and pull up, oh, this is when you went to a protest, this is

4    another time you went to a protest, oh, and you bought a gun.

5    You were a counselor at a peace camp.

6         Everyone is protected by these laws.  This isn't a

7    right/left issue.  This isn't whether you're a Democrat or a

8    Republican.  You can be a peace camp counselor; you can be a

9    gun collector.  Everyone has rights to privacy.  And that's

10   what this case is about at its core is George Loder's concern

11   about the privacy of Maine citizens.  And his concern was

12   based on his training at very high levels of government.

13        Now, the story essentially began in November when

14   Lieutenant Johnston went to a conference in Washington and

15   came back with this document.  It's Plaintiff's Exhibit 56.

16   And this document -- you might be dying to see it because

17   there's such secrecy surrounding it.  It's a sealed document.

18   And as you saw, when the federal officials were here to

19   testify, it's very carefully regulated what could be said and

20   what could not be said.  This document is secret.  So just

21   imagine the restrictions on Mr. Loder as a federal deputized

22   agent working with very sensitive information when he was told

23   by Lieutenant Johnston that he needed to share information

24   about his cases, the roundtable discussion, some people over

25   the phone, some people at their desks in the MIAC, some people

1    working remotely.  Tina Lambert said it was a revolving door

2    of agency representatives who showed up at the MIAC meetings.

3    And George had concerns about talking about his cases at these

4    weekly meetings.  And he said, I will talk to you.  I'll give

5    you all the information you need as my supervisor at the state

6    police, but I can't share the information with people from the

7    University of Maine, people from Border Patrol.  And he did

8    share the information, and that is indicated in his

9    evaluations.

10        I want you to look carefully at defendant's -- excuse

11   me, Plaintiff's Exhibits 7, 8, 9, and 10, because these

12   documents contain the official record of George Loder's

13   performance as a member of the Joint Terrorism Task Force.

14   And you're going to see in these documents that he excelled at

15   his job, that there were a few things that we all know that

16   George isn't good at.  Namely, he's not a good paperwork

17   person necessarily, but he exceeded at the job.  He brought

18   value.  Aaron Steps is quoted in these documents.  I want you

19   to read carefully the words that Aaron Steps uses in

20   describing Mr. Loder's work.

21        Assistant Attorney U.S. -- Assistant United States

22   Attorney Rick Murphy, who you heard from, is quoted in these

23   documents.  Read carefully what Rick Murphy said.  Aaron Steps

24   said that the partner agency, the home agency that George

25   should be sharing information with, was the Maine State

1    Police.  And that's who George Loder shared information with,

2    that's who he was willing to share information with.  That's

3    what the documents say, he did share information.  But what

4    Lieutenant Ireland wanted and demanded of him is that he share

5    the information at the MIAC.

6        And the reason why George Loder was concerned with

7    sharing information with the MIAC is because all of the

8    information, all of the activity of the MIAC, is recorded in

9    the activity report and maintained forever.  And the

10   information contains criminal intelligence, which we heard.

11   The information contains noncriminal intelligence that we

12   heard, the kinds of information that the regulations clearly

13   say are governed by 28 CFR Part 23.  And those regulations say

14   if there's information that's speculative, that isn't attached

15   to a real report, then it needs to be identified as such, it

16   needs to be reviewed periodically, and it needs to be purged.

17       That's our right to privacy is that, sure, you can

18   collect information if there's a tip and you can analyze it.

19   But if there's a determination that there's no criminal nexus

20   then it needs to be purged.  And the activity report had no

21   retention policy -- well, I shouldn't say that.  The privacy

22   policy at the time said it should be purging, but we know from

23   the testimony that they weren't purging the documents.  And

24   that was the source of George's concern about the activity

25   report.  And whether you know what the activity report is or

1   not, because it's confusing, you should be concerned about it

2   or you may be concerned about it based on this evidence.

3       When Sergeant Johnston came back from the conference

4   with this document that he says clearly shows that George

5   Loder as a Joint Terrorism Task Force member needed to share

6   more, look through this carefully and I think you'll find that

7   this document says a lot of things but nowhere in it does it

8   say that George Loder is required to share information with

9   the MIAC.  It talks about the appropriate sharing of

10  information for the protection of the citizens of the United

11  States.  That's the goal.  The antiterrorism effort of the

12  fusion center and the MIAC, the purpose is to protect us, not

13  to spy on us.

14      I told you in the opening that following the November

15  discussion when Sergeant Johnston came back from the

16  conference, told George he needed to share the information,

17  George says, I really can't share the information because of

18  FBI policy.  George Loder did attend the weekly meetings that

19  he could, and he shared the information that he could.  But

20  that wasn't good enough.

21      And in March when George Loder met in Portland with

22  Aaron Steps and Sergeant Johnston, George testified that

23  before the meeting he met with Sergeant Johnston before Aaron

24  Steps came in and they had conversation about, hey, what are

25  you going to be doing, this is your last year.  George at that

1     point had one more year until he was eligible for retirement.

2     And Sergeant Johnston said, oh, this might be your last

3     evaluation since you're coming up for retirement, what do you

4     want to do.  George said, well, I'd like to finish my time on

5     the Joint Terrorism Task Force; I love the work I'm doing.

6     But if it's my time to go and there was an opening at the time

7     for a Major Crimes detective position, and George said, you

8     know, I could apply for that.  And Sergeant Johnston said,

9     there's no reason to think you won't stay on the Joint

10    Terrorism Task Force, so George didn't apply to be laterally

11    transferred at that time and that opportunity came and went.

12          They talked about Dave Pelletier's retirement at that

13    meeting, because, as Dave Pelletier testified, he had told --

14    he had announced that he was retiring in January.  He had told

15    Sergeant Johnston and Lieutenant Ireland in January he would

16    be retiring in the summer.  Now, there's conflicting testimony

17    about whether at a later date he was more clear about the

18    date, but there's no testimony about when that later

19    conversation had and -- and the dates are important.

20          So following the meeting on March 26th with -- first

21    with George and Lieutenant -- or Sergeant Johnston at the

22    time, they met with Aaron Steps for the purposes of the

23    evaluation.  That evaluation is in evidence, and you'll see

24    that at that time George was exceeding the expectations of the

25    job.  When Aaron Steps left the meeting, Lieutenant Ireland

1    said to George, look, you need to start sharing more

2    information.  And George's testimony is that he wanted

3    details, and that's corroborated by the document that says at

4    the top, documenting names in the activity report.  Sergeant

5    Johnston wanted names in the activity report because -- and

6    this is Plaintiff's Exhibit 29, the subject documenting names

7    in the activity report -- because if you have names in the

8    activity report then you can search it.  And that's what this

9    is about, right?  Is having a database that you can search.

10   George again said, I -- I can't share the information with a

11   roundtable on GoTo Meeting.  That's my summary.  You heard his

12   testimony.  He expressed concern about sharing information

13   with Sergeant Johnston at that time.

14       The next day George Loder, being concerned about what

15   Sergeant Johnston wanted him to do but also wanting to comply

16   with the order to share more information, met with Aaron

17   Steps.  And Aaron Steps, as you heard, said maybe you should

18   call the lawyer down in Boston.  And that's what George did.

19   He called Alethea Harris and he got information from her.  And

20   the information was that he needed to share information with

21   the MIAC or with the Maine State Police in accordance with the

22   FBI policy, and the policy requires specific disclosure forms,

23   these FD-999s.

24       In May George attended a conference about criminal

25   discovery and had a conversation later with Assistant U.S.

1    Attorney Rick Murphy and again received guidance about the

2    sharing of information and understood that his concerns were

3    legitimate.  He -- he had a legitimate basis for these

4    concerns about sharing very secret information.

5        So after his receipt of guidance from the FBI lawyer in

6    Boston, from the -- the First Assistant U.S. Attorney, he had

7    a conversation with Sergeant Johnston on May 5th and he told

8    him, look, I've -- I've talked to the FBI lawyer, I've -- I've

9    talked to the Assistant U.S. Attorney, I've talked to these

10   people that I work with.  And they've -- they've told me I

11   can't share the information until I follow the procedure.  And

12   the testimony is is that what Sergeant Johnston told George

13   Loder is, I can tell you right now the lieutenant does not

14   want to hear that.

15       Now, we know that the sharing of information was a

16   frustration on the part of the Lieutenant Ireland and Mike

17   Johnston because they documented it.  And they -- immediately

18   after George told Sergeant Johnston on March 26th that he

19   couldn't share the information, you'll see Plaintiff's Exhibit

20   55 says -- this is an e-mail that Mike Johnston sent to Scott

21   Ireland -- a fair amount of material in the weekly, including

22   some personnel observations on George Loder as requested.  And

23   the personnel observation is that George -- reluctance

24   bordering on refusal to share information with the MIAC

25   regarding his activities, not with the state police but with

1    the MIAC.  They wanted him to share the information with the

2    MIAC.

3         So the May 5th call with Sergeant Johnston is important

4    because -- because Lieutenant Ireland didn't want to hear it.

5    He didn't -- he didn't want to hear it.  So ten days later

6    when they sat down to go over George's evaluation on May 15th,

7    and you'll see in the documents this is the -- the evaluation

8    that is -- well, they went over -- they met to go over the

9    evaluation.  And one of the deficiencies at that point,

10   according to Sergeant Johnston, was that he wasn't sharing

11   enough information.

12        Now, the question you have to ask in your mind is if

13   what he was following -- what he was failing to do according

14   to Johnston was sharing information.  Is it reasonable to

15   think that at that time George did not raise the issue of

16   sharing information?  On May 15th is it reasonable to think

17   that in a discussion about information sharing and that he

18   needs to share more of it that George didn't tell Sergeant

19   Johnston and Lieutenant Ireland that sharing was a concern?

20   On that date, May 15th, he was told he was being removed from

21   the MIAC, and the reason that was given was that it had been

22   five years.  And the most contemporaneous document that we

23   have about what happened outside of George's testimony about

24   it is the Plaintiff's Exhibit 14.  This is the document that's

25   dated May 16th, 2018, and it's the document that reprimands

1    George for being rude on a phone call.  But when you look at

2    what describes as what happened on May 15th, you'll see that

3    it says that when George got the information that he was being

4    removed from the task force he wasn't happy about it but he

5    said, well, can you at least check if there's any other

6    positions, any other detective positions, in the south,

7    because I really don't want to go back to the MIAC.  I think

8    it's pretty obvious that George Loder and the MIAC was not a

9    good match of skill sets.  It was -- it was a very

10   administrative job in a windowless building at a cubicle doing

11   paperwork.  And that's not what he was good at.

12        And this is important, because at that time it says

13   right here, I -- this is Lieutenant Ireland's document.  I

14   advised Detective Loder that I would check with Major Grotton

15   on this, they would check to see if there was a Major Crimes

16   Unit South detective position on that day.  Now, why, if there

17   was such an operational need, if it was so urgent that George

18   get to the MIAC for training, why would they say first that he

19   was being removed for -- because it had been five years, and

20   second that they would check to see if there was another job?

21        But there wasn't another job, and so the next day there

22   was a conversation and they told George, there's no other

23   jobs, you have to go to the MIAC.  And the conversation got

24   heated, you heard.  And in that heated discussion, according

25   to the defendants, there was a lot of screaming and yelling.

```
 1      And trained law enforcement officers who write detailed

 2      reports for a living wrote a description of what happened in

 3      the phone call on May 16th that George was screaming and

 4      yelling and that he was rude, but they did not include what he

 5      was screaming or yelling about.  Their testimony is they

 6      didn't understand what George was saying.  And what he was

 7      trying to tell them is that we can't collect all this

 8      information and keep it forever.  I can't share information

 9      with the MIAC.  I can share information with the state police;

10      I can't share information at the MIAC.

11          And instead of looking into it, instead of seeking maybe

12      an additional opinion about it, they disciplined him.  But

13      they disciplined him in a way that he couldn't grieve.

14      Because you'll see tacked on at the end it says, this job

15      performance record shall not be put in your personnel file and

16      it shall go into your incident file.  The record does not

17      constitute any form of reprimand.  So you have to ask yourself

18      why, if this behavior was so egregious, insubordinate, why he

19      wasn't disciplined.  And I think it's reasonable to infer that

20      it's not described as discipline because they didn't want him

21      to grieve it.

22          Do you recall Anna Love?  She was the director of the

23      MIAC and then later was in the Office of Professional

24      Standards.  And when I was talking to her about the discipline

25      that George received, I asked her, so is the finding of George
```

1    Loder being rude, is that egregious in the scale of

2    discipline?  She said no, it's the lowest level.  And I asked

3    her, so he could have grieved it?  And she said yes.  But

4    that's not what he was allowed to do; he was not allowed to

5    grieve it.

6         The other thing that George -- and this is important --

7    George told Lieutenant Ireland and Sergeant Johnston on May

8    16th, he said, if you're going to force me to work in the

9    MIAC, you're forcing me out of the state police.  Because he

10   knew if he was at the MIAC he would be working with this

11   activity report that he clearly felt had concerns, and his

12   concerns were reasonable because the MIAC activity report

13   contained all this information about people who hadn't

14   committed any crimes, there was no criminal nexus.  We heard

15   that from Tina Lambert.  There was information in the MIAC

16   about Seeds of Peace camp counselors that had no public

17   threat, had no criminal nexus, they were maintained forever,

18   included the names, the dates of birth, Social Security

19   numbers.  And George said, if you're going to make me work at

20   the MIAC you're forcing me out of the state police.

21        Sergeant Johnston, Lieutenant Ireland, responded with a

22   revised State of Maine management form.  You'll see the

23   last -- the last evaluation that they did of George was

24   Plaintiff's Exhibit 12.  This is the one following the meeting

25   with Aaron Steps that is exceeding expectations but notes that

1    they wanted more information sharing.  This is the one that

2    they discussed and, according to the defendants, George didn't

3    raise his concerns about information sharing, which I contend

4    is an unreasonable -- it's hard to believe that they would

5    discuss information sharing and that George wouldn't raise his

6    concerns about the legality of the information sharing.

7         But on May 29th, following this heated discussion on the

8    16th, he was issued a revised State of Maine performance

9    management form.  And what they said is that -- that this is a

10   job description.  This was his new job description that was

11   going to be at the MIAC.  Now, this doesn't look like any

12   other job description you'll have to review.  There's plenty

13   of job descriptions, and you'll see that this one's very

14   different.  And it concludes at the end that he was meeting

15   expectations, not exceeding.

16        Now, the only thing that had happened between Exhibit 12

17   when he was issued his performance management evaluation dated

18   May 15th and May 29th was the conversation that took place,

19   the conversation where George said, I can't share the

20   information.  And he was investigated for being rude.  But the

21   important thing about this is they had said and they -- their

22   defense, the defendant, the Maine Department of Public Safety,

23   the high-ups who were here speaking on behalf of them, they

24   said that the reason why George needed to go to the MIAC was

25   to perform the duties of Detective Pelletier, because

1    Detective Pelletier was going to be retiring and that this is

2    very important work, statutorily required professional

3    licensing.  But you're going to have in the -- in the jury

4    room, you're going to have the description of the job that

5    Dave Pelletier was doing because we know that Jarod Stedman

6    ultimately got that job.

7         Now, if you compare Plaintiff's Exhibit 25, which

8    purports to be George Loder's new job description, you'll see

9    that when it comes time to the MIAC he was expected to do

10   mostly clerical work, but most importantly you'll see that

11   the -- Dave Pelletier's job, the one that Jarod Stedman got,

12   the one that was posted on September 28th, is very different.

13   So the question that you have to answer is, is this revised

14   performance management form an adverse action?  Is it

15   punishment?

16        The responsibilities were substantially reduced.  George

17   went from being, as we know, a member of a federal task force

18   investigating, helping to prosecute, international terrorists

19   with a top-secret security clearance, testifying in this

20   building in federal court, making sworn statements for search

21   warrants, to data entry in a windowless room, not performing

22   the job that Dave Pelletier had because, we know, Jarod

23   Stedman got that job.

24        And when Jarod Stedman got the job he was trained by

25   Sergeant Johnston and then Tyler Stevenson, who I believe was

1    a detective.  And those two people trained Jarod Stedman, and
2    I think it's reasonably to infer -- reasonable to infer that
3    they clearly could have trained George Loder.  But the
4    question is, is do you really think that it was absolutely
5    necessary for George to have three weeks of training before he
6    took the job?  And I suggest that the -- that that is
7    unreasonable, that the -- the duties that you'll see that are
8    described to be the -- the job that Jarod Stedman got are
9    practically identical to the duties that are described in the
10    JTTF position that George got.  Before George went to the
11    JTTF, these -- this was the job description.  And if you
12    compare that job description with the job description of
13    Jarod -- Jarod Stedman's job, if you compare the job
14    description of the Major Crimes Unit position, detective job,
15    they're all very similar.

16        You're going to have -- rather than put them on the
17    screen, you're going to have defendant's -- Plaintiff's
18    Exhibit 23 and 26 and 27 and 24.  All of them you'll see at
19    the top dated -- 23 is the job description of the first job
20    that George had at the MIAC.  Those duties you've heard were
21    performed satisfactorily.  Plaintiff's Exhibit 26 is the job
22    description of a Major Crimes Unit detective position, and
23    you'll see that the duties and responsibilities are
24    practically identical to the job description of Exhibit 27,
25    which is the JTTF position.

1          The job description of -- the revised performance job

2     description that he was handed after reporting that the MIAC

3     activity report was illegal after refusing to engage in the

4     order to share information is different.  It's not the same

5     job.  He wasn't -- he wasn't brought back to the MIAC to do

6     Dave Pelletier's job.  He was brought back to the MIAC to do

7     administrative work, I suggest, as punishment, as retaliation

8     for refusing to follow the order to share information, for

9     resisting participating in collecting and retaining

10    information on Maine citizens who were engaged in lawful

11    activity.

12         Now, we heard about the May -- there was -- May 15th

13    they met to go over the job evaluation, and that's the day he

14    was removed from the Joint Terrorism Task Force.  May 16th was

15    the telephone call where there was some yelling and screaming.

16    The yelling and screaming was about his concerns; those

17    concerns didn't make its way into the report to the Office of

18    Professional Standards.  He was found to be rude.  He

19    admits -- he admitted that he was rude, and he accepted the

20    consequence of the counseling, the counseling that he could

21    not grieve.

22         Now, on May 29th, that's when he was ordered up to

23    Augusta.  Now, prior to that there was an e-mail that -- on

24    May 22nd, Lieutenant Ireland had sent an e-mail telling George

25    Loder that he needed to show up at the MIAC on the 29th.  And

 1    the testimony is that George didn't see the e-mail, that he

 2    had three e-mail addresses at the time, two for the state, one

 3    for the FBI, he had hundreds of e-mails.  He hadn't opened his

 4    e-mail and he missed it.

 5        Now, the suggestion by Sergeant Johnston that he knew

 6    about it and intentionally didn't go to the meeting I say is

 7    unreasonable because the sophistication of the Maine State

 8    Police is such that they should be able to know whether he

 9    opened the e-mail or not.  But regardless, as soon as he was

10    called on that morning on the 29th and told to report, he was

11    washing his car, he jumped in his car, went up there.  And he

12    was told, you've got to get on board with this fusion center

13    concept.  You need to share information with the MIAC.  And

14    what's very important is that the notes of Sergeant Johnston,

15    who testified just moments ago this morning, the notes say

16    that George kept saying -- he interrupted again and talked

17    about the unlawful collection and retention of information.

18        Sergeant Johnston said, you keep saying what we're doing

19    is illegal but it's been decided it's not illegal.  And it

20    hadn't been decided.  It hadn't been decided.  What had

21    happened is that Sergeant Johnston and the privacy officer and

22    Lieutenant Ireland had gotten information from the United

23    States Department of Justice about a new system that they were

24    about to launch called Netsential, and the information they

25    got was that Netsential, if it complied with certain

1   regulations it would be outside the scope of 28 CFR Part 29

2   [sic], but during those discussions with the U.S. Department

3   of Justice -- and you'll see on the exhibit -- the information

4   that they got was that certain information, if it's

5   speculative in nature, has to comply with 28 CFR Part 23.  So

6   they hadn't gotten confirmation from the U.S. Department of

7   Justice at that time.  And you'll see that in -- in the

8   exhibit.  I believe it's Exhibit 44.  You'll see that the

9   information that they had gotten at that point did not say

10  that the activity report falls outside the regulation.  Does

11  not say that at all.

12       But what's important is on May 29th, there's no dispute

13  that at that time George was telling them his concerns, his

14  concerns about following the order, the directive to share the

15  FBI information without the proper disclosures, and he was

16  concerned about the activity report.  And on that day Sergeant

17  Johnston and Lieutenant Ireland met with Major Grotton.  They

18  met with Major Grotton to report what had happened on

19  May 29th, that there was a meeting that -- that they described

20  as hot, but they -- they didn't tell Major Grotton what

21  George's concerns were, or at least that's their testimony.

22       Now, Colonel Cote said if someone in George's

23  position -- someone with 24 years of law enforcement who had

24  taken a federal polygraph, who had been trained on federal

25  laws, who had a top-secret security clearance had reported a

1    concern about unlawful activity that the expectation that the

2    report be reported up the chain, but the defendants say that

3    on May 29th Major Grotton didn't know.  Major Grotton says he

4    didn't find out about George's concerns until after he

5    returned from the MIAC.  So why didn't he know?  Why didn't

6    they tell him?

7        So following the May 29th meeting that was very

8    stressful, can you imagine, you've seen these gentlemen,

9    Sergeant Johnston, now lieutenant, Lieutenant Ireland, Tyler

10   Stevenson, can you imagine being in a room with them and not

11   being able to leave?  George testified he -- he asked at one

12   point, am I being arrested?  You can imagine how stressful it

13   might have been.  And despite that, there's no record other

14   than Lieutenant Ireland's after-the-fact description.  And so

15   is it reasonable that during those conversations none of them

16   understood what George's concerns were?  None of them

17   understood that his concerns were the activity report?  That

18   the sharing and collection and retention of information was

19   unlawful?  That it's a violation of the order establishing the

20   MIAC that says these regulations should apply?  That it's a

21   violation of the privacy policy that the privacy officer said

22   also imposed limits on the information that could be collected

23   and imposed a requirement that certain information be

24   expunged?

25       So George requested vacation.  He by that point had

1    finished his work at the JTTF, he was cut from the JTTF.  They

2    told him, you're done, don't go there anymore.  They called

3    Aaron Steps.  We don't know the reason they gave Aaron Steps;

4    Aaron Steps couldn't recall.  Aaron Steps recalls that George

5    was removed from the terrorism task force, and that was

6    probably a good time for George to take a break; don't you

7    think?  After that very stressful series of events, he had

8    earned vacation time, and so he requested vacation that would

9    have brought him back on July 27th.  And at that time the

10   retirement date of Dave Pelletier was a week later.  So that

11   would have enabled George to come back and have a week with

12   Dave Pelletier and then have additional time with Sergeant

13   Johnston and Tyler Stevenson, who were the supervisors of the

14   office and clearly had the capacity to train George on the new

15   position because they trained Jarod Stedman.

16        But his request for vacation was denied.  And they said

17   the reason why it was denied is because it was absolutely

18   imperative that George have three full weeks at the MIAC, from

19   8:00 in the morning until 4:00.  And I have -- you have to ask

20   yourself, is that -- is that reasonable, is that -- does that

21   sound legitimate that there would be an urgent need for both

22   Dave Pelletier and George Loder to be at the MIAC doing this

23   work?

24        There's no evidence that the work wasn't done.  There

25   was no evidence that they didn't have the resources.  There

1    was testimony that there was a staffing shortage, but none of

2    the defendants who testified knew whether or not another

3    analyst had been hired.  George knew that.  They didn't know

4    if there was really any problem whatsoever.  There's no

5    evidence that it was such an urgency other than after-the-fact

6    testimony that there was.

7        So after the vacation request was put in they said,

8    George, come back up.  And so he did.  He went up and on May

9    31st, that's when he was given the negative performance report

10    that could not be grieved, and he was told it was going to

11    add -- be added to his incident file.  Now, remember when we

12    talked to Anna Love she was confused about what an incident

13    file was.  Because there was no such thing.  There was a

14    personnel file and then there was the internal affairs file,

15    at least that's how it was when Anna Love was in charge.  With

16    Mike Johnston in charge there was an incident file, and in the

17    incident file is where the negative information about George

18    Loder was kept.

19        THE COURT:  Attorney Dill, just for your

20    information, you're at the 45-minute mark.

21        MS. DILL:  I'm going to use a few more.

22        What brings us together in this courtroom, this quilt

23    that we've pieced together, is justice.  And justice applies

24    to all of us.  And the Whistleblower Protection Act was

25    enacted to protect people who blow the whistle.  And maybe

1    blowing the whistle is rude, but I'm grateful to George Loder

2    that he blew the whistle because as a result the policies of

3    the MIAC have changed.  And the question is, if George Loder

4    isn't protected under the Whistleblower Protection Act, none

5    of us are.  None of us are.  Because he reported what he

6    reasonably believed was unlawful activity, and it's reasonable

7    because it's the collection and retention of sensitive

8    intelligence information that violates the code, violates the

9    state law, and violates the privacy policy.  And he refused to

10   engage -- he refused to follow the directive to share

11   information.  And that was reasonable because the federal law

12   prohibited him from doing that.

13       And when he made those reports he was removed from the

14   task force.  He was not given Dave Pelletier's job; he was

15   given an administrative clerk's job.  He was denied vacation

16   and he was disparaged publicly by his superiors about his

17   truthfulness.  This Giglio incident was dragged up.  There are

18   no records about the Giglio incident.  The only thing we know

19   about is what George testified because he told us about it.

20   Not only did he tell us about it, but he told everyone he was

21   supposed to tell that in 1997 he said a stupid thing.  I don't

22   know what you're talking about, he retracted it, but for that

23   reason he's on a list.  But that list has never prevented him

24   from doing any job.  He's testified in court.  As you recall,

25   when we were selecting this jury he was identified, he

1    testified about this, he was identified as a witness for the

2    Government.  He's never been prevented from testifying in

3    court.  He was qualified for the job, he was qualified to be

4    laterally transferred, and he wasn't.  He was given a negative

5    performance review; he was retaliated against.

6        And under the Whistleblower Protection Act I believe he

7    deserves protection, and I would ask for you to find that he

8    engaged in protected activity, and because of his protected

9    activity he suffered an -- adverse employment actions, he

10   suffered a few of them, several of them.  And it was because

11   of -- it might have not been entirely because of, and the

12   judge will instruct you on this, but you have to find that

13   that was the main reason, that the other reasons that they

14   give -- first they gave it was five years, then they said it

15   was because of this urgent need, but the urgent need could

16   have been met by posting the position of Dave Pelletier, which

17   is what they did, and when they posted it Jarod Stedman was

18   hired.

19       And so there was a time at the MIAC that George Loder

20   was working there and so was Jarod Stedman.  And so it's

21   impossible in my view to conclude that there was such an

22   urgent need that he had to go to the MIAC, the place that he

23   did not want -- he didn't want to be there.  And it's

24   unreasonable to think that the reason why he didn't want to be

25   at the MIAC was because of traveling, because what he chose

1    instead to do, instead of engaging in unlawful behavior, he

2    went on the road as a trooper and drove hundreds of miles for

3    hundreds of hours to help the state police at a time when they

4    needed people to step up.

5        And I thank you again for your time and attention.  And

6    I -- and I think once you weigh the evidence, once you put

7    this evidence on a scale, you'll see that it's tipped, it

8    doesn't have to be, it's just tipped, it's tipped in Mr.

9    Loder's favor.  And for that reason I urge you to find that

10   there's been protected activity and there's a causal

11   connection between the protected activity and what happened to

12   George Loder.  Thank you very much.

13       THE COURT:  Thank you, Attorney Dill.

14                   *   *   *   *   *

15       MS. DILL:  Yes, thanks.  The witnesses that were

16   called by the plaintiff were not experts or called for their

17   opinion on whether or not the work that they do now is

18   illegal.  Would you expect someone who works at the MIAC to

19   testify, yes, I think what we're doing at the MIAC is illegal?

20   What they were called to do is to give you the facts.  And

21   what Tina Lambert said is that she was uncomfortable doing

22   background checks on the Seeds of Peace because there was no

23   criminal nexus.  Now, she didn't say, yeah, the work I'm doing

24   is illegal.  She still works for the Maine Department of

25   Public Safety.

1    Aaron Steps testified, I said, who is Mr. Loder's home

2  agency?  The home agency was the state police.  That's who Mr.

3  Loder was expected to share information with and that's who he

4  shared information with.  Corey Pike testified that before she

5  was a detective she did investigations in child sex abuse

6  cases and death cases, and she was on the JTTF for seven years

7  and when she got off the JTTF she was offered a lateral

8  transfer.  Detective Loder said he as a trooper did

9  investigations on child sex abuse cases and death cases.  He

10  was on the JTTF for five years.  He was told that was enough

11  time.  He was not offered a lateral transfer.  They say he was

12  not offered a lateral transfer because he didn't have the

13  requisite skills.

14    Is it reasonable to believe that Mr. Loder had the

15  capacity, had the privilege, of testifying in this court, in

16  this federal court, hundreds of times in the state court,

17  investigating international terrorism, that he couldn't

18  testify in major crimes investigations?  That's not

19  reasonable.

20    Anna Love recommended Detective Loder apply for the JTTF

21  position.  She knew at the time that he had this Giglio

22  impairment.  Several people are on this Giglio list.  Is it

23  reasonable to think that the Giglio impairment somehow now

24  prevents Detective Loder from doing the job that he's been

25  doing, that he's been excelling at?

1          So when you think about the witnesses' testimony, judge

2     their credibility.  For instance, Colonel Cote, now, a lot of

3     what he said obviously was true.  But he didn't have any

4     knowledge about, he says, what George's reports were.  Well,

5     why not?  He got the e-mail.  I asked him, did you know about

6     his vacation request?  Oh, no, I don't cover that kind of

7     stuff, it's too -- and then I produced the document.  It was

8     forwarded to him.  So he said no.  He is someone who testifies

9     for a living.  He didn't say I don't recall.  He didn't say

10    I'm not sure.  He -- I said, did you get the e-mail request

11    about the vacation.  He said no.  He did get it.

12          Assess the credibility of Sergeant Johnston, who alleged

13    that my client was deficient in reporting information about

14    the incident regarding Espen Brungodt when he knew that the

15    FBI had explicitly told Lieutenant Ireland, copied to Sergeant

16    Johnston, that Detective Loder wasn't in a position to know.

17    But he testified to you, led you to believe, that George

18    hadn't shared the information.

19          The witnesses who we called are not because they're our

20    friends.  It's because they were expected to testify about the

21    truth of facts, not their opinion.  And the facts are that the

22    MIAC maintains a system, a collection of information, it

23    retains it forever, about people who are engaging in lawful

24    activity.  And George Loder knew that and he blew the whistle

25    and he blew it loud and that was rude.  But I'm grateful that

1    he was rude because we're protected now, our privacy is

2    protected.

3        So this isn't about who -- what friends we brought in to

4    corroborate the story.  This is about the evidence, and the

5    evidence you'll have in the jury room is that the Maine State

6    Police consistently rated George Loder's performance as a

7    dedicated public service to meet or exceed expectations.  They

8    recommended to the Joint Terrorism Task Force that he was

9    eligible for the job, knowing about this Giglio impairment.

10   But suddenly he brings this lawsuit and, oh, that 1997 Giglio

11   impairment, oh, he can't be a Major Crimes detective.  That's

12   not reasonable.

13       And you're going to be asked to find whether or not he

14   was adversely affected.  And it's not just a -- a vacation

15   request.  It's a diminution of his responsibility.  And is

16   that embarrassing?  Yes, it is.  If you're a federal task

17   force officer and you're doing important work and suddenly

18   you're expected to be in a one -- a dark room doing clerical

19   work -- that's the testimony.  It's not that he was doing

20   Detective Pelletier's job.  He was doing clerical work.  He

21   was asked, he was ordered, to enter information into the

22   database that he knew was problematic.  And nobody cared

23   because, as Lieutenant Ireland said, they knew they were

24   right.  They didn't even follow up.

25       And this idea, somehow, that Major Grotton didn't know

1    when he made the decision, well, why didn't he know?  Why

2    didn't Sergeant Johnston and Lieutenant Ireland tell him?  Why

3    was the only information that was traveling up the chain of

4    command was about George's alleged rudeness.  Why wasn't the

5    other information included, the yelling and screaming about

6    the unlawful activity?  Blowing the whistle, it's hard on the

7    ears, it can be rude, but it's important.  And like I said, if

8    George Loder isn't protected by the Whistleblower Protection

9    Act, then none of us are.

10         So I urge you, look carefully at the evidence, think

11   carefully about the witnesses who testified, not about their

12   opinion about whether or not the work they're doing right now

13   is unlawful, because who in their right mind would take an

14   oath and say in the presence of the people in the courtroom,

15   including the press and their superiors that, yes, oh,

16   absolutely, what we're doing up in Augusta is completely

17   illegal.  Most of the people who testified don't know about

18   the activity report.  They've never had access to it.  The

19   privacy policy guy, Chris Parr, he was the privacy officer, he

20   never had access to the activity report.  Major Grotton

21   testified it was -- he didn't have access to the activity

22   report.  Colonel Cote didn't have access to the activity

23   report.  They don't know what's in it.

24         You know who knows?  George Loder.  And he produced the

25   evidence and you now know what's in it.  Seeds of Peace camp

1    counselors are in it and their personal identifying

2    information.  The people who know about the activity report

3    are George Loder and Sergeant Johnston, and those are the two

4    people whose credibility is at issue here.  Because Sergeant

5    Johnston testified that it's his belief that the Code of

6    Federal Regulations doesn't apply, even though the state law

7    says it unequivocally that the governor wants the state of

8    Maine to apply those guidelines, and you'll see the reasons is

9    because that protects us, it protects our privacy.  And the

10   governor ordered the Maine State Police to apply those

11   guidelines and they didn't.  And that's what insubordination

12   is, is not following an order, not following an order.

13        George Loder was not found to be insubordinate.  They

14   accused him of insubordination, and the finding was that he

15   was rude.  And I would suggest that it's the MIAC that was

16   insubordinate because it was supposed to follow this law and

17   it didn't.  And the reason why we know that and the reason why

18   the MIAC now has a new privacy policy that protects us and the

19   reason why there's a new director and the reason why things

20   have changed is because what George Loder did -- and that's

21   why when you're in that jury room it's not about whether he's

22   convinced you who his friends are.  It's about what the

23   evidence says happened.  And what happened is he engaged in

24   protected activity and he was retaliated against.

25        And while there's not monetary damage, imagine the

1   anguish, the embarrassment, the complete change in lifestyle

2   to all of a sudden being forced to sit in a cubicle from 8:00

3   in the morning until 4:00 doing data entry.  Is that a good

4   return on our investment?  Knowing that it was a very

5   administrative task?  Is that the best work that they could

6   find for George Loder after 24 years of service is to do

7   clerical work?  No, that's retaliation.

8          And that's why when you're in that jury room I urge you

9   to consider finding that there was protected activity, finding

10  that he was retaliated against as a result.  And you're going

11  to hear instructions what that means.  It doesn't mean that he

12  just lost money.  It doesn't mean that he had, you know, a

13  job.  He lost responsibility; he lost dignity; he lost his

14  reputation.  It was a different location, different

15  privileges.  He was denied a lateral transfer, and the reasons

16  they give are not reasonable, that he can't testify in court?

17  He's testified in court and you know that.

18         There was protected activity, there was retaliation, and

19  the reasons the state give are pretextual.  And the testimony

20  by the people who made those decisions is not -- is not

21  reasonable.  It's not reasonable to know -- to think that the

22  higher-ups of the state police somehow got all the information

23  about him being rude when the rudeness occurred in the context

24  of him reporting unlawful activity but never the -- the

25  reporting made its way up.

1       So, again, this is about all of us and the protection of

2   our privacy.  And whistle-blowing is loud and it may be rude,

3   but it's -- it's protected and I'm glad it's protected.  And

4   I'm glad that you're finally going to have the opportunity to

5   consider the evidence and discuss it amongst yourselves.  And

6   I'm confident that you're going to return a verdict that's

7   fair, and I appreciate your time and public service.  Thank

8   you.

9                       *   *   *   *   *

10                  **C E R T I F I C A T I O N**

11  I, Lori D. Dunbar, Registered Merit Reporter, Certified

12  Realtime Reporter, and Official Court Reporter for the United

13  States District Court, District of Maine, certify that the

14  foregoing is a correct transcript from the record of

15  proceedings in the above-entitled matter.

16  Dated:  January 6, 2023

17              /s/ Lori D. Dunbar

18              Official Court Reporter

19

20

21

22

23

24

25